# EXHIBIT A

*Execution Version*

ASSET CONTRIBUTION AGREEMENT

by and between

TRIGENEX OF TEXAS, INC.,

and

CORRLINE INTERNATIONAL, LLC

Dated as of September 20, 2012

HATLE_0003369

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS AND RULES OF CONSTRUCTION ...............................................1

    1.1    Definitions.............................................................................................................1

    1.2    Rules of Construction. .........................................................................................6

ARTICLE II ACQUISITION & CONTRIBUTION; CLOSING..................................................7

    2.1    Contribution of Assets; Assumption of Liabilities .............................................7

    2.2    Issuance of Common Units at Closing.................................................................7

    2.3    Computation of Agreed Value ..............................................................................7

    2.4    The Closing...........................................................................................................7

ARTICLE III REPRESENTATIONS AND WARRANTIES RELATING TO THE ASSETS .....8

    3.1    Litigation..............................................................................................................8

    3.2    Intellectual Property.............................................................................................8

    3.3    Compliance with Laws; Permits ..........................................................................9

    3.4    Defensible Title....................................................................................................9

    3.5    Brokers' Fees .......................................................................................................9

    3.6    Illegal Payments...................................................................................................9

    3.7    Sufficiency of Assets ...........................................................................................9

ARTICLE IV REPRESENTATIONS AND WARRANTIES RELATING TO CONTRIBUTOR10

    4.1    Organization of Contributor...............................................................................10

    4.2    Authorization; Enforceability ............................................................................10

    4.3    Taxes ..................................................................................................................10

    4.4    No Conflict; Consents........................................................................................10

ARTICLE V REPRESENTATIONS AND WARRANTIES RELATING TO COMPANY .......10

    5.1    Organization.......................................................................................................10

    5.2    Authorization; Enforceability ............................................................................11

    5.3    No Conflict; Consents........................................................................................11

ARTICLE VI COVENANTS ...................................................................................................11

    6.1    Conduct of Business ..........................................................................................11

    6.2    Third Party Approvals........................................................................................12

    6.3    Books and Records.............................................................................................12

    6.4    Permits ...............................................................................................................12

    6.5    Further Assurances.............................................................................................12

**HATLE_0003370**

ARTICLE VII TAX MATTERS ....................................................................................12

   7.1   Character and Treatment of Transaction.................................................................12

   7.2   Transfer Taxes. ...................................................................................................13

   7.3   Disputes over Tax Provisions. ...........................................................................13

   7.4   Limitations on Indemnity....................................................................................13

ARTICLE VIII CONDITIONS TO closing ................................................................13

   8.1   Conditions to Obligations of Company ..............................................................13

   8.2   Conditions to the Obligations of Contributor ...................................................14

ARTICLE IX INDEMNIFICATION ...........................................................................15

   9.1   Survival ...............................................................................................................15

   9.2   Indemnification ...................................................................................................15

   9.3   Limitations on Liability ......................................................................................16

   9.4   Procedures...........................................................................................................17

   9.5   Notice of Claim Dispute .....................................................................................19

   9.6   No Special, Consequential or Punitive Damages ..............................................20

   9.7   Waiver of Other Representations.........................................................................20

   9.8   Exclusive Remedy and Release ..........................................................................20

ARTICLE X MISCELLANEOUS ...............................................................................20

   10.1  Notices ................................................................................................................20

   10.2  Assignment .........................................................................................................21

   10.3  Rights of Third Parties .......................................................................................21

   10.4  Expenses .............................................................................................................21

   10.5  Counterparts........................................................................................................21

   10.6  Entire Agreement ................................................................................................22

   10.7  Disclosure Schedules .........................................................................................22

   10.8  Amendments .......................................................................................................22

   10.9  Publicity ..............................................................................................................22

   10.10 Severability .........................................................................................................22

   10.11 Governing Law; Jurisdiction...............................................................................23

519446 000001 Active 5211602.7

HATLE_0003371

## LIST OF EXHIBITS AND SCHEDULES

Exhibit A:        Limited Liability Company Agreement of CorrLine International, LLC

Exhibit B:        Services Agreement

Exhibit C:        Schedule of Assets Contributed to the Company by Contributor

HATLE_0003372

**ASSET CONTRIBUTION AGREEMENT**

THIS ASSET CONTRIBUTION AGREEMENT (this "*Agreement*"), dated as of September 20, 2012, is entered into by and between **TRIGENEX OF TEXAS, INC.**, a Texas corporation ("*Contributor*"), and **CorrLine International, LLC**, a Texas limited liability company (the "*Company*").

**RECITALS**

WHEREAS, the Contributor owns, directly or indirectly, certain assets and properties constituting the Assets (defined below);

WHEREAS, subject to the terms and conditions of this Agreement, the Contributor desires to transfer and assign to Company, and Company desires to acquire from the Contributor, the Assets, in exchange for the Disguised Sale Proceeds described in Section 6.15(a) of the LLC Agreement and Common Units of the Company (each as defined below) on the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the transfer of the Assets shall be treated as a disguised sale under Code Section 707(a)(2)(B) as more specifically provided herein;

WHEREAS, concurrently with the consummation of the transactions contemplated hereby, each of the following shall occur:

        1.     The Company, The Tagos Group, LLC, a Texas limited liability company ("*Tagos*") and Contributor will enter into the Limited Liability Company Agreement substantially in the form attached as Exhibit A hereto (the "*LLC Agreement*").

        2.     The Company will issue 55,000 Common Units to Contributor, representing a 55% membership interest in the Company and 45,000 Common Units to Tagos, representing a 45% membership interest in the Company.

        3.     The Company and Tagos will enter into the Services Agreement substantially in the form attached as Exhibit B hereto.

NOW, THEREFORE, in consideration of the premises and mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**ARTICLE I**
**DEFINITIONS AND RULES OF CONSTRUCTION**

        1.1     Definitions.  As used herein, the following terms shall have the following meanings:

"*AAA*" has the meaning provided such term in Section 9.5.

"*Accountants*" has the meaning provided such term in Section 7.3.

HATLE_0003373

"*Action*" means any action, appeal, petition, plea, charge, complaint, claim, suit, demand, litigation, arbitration, mediation, hearing, inquiry, investigation or similar event, occurrence or proceeding.

"*Affiliate*" means, when used with reference to a specified Person, any other Person controlling, controlled by or under common control with such particular Person.

"*Aggregate Basket Amount*" has the meaning provided such term in Section 9.3(b).

"*Agreed Value*" has the meaning provided such term in Section 2.3.

"*Agreement*" has the meaning provided such term in the preamble to this Agreement.

"*Allocation*" has the meaning provided such term in Section 7.1(b).

"*Arbitrator*" has the meaning provided such term in Section 9.5(b).

"*Arbitrator's Decision*" has the meaning provided such term in Section 9.5(b).

"*Assets*" means, as of the Effective Time, all of the right, title, and interest of the Contributor in and to the assets described on Exhibit C attached hereto.

"*Assignment*" has the meaning provided such term in Section 2.4(b)(i) hereof.

"*Assumed Liabilities*" has the meaning provided such term in Section 2.1.

"*CERCLA*" means the Federal Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. § 9601 et seq.

"*Claim Notice*" has the meaning provided such term in Section 9.4(a).

"*Claim Settlement Agreement*" has the meaning provided such term in Section 9.4(d).

"*Closing*" has the meaning provided such term in Section 2.4.

"*Closing Date*" has the meaning provided such term in Section 2.4.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Common Units*" means a common unit of membership interest of the Company issued pursuant to Section 2.2 hereof.

"*Company*" has the meaning provided such term in the preamble to this Agreement.

"*Company Indemnified Parties*" has the meaning provided such term in Section 9.2(a).

"*Contract*" means any legally binding agreement, commitment, lease, license or contract, but excluding Plans.

HATLE_0003374

"*Contributor Indemnified Parties*" has the meaning provided such term in <u>Section 9.2(b)</u>.

"*Contributor*" has the meaning provided such term in the preamble to this Agreement.

"*Data*" means all computer software (in source code or object code form), documentation, works of authorship, mask works, know-how, data and data bases, formulas, algorithms, processes, inventions and discoveries (whether or not patented), ideas, concepts, techniques, methods, content, technical information, engineering, production and other designs, drawings, schematics, specifications, confidential information, and all other information, technology and materials, tangible or otherwise.

"*Direct Claim*" has the meaning provided such term in <u>Section 9.4(d)</u>.

"*Disclosure Schedules*" means the disclosures and exceptions set forth in the disclosure schedule delivered by Contributor to the Company simultaneously with the execution and delivery of this Agreement.

"*Dollars*" and "*$*" mean the lawful currency of the United States.

"*Effective Time*" means 12:01 a.m. Central Time, on September 20, 2012.

"*Encumbrance*" means any material title defect, mortgage, assignment, pledge, hypothecation, security interest, title or retention agreement, levy, execution, seizure, attachment, garnishment, deemed trust, lien, easement, option, right or claim of others, or charge or encumbrance of any kind whatsoever.

"*Environmental Law*" means all applicable Laws of any Governmental Authority relating to the protection of human health or the environment, including: (a) all requirements pertaining to liability for reporting, management, licensing, permitting, investigation, and remediation of emissions, discharges, releases, or threatened releases of a Constituent of Concern; and (b) all limitations, restrictions, conditions, standards, prohibitions, obligations, and timetables contained therein or in any notice or demand letter to Contributor issued, entered, promulgated or approved thereunder. The term "*Environmental Law*" includes, without limitation, CERCLA, the Federal Water Pollution Control Act (which includes the Federal Clean Water Act), the Federal Clean Air Act, the Federal Solid Waste Disposal Act (which includes the Resource Conservation and Recovery Act), the Federal Toxic Substances Control Act, and the Federal Insecticide, Fungicide and Rodenticide Act, each as amended as of the date hereof, any regulations promulgated pursuant thereto, and any state or local counterparts.

"*GAAP*" means generally accepted accounting principles of the United States, consistently applied.

"*Governmental Authority*" means any federal, state, municipal, local or similar governmental authority, regulatory or administrative agency, court or arbitral body.

"*Indemnified Party*" has the meaning provided such term in <u>Section 9.4(a)</u>.

"*Indemnifying Party*" has the meaning provided such term in <u>Section 9.4(a)</u>.

HATLE_0003375

"*Individual Basket Amount*" has the meaning provided such term in <u>Section 9.3(b)</u>.

"*Intellectual Property*" means intellectual property rights, statutory or common Law, worldwide, including (a) trademarks, service marks, trade dress, slogans, logos and all goodwill associated therewith, and any applications or registrations for any of the foregoing; (b) copyrights and any applications or registrations for any of the foregoing; and (c) patents, all confidential know-how, trade secrets and similar proprietary rights in confidential inventions, discoveries, improvements, processes, techniques, devices, methods, patterns, formulae, specifications, and lists of suppliers, vendors, customers, and distributors.

"*IRS*" means Internal Revenue Service of the United States.

"*Knowledge*" means as to Contributor, the actual knowledge of any Named Officer and any other officers or directors of Contributor. A Person has "actual knowledge" of those matters which the individual involved could reasonably be expected to have as a result of undertaking an investigation of such a scope and extent as a reasonably prudent Person in a same or similar position or office would undertake concerning the particular subject matter.

"*Law*" means any applicable statute, writ, law, rule, regulation, ordinance, order, judgment, injunction, award, determination or decree of a Governmental Authority, in each case as in effect on and as interpreted on the date of this Agreement or on and as of the Closing Date, as applicable, unless the context otherwise clearly requires a different date, in which case on and as of such date.

"*Lien(s)*" means any charges, pledges, options, mortgages, deeds of trust, hypothecations, or security interests.

"*LLC Agreement*" has the meaning set forth in the Recitals.

"*Losses*" has the meaning provided such term in <u>Section 9.2(a)</u>.

"*Material Adverse Effect*" means, with respect to any Person, any circumstance, change or effect that (a) is adverse to the business, operations (including results of operation), assets, prospects, liabilities or financial condition of such Person in an amount individually or in the aggregate, of $50,000 or more, or (b) that materially impedes the ability of such Person to complete the transactions contemplated herein, but shall exclude any circumstance, change or effect resulting or arising from: (i) any change in general economic conditions in the industries or markets in which the Contributor operates; (ii) seasonal reductions in revenues and/or earnings of the Contributor in the ordinary course of its business; (iii) any adverse change, event or effect on the global energy industry as a whole, including those impacting energy prices or the value of Assets; (iv) national or international political conditions, including any engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack; (v) changes in Law, GAAP or the interpretation thereof; (vi) the entry into or announcement of this Agreement, actions contemplated by this Agreement, or the consummation of the transactions contemplated hereby; or (vii) matters only to the extent such matters are reflected in the Preliminary Settlement Statement as of the Closing Date.

HATLE_0003376

"*Mediator*" has the meaning provided such term in <u>Section 9.5.</u>

"*Named Officer*" means each of Loren L. Hatle, founder and Chief Technology Officer of Contributor, Christopher R. Knowles, President of Contributor, and Kirk Chrisman, Vice President of Sales & Marketing of Contributor.

"*Notice of Claim Dispute*" has the meaning provided such term in <u>Section 9.4(d).</u>

"*Order*" means any order, judgment, injunction, edict, decree, ruling, pronouncement, determination, decision, opinion, sentence, subpoena, writ or award issued, made, entered or rendered by any court, administrative agency or other Governmental Authority or by any arbitrator.

"*Parties*" means Contributor and Company.

"*Permits*" means authorizations, licenses, permits or certificates issued by Governmental Authorities; *provided,* right-of-way agreements and similar approvals are not included in the definition of Permits.

"*Permitted Liens*" means:

(a)     terms, conditions, restrictions, exceptions, reservations, limitations and other matters contained in the contracts, agreements, instruments and other documents which pertain to, relate to or cover the Assets, or create or reserve to the Contributor its interest in the Assets, or to which the interest of the Contributor therein is subject;

(b)     changes in the interest associated with the Assets or any of them, occurring after the Effective Time from any cause insofar as said changes are either reflected on the Exhibits attached hereto, or are described in the Contracts pertaining to the Assets;

(c)     defects or irregularities arising out of lack of corporate authorization, unless Company provides affirmative evidence that such corporate action was not authorized and results in another Person's superior claim of title to the relevant Property;

(d)     defects or irregularities that have been cured or remedied by the passage of time, including, without limitation, applicable statutes of limitation or statutes for prescription, unless the defect or irregularity is of such a nature that a reasonably prudent Person would not rely on the passage of time to cure or remedy such defect or irregularity;

(e)     all Liens against the Assets and/or the Contributor's interest in the Assets held by banks or other financial or lending institutions assuming that all such Liens are released at or before Closing; and

(h)     any other liens, charges, encumbrances, contracts, agreements, instruments, obligations, defects, or irregularities of any kind whatsoever affecting the Assets that individually or in the aggregate are not such as would materially adversely affect the ownership, value, or use of the Assets.

HATLE_0003377

"***Person***" means any individual, firm, corporation, partnership, limited liability company, incorporated or unincorporated association, joint venture, joint stock company, Governmental Authority or other entity of any kind.

"***Position Statement***" has the meaning provided such term in <u>Section 9.5.</u>

"***Proceeding***" means any action, suit, litigation, arbitration, lawsuit, claim, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding and any informal proceeding), prosecution, contests, hearing, inquiry, inquest, audit, examination, investigation, challenge, controversy or dispute commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or any arbitrator.

"***Reasonable Efforts***" means efforts in accordance with reasonable commercial practice and without the incurrence of material expense.

"***Regulations***" means the Treasury Regulations, including Temporary Regulations, promulgated by the United States Treasury Department under the Code.

"***Representatives***" means a Person's directors, officers, employees, agents or advisors (including, without limitation, attorneys, accountants, consultants, bankers, financial advisors and any representatives of those advisors).

"***Tax***" or "***Taxes***" means all taxes, assessments, charges, duties, fees, levies, imposts or other similar charges imposed by a Governmental Authority, including all income, franchise, profits, margins, capital gains, capital stock, transfer, gross receipts, sales, use, transfer, service, occupation, ad valorem, real or personal property, excise, severance, windfall profits, customs, premium, stamp, license, payroll, employment, social security, unemployment, disability, environmental, alternative minimum, add-on, value-added, withholding and other taxes, assessments, charges, duties, fees, levies, imposts or other similar charges of any kind, and all estimated taxes, deficiency assessments, additions to tax, penalties and interest, whether disputed or otherwise.

"***Tax Returns***" means any report, return, election, document, estimated tax filing, declaration, claim for refund, extensions, information returns, or other filing with respect to any Taxes including any schedules or attachments thereto and any amendment thereof.

"***Third Party Claim***" has the meaning provided such term in <u>Section 9.4(a).</u>

"***United States***" means United States of America.

      1.2   <u>Rules of Construction</u>. All article, section, schedule and exhibit references used in this Agreement are to articles and sections of, and schedules and exhibits to, this Agreement unless otherwise specified. The schedules and exhibits attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.

      (a)   If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb). Terms defined in the singular have the corresponding meanings in the plural, and vice versa.

HATLE_0003378

Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa. The term "includes" or "including" shall mean "including without limitation." The words "hereof," "hereto," "hereby," "herein," "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear.

(b) With respect to the Contributor the term *"ordinary course of business"* will be deemed to refer to the ordinary conduct of the business in a manner consistent with the past practices and customs of the Contributor.

(c) The Parties acknowledge that each Party and its attorney have reviewed this Agreement and that any rule of construction to the effect that any ambiguities are to be resolved against the drafting Party, or any similar rule operating against the drafter of an agreement, shall not be applicable to the construction or interpretation of this Agreement.

(d) The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

(e) All references to currency herein shall be to, and all payments required hereunder shall be paid in, Dollars.

(f) All accounting terms used herein and not expressly defined herein shall have the meanings given to them under GAAP.

## ARTICLE II
## ACQUISITION & CONTRIBUTION; CLOSING

2.1 <u>Contribution of Assets; Assumption of Liabilities</u>. At the Closing, upon the terms and subject to the conditions set forth in this Agreement, Contributor shall contribute, assign, transfer and convey to Company, and Company, shall acquire from Contributor all of its right, title and interest in and to the Assets set forth on <u>Exhibit C</u> attached hereto, free and clear of any Liens other than Permitted Liens, and Company does not hereby assume any liabilities, obligations and commitments of the Contributor associated with the Assets, whether known or unknown, fixed or contingent, liquidated or unliquidated.

2.2 <u>Issuance of Common Units at Closing</u>. In exchange for the contribution of the Assets at the Closing, Company shall deliver to Contributor 55,000 Common Units representing a 55% membership interest in the Company, plus rights related to the payment of the Disguised Sale Proceeds as set forth in Section 6.15(a) of the LLC Agreement.

2.3 <u>Computation of Agreed Value</u>. For purposes of this Agreement, *"Agreed Value"* shall mean $300,000.

2.4 <u>The Closing</u>.

HATLE_0003379

(a)     The closing of the transactions contemplated by this Agreement (the "*Closing*") shall take place at the offices of Thompson & Knight LLP, 333 Clay Street, Suite 3300, Houston, Texas 77002, commencing on the earlier to occur of (i) September 20, 2012; (ii) the third (3rd) Business Day following the satisfaction or waiver of all conditions to the obligations of the Parties set forth in Article VIII; or (iii) such other date as permitted in this Agreement or as Company and Contributor may mutually determine (the date on which the Closing occurs is referred to herein as the "*Closing Date*").

(b)     At the Closing:

(i)     Contributor shall execute, acknowledge and deliver to Company an assignment agreement with respect to the Assets (the "*Assignment*"), in a form mutually agreed to by and between Contributor and Company which (A) contains an assignment, conveyance and transfer of title by, through and under Contributor but not otherwise, (B) includes, to the extent transferable and permitted by law, the benefit of and the right to enforce the covenants, representations, and warranties, if any, that Contributor is entitled to enforce with respect to the Assets, and (C) certificates and other documents, required to be delivered pursuant to Article VIII hereof, with such additional terms, provisions and modifications as may be mutually agreed to by Contributor and Company;

(ii)     Contributor and Company shall each execute and deliver to the other such other certificates, instruments of conveyance and documents as may be reasonably requested by one or more of the Parties to carry out the intent and purposes of this Agreement.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES RELATING TO THE ASSETS

Except as set forth on the Disclosure Schedules delivered by Contributor to Company at or prior to the execution and delivery of this Agreement, Contributor and each Named Officer represents and warrants to Company as follows:

3.1     <u>Litigation</u>.  Contributor is not (a) subject to any outstanding injunction, judgment, order, decree, ruling, or charge or, (b) a party to any action, suit, proceeding, hearing, or investigation of, in, or before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction, with respect to the Assets.  To the Knowledge of Contributor, no such action, suit, proceeding, hearing or investigation has been threatened against Contributor.

3.2     <u>Intellectual Property</u>.  <u>Exhibit C</u> sets forth a list of all Intellectual Property that is included as part of the Assets.  Contributor owns or has the right to use pursuant to license, sublicense, agreement or otherwise all items of Intellectual Property for use in the business activities and operations of Contributor.  The Intellectual Property does not infringe on the rights of any party.  No party has asserted in writing against Contributor a claim that such Contributor is infringing on the Intellectual Property of such third party and, to the Knowledge of Contributor, no third party is infringing on the Intellectual Property owned by Contributor.  All Data relating to, or in any way affecting, the Assets has been (or will have been prior to Closing)

HATLE_0003380

made available to Company for inspection and/or copying, and all files to be furnished or made available to Company by Contributor hereunder are the complete files and were maintained by Contributor in the course of their ownership of the Assets.

3.3   Compliance with Laws; Permits.

(a)   Contributor is in compliance with all Laws applicable to ownership and operation of the Assets. The Contributor has not received any written communication from a Governmental Authority that the business of Contributor is not being conducted in compliance with all applicable Laws.

(b)   To the Knowledge of the Contributor (i) Contributor possesses all Permits necessary to own and operate its Assets as currently owned and operated, and (ii) all such Permits are valid and in full force and effect and will not be invalidated or otherwise negatively affected by consummation of the transactions contemplated by this Agreement. Section 3.3 of the Disclosure Schedules sets forth a list of all Permits. There are no lawsuits or other proceedings pending or, to the Knowledge of Contributor and the Contributor, threatened in writing before any Governmental Authority that seek the revocation, cancellation, suspension, or adverse modification thereof. To the Knowledge of the Contributor, Contributor has complied with all requirements and has taken all actions necessary to obtain and maintain the applicable Permits in full force and effect.

3.4   Defensible Title. The Contributor has good, valid and defensible title to the Assets, free and clear of all Liens, other than Permitted Liens or Liens listed on Section 3.4 of the Disclosure Schedule. No Person has any right, title or interest in the Assets other than the Contributor, other than in connection with any Permitted Liens or Liens listed on Section 3.4 of the Disclosure Schedule. At the Closing, the Contributor will transfer to Company good, valid and defensible title to the Assets, free and clear of any and all Liens, except Permitted Liens.

3.5   Brokers' Fees. No broker, finder, investment banker or other Person is entitled to any brokerage fee, finders' fee or other commission in connection with the transactions contemplated by this Agreement based upon arrangements made by Contributor.

3.6   Illegal Payments. None of the Contributor or any director, officer, employee, or agent of the Contributor has, directly or indirectly, paid or delivered any fee, commission, or other sum of money or item of property however characterized to any broker, finder, agent, government official, or other person, in the United States or any other country, in any manner related to the business or operations of the Contributor, which the Contributor or any such director, officer, employee, or agent knows or has reason to believe to have been illegal under any applicable Law.

3.7   Sufficiency of Assets. The Assets constitute all of the assets, properties and other rights owned by the Contributor for use primarily in the business activities and operations of Contributor necessary to conduct the business activities and operations of Contributor as currently conducted by the Contributor, and as currently contemplated as of the date hereof to be conducted by the Company.

HATLE_0003381

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES RELATING TO CONTRIBUTOR

Contributor and each Named Officer represents and warrants to Company as follows:

4.1     <u>Organization of Contributor</u>.  Contributor is a corporation duly organized, validly existing and in good standing under the Laws of the state of Texas.

4.2     <u>Authorization; Enforceability</u>.  Contributor has full capacity, power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement and to perform its obligations hereunder.  This Agreement has been duly and validly executed and delivered by Contributor, and this Agreement constitutes a valid and binding obligation of Contributor, enforceable against Contributor in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity.

4.3     <u>Taxes</u>.  Except as set forth in the Disclosure Schedules, (a) there are no Liens on any of the Assets that arose in connection with any failure to pay any Tax (other than Permitted Liens) and (b) Contributor is not a "foreign person" within the meaning of Section 1445 of the Code and the Regulations promulgated thereunder.

4.4     <u>No Conflict; Consents</u>.  The execution and delivery of this Agreement by Contributor and the consummation of the transactions contemplated hereby by Contributor do not and shall not:

(a)     violate any Law applicable to Contributor or require any filing with, consent, approval or authorization of, or, notice to, any Governmental Authority;

(b)     violate any Organizational Document of Contributor;

(c)     require any filing with or permit, consent or approval of, or the giving of any notice to, any Person; or

(d)     violate or conflict with, or constitute a breach of any of the terms or provisions of or a default under, or results in the creation or imposition of any Lien upon any property or asset of Contributor, or trigger any charge, payment or requirement of consent, or the acceleration or increase of the maturity of any payment date under any applicable Law to which Contributor or any of the Assets are subject, other than where such failure, conflict or breach would not have a Material Adverse Effect.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES RELATING TO COMPANY

Company hereby represents and warrants to Contributor as follows:

5.1     <u>Organization</u>.  Company is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Texas.

HATLE_0003382

5.2     Authorization; Enforceability.  Company has all requisite limited liability company power and authority to execute and deliver this Agreement and to perform all obligations to be performed by it hereunder.   The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized and approved by Company and the Board of Managers of the Company, and no other action on the part of Company is necessary to authorize this Agreement.  This Agreement has been duly and validly executed and delivered by Company, and this Agreement constitutes a valid and binding obligation of Company, enforceable against Company in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity.

5.3     No Conflict; Consents.  The execution and delivery of this Agreement by Company and the consummation of the transactions contemplated hereby by Company do not and shall not:

(a)     violate any Law applicable to Company or require any filing with, consent, approval or authorization of, or, notice to, any Governmental Authority;

(b)     violate any Organizational Document of Company; or

(c)     require any filing with or permit, consent or approval of, or the giving of any notice to, any Person.

## ARTICLE VI
## COVENANTS

6.1     Conduct of Business.

(a)     From the date of this Agreement through the Closing, Contributor shall operate their business in the ordinary course and, without limiting the generality or effect of the foregoing, Contributor will use their Reasonable Efforts to preserve intact its business and its relationships with customers, suppliers, and others having business relationships with the Contributor, in each case in all material respects.

(b)     Without limiting the generality or effect of Section 6.1(a), prior to the Closing, the Contributor shall not take any action to:

(i)     liquidate, dissolve, recapitalize or otherwise wind up its business;

(ii)     sell, assign, transfer, lease or otherwise dispose of any material non-current assets except pursuant to the terms of a Contributed Contract or this Agreement;

(iii)     merge or consolidate with, or purchase substantially all of the assets or business of, or equity interests in, or make an investment in any Person (other than extensions of credit to customers in the ordinary course of business or in accordance with the terms of a Contributed Contract or this Agreement); or

HATLE_0003383

(iv)     agree, whether in writing or otherwise, to do any of the foregoing.

6.2     Third Party Approvals.  Company and Contributor shall (and shall each cause their respective Affiliates to) use Reasonable Efforts to obtain all material consents and approvals of third parties that any of Company, the Contributor, or their respective Affiliates are required to obtain in order to consummate the transactions contemplated hereby.

6.3     Books and Records.  From and after the Closing, Company shall preserve and keep a copy of all books and records relating to the business or operations of the Contributor on or before the Closing Date in Company's possession for a period of at least five (5) years after the Closing Date.  After such five (5) year period, before Company shall dispose of any such books and records, Company shall give Contributor at least ninety (90) days' prior notice to such effect, and Contributor shall be given an opportunity, at their cost and expense, to remove and retain all or any part of such books and records as Contributor may select.  Company shall provide to Contributor, at no cost or expense to Contributor, full access to such books and records as remain in Company's possession and full access to the properties and employees of Company and the Contributor in connection with matters relating to the business or operations of the Contributor on or before the Closing Date and any disputes relating to this Agreement.

6.4     Permits.  Contributor shall provide all notices and otherwise take all actions required to transfer or reissue any Permits, including those required under Environmental Laws, as a result of or in furtherance of the transactions contemplated by this Agreement.  Contributor shall cooperate with Company to provide information necessary to apply for such Permits.

6.5     Further Assurances.  The Contributor agrees to execute and deliver, or cause to be executed and delivered, such further instruments or documents or take such other action as may be reasonably necessary or convenient to carry out the transactions contemplated by this Agreement.

## ARTICLE VII
## TAX MATTERS

7.1     Character and Treatment of Transaction.

(a)     Disguised Sale Transaction. Company and Contributor agree to treat the contribution of the Assets pursuant to Section 2.1 as a disguised sale by Contributor to the Company pursuant to Code Section 707(a)(2)(B) and the Regulations promulgated thereunder.

(b)     Valuations and Allocations. The parties shall agree to an allocation of the Agreed Value among the Assets prior to the Closing Date (the "*Allocation*").

(c)     Allocation Consistency.  Contributor and Company shall report the transactions contemplated hereby on all Tax Returns in a manner consistent with the Allocation.  If, contrary to the intent of the parties hereto as expressed in this Section 7.1(c), any Taxing authority makes or proposes an allocation different from the Allocation, Contributor and Company shall cooperate with each other in good faith to

contest such Taxing authority's allocation (or proposed allocation), provided, however, that, after consultation with the party (or parties) adversely affected by such allocation (or proposed allocation), the other party (or parties) hereto may file such protective claims or Tax Returns as may be reasonably be required to protect its (or their) interests.

7.2     <u>Transfer Taxes.</u> Contributor shall be responsible for state or local transfer, sales, use, stamp, registration or other similar Taxes imposed on the contribution of its assets and resulting from the transactions contemplated by this Agreement.

7.3     <u>Disputes over Tax Provisions.</u> If the Parties cannot agree, after good faith consultation, on the calculation of any Taxes that would result in a payment hereunder by one to the other or an adjustment of the Agreed Value, then each Party shall deliver to any nationally or regionally recognized accounting firm mutually agreed on by the Parties (the accounting firm ultimately chosen being referred to herein as the "*Accountants*") such work papers and other reports and information relating to the disputed matter(s) as the Accountants may request and shall be afforded the opportunity to discuss the disputed matter(s) with the Accountants. The Accountants shall have thirty (30) days to carry out a review and prepare a written statement of its determination regarding the disputed matter(s) (including a statement regarding the Accountants' determination of the prevailing Party in any such disputed matter) which determination shall be final and binding upon the Parties. Any fees and expenses of the Accountants incurred in resolving the disputed matter(s) shall be borne equally by the Parties.

7.4     <u>Limitations on Indemnity.</u> This <u>ARTICLE VII</u> shall be expressly subject to the limits on indemnity set forth in <u>ARTICLE IX</u> hereof.

## ARTICLE VIII
## CONDITIONS TO CLOSING

8.1     <u>Conditions to Obligations of Company.</u>  The obligation of Company to consummate the transactions contemplated by this Agreement is subject to the satisfaction of the following conditions, any one or more of which may be waived in writing by Company:

(a)     <u>Representations, Warranties and Covenants of Contributor.</u>  (i) Each of the representations and warranties of Contributor made in this Agreement will be true and correct in all material respects as of the date of this Agreement and as of the Closing (as if made anew at and as of the Closing), except that, to the extent any such representation or warranty is qualified by materiality or Material Adverse Effect, such representation or warranty shall be true and correct in all respects, (ii) Contributor shall have performed or complied in all material respects with all of the covenants and agreements required by this Agreement to be performed or complied with by Contributor on or before the Closing, and (iii) Contributor shall have delivered to Company a certificate, dated the Closing Date, certifying that the conditions specified in this <u>Section 8.1(a)</u> have been fulfilled;

(b)     <u>Third Party Consents; Governmental Approvals.</u>  All consents, approvals or waivers, if any, disclosed on any schedule to this Agreement or otherwise required in connection with the consummation of the transactions contemplated by this Agreement have been received.  All of the consents, approvals, authorizations, exemptions and

**HATLE_0003385**

waivers from Governmental Authorities that will be required to enable Company to consummate the transactions contemplated by this Agreement have been obtained;

(c)    <u>No Injunction, Etc</u>. No provision of any applicable Law and no order will be in effect that will prohibit or restrict the consummation of the Closing;

(d)    <u>No Proceedings</u>. No proceeding challenging this Agreement or the transactions contemplated hereby or seeking to prohibit, alter, prevent or materially delay the Closing or seeking Losses from Contributor incident to this Agreement or the transactions contemplated hereby, will have been instituted by any Person before any Governmental Authority and be pending;

(e)    <u>No Material Adverse Change</u>. Since the Effective Time, there shall not have been a material adverse change in the Assets;

(f)    <u>Assignment of Assets</u>. Assignment agreements relating the assignment, conveyance and transfer of the Assets, in form and substance reasonably acceptable to Company, contemplated by <u>Section 2.4</u> shall have been executed and delivered by Contributor; and

(g)    <u>Other Deliveries</u>. Contributor shall have delivered such other certificates, instruments of conveyance and documents as may be reasonably requested by Company and agreed to by Contributor prior to the Closing Date to carry out the intent and purposes of this Agreement.

8.2    <u>Conditions to the Obligations of Contributor</u>. The obligation of Contributor to consummate the transactions contemplated by this Agreement is subject to the satisfaction of the following conditions, any one or more of which may be waived in writing by Contributor:

(a)    <u>Representations, Warranties and Covenants of Company</u>. (i) Each of the representations and warranties of Company made in this Agreement will be true and correct in all material respects in all respects as of the date of this Agreement and as of the Closing (as if made anew at and as of the Closing), except that, to the extent any such representation or warranty is qualified by materiality or Material Adverse Effect, such representation or warranty shall be true and correct in all respects, (ii) Company shall have performed or complied in all material respects with all of the covenants and agreements required by this Agreement to be performed or complied with by Company on or before the Closing, and (iii) Company shall have delivered to Contributor a certificate, dated the Closing Date, certifying that the conditions specified in this <u>Section 8.2(a)</u> have been fulfilled;

(b)    <u>Third Party Consents; Governmental Approvals</u>. All consents, approvals or waivers, if any, disclosed on any schedule to this Agreement or otherwise required in connection with the consummation of the transactions contemplated by this Agreement have been received. All of the consents, approvals, authorizations, exemptions and waivers from Governmental Authorities that will be required to enable Contributor to consummate the transactions contemplated by this Agreement have been obtained;

HATLE_0003386

(c)  <u>No Injunction, Etc</u>.  No provision of any applicable Law and no order will be in effect that will prohibit or restrict the consummation of the Closing;

(d)  <u>No Proceedings</u>.  No proceeding challenging this Agreement or the transactions contemplated hereby or seeking to prohibit, alter, prevent or materially delay the Closing or seeking Losses from Company incident to this Agreement or the transactions contemplated hereby, will have been instituted by any Person before any Governmental Authority and be pending; and

(e)  <u>Other Deliveries</u>.  Company shall have delivered such other certificates, instruments and documents as may be reasonably requested by Contributor and agreed to by Company prior to the Closing Date to carry out the intent and purposes of this Agreement.

**ARTICLE IX**
**INDEMNIFICATION**

9.1  <u>Survival</u>.  The representations and warranties in this Agreement and all covenants contained in this Agreement shall survive the Closing until one (1) year after the Closing Date, except that (a) the representations and warranties in <u>Section 3.5</u> (Defensible Title), <u>Section 4.1</u> (Organization of Contributor), <u>Section 4.2</u> (Authorization; Enforceability), <u>Section 5.1</u> (Organization of Company), and <u>Section 5.2</u> (Authorization; Enforceability) shall survive indefinitely, (b) the representations and warranties in <u>Section 4.3</u> (Taxes) and the covenants in <u>ARTICLE VII</u> (Tax Matters) shall survive until the expiration of the applicable statute of limitations; and (c) certain covenants with a specified expiration date shall continue in effect as provided therein.  Notwithstanding the preceding sentence, any representation or warranty in respect of which indemnity may be sought under this Agreement will survive the time at which it would otherwise terminate pursuant to the preceding sentence if written notice of the inaccuracy or breach thereof giving rise to such right of indemnity has been given to the Party against whom such indemnification may be sought prior to such time; *provided* that such right of indemnity shall continue to survive and shall remain a basis for indemnification hereunder only until the related claim for indemnification is resolved or disposed of in accordance with the terms hereof.

9.2  <u>Indemnification</u>.

(a)  From and after the Closing, Contributor will indemnify, defend and hold harmless Company and its officers, members, directors, employees and Affiliates (the "***Company Indemnified Parties***") against any and all liabilities, damages, losses, costs and expenses (including reasonable attorneys' and consultants' fees and expenses) ("***Losses***") Company shall suffer (any Loss of the Contributor after the Closing Date shall be deemed a Loss suffered by Company) as a result of, or arising out of, (i) any failure or breach of any representation or warranty made by Contributor pursuant to <u>ARTICLE IV</u> or <u>ARTICLE III</u> under this Agreement to be true and correct as of the date hereof and as of the Closing (as if made anew at and as of the Closing); (ii) the breach of any covenant or agreement made or to be performed by Contributor pursuant to this Agreement; (iii) the ownership or operation of the Assets prior to the Effective Time, not including any Assumed Liabilities.  Notwithstanding the foregoing, any claims arising under <u>Section 9.2(a)(i)</u> and <u>Section 9.2(a)(iii)</u> shall be recoverable exclusively against the Escrow

HATLE_0003387

Account, and, except for any claim pertaining to transfer Taxes under Section 7.2, shall be subject to such other limitations as set forth in Section 9.3 below.

(b)     From and after the Closing, Company will indemnify, defend and hold harmless Contributor and its officers, members, directors, employees and Affiliates (the "*Contributor Indemnified Parties*") against any and all Losses incurred or suffered as a result of, relating to or arising out of (i) any failure of any representation or warranty made by Company in this Agreement to be true and correct as of the Closing (as if made anew at and as of the Closing), (ii) the breach of any covenant or agreement made or to be performed by Company pursuant to this Agreement, and (iii) the Assumed Liabilities or the ownership or operation of Assets after the Effective Time.

(c)     THE INDEMNIFICATION PROVISIONS IN THIS ARTICLE IX SHALL BE ENFORCEABLE REGARDLESS OF WHETHER ANY PERSON (INCLUDING THE PERSON FROM WHOM INDEMNIFICATION IS SOUGHT) ALLEGES OR PROVES (i) NEGLIGENCE (INCLUDING SOLE NEGLIGENCE, SINGLE NEGLIGENCE, CONCURRENT NEGLIGENCE, ACTIVE OR PASSIVE NEGLIGENCE, BUT EXPRESSLY NOT INCLUDING GROSS NEGLIGENCE OR WILLFUL MISCONDUCT) OF ANY INDEMNIFIED PARTY, OR (ii) STRICT LIABILITY.     THE PARTIES HERETO AGREE THAT THE FOREGOING COMPLIES WITH THE EXPRESS NEGLIGENCE RULE AND IS CONSPICUOUS.

9.3     Limitations on Liability.  Notwithstanding anything to the contrary in this Agreement, in the event a Company Indemnified Party has a claim for indemnification under Section 9.2 hereof:

(a)     Neither a Company Indemnified Party nor a Contributor Indemnified Party will be entitled to indemnity under Section 9.2(a)(i), Section 9.2(a)(iii) or Section 9.2(b)(i) of this Agreement with respect to claims for Losses until the amount for any individual claim for Losses exceeds Twenty-five Thousand Dollars ($25,000) (the "*Individual Basket Amount*") and the aggregate amount for all claims for Losses that exceed the Individual Basket Amount exceeds Fifty Thousand Dollars ($50,000) (the "*Aggregate Basket Amount*"), and thereafter, the Company Indemnified Parties shall be entitled to indemnity for the aggregate amount of all individual claims for Losses in excess of the Individual Basket Amount applicable to each of such individual claims.

(b)     The maximum aggregate liability of Contributor under Section 9.2(a)(i) (for breach of representations and warranties which survive one (1) year or less after the Closing Date) and Section 9.2(a)(iii) of this Agreement shall not exceed the greater of $300,000 or the amount of actual damages awarded by a court of competent jurisdiction, and Company Indemnified Parties shall have no further right to indemnity thereunder. Under no circumstance shall a Company Indemnified Party be entitled to recover an indemnity claim arising under Section 9.2(a)(i) (for breach of representations and warranties which survive one (year) or less after the Closing Date) and Section 9.2(a)(iii) of this Agreement directly against Contributor.

(c)     The amount of any Losses subject to indemnification under this ARTICLE IX shall be reduced or reimbursed, as the case may be, by any third party insurance

HATLE_0003388

proceeds, third party recoveries less the costs expended for such recoveries. Each Party shall, and shall cause their respective Indemnified Parties to, use Reasonable Efforts to collect any amounts available under such insurance coverage and from such other third party alleged to have responsibility. If a Company Indemnified Party receives an amount under insurance coverage or from such third party with respect to Losses that were the subject of indemnification under Section 9.2 at any time subsequent to indemnification provided thereunder, then such Company Indemnified Party shall promptly reimburse Contributor.

9.4    Procedures.    Claims for indemnification under this Agreement shall be asserted and resolved as follows:

(a)    If any Person who or which is entitled to seek indemnification under Section 9.2 (an "*Indemnified Party*") receives notice of the assertion or commencement of any claim asserted against an Indemnified Party by a third party ("***Third Party Claim***") in respect of any matter that is subject to indemnification under Section 9.2, the Indemnified Party shall promptly (i) notify the Party obligated to the Indemnified Party pursuant to Section 9.2 above, (the "*Indemnifying Party*") of the Third Party Claim and (ii) transmit to the Indemnifying Party a written notice ("***Claim Notice***") describing in reasonable detail the nature of the Third Party Claim, a copy of all papers served with respect to such claim (if any), the Indemnified Party's best estimate of the amount of Losses attributable to the Third Party Claim and the basis of the Indemnified Party's request for indemnification under this Agreement. Failure to timely provide such Claim Notice shall not affect the right of the Indemnified Party's indemnification hereunder, except to the extent the Indemnifying Party is prejudiced by such delay or omission.

(b)    The Indemnifying Party shall have the right to defend the Indemnified Party against such Third Party Claim. If the Indemnifying Party notifies the Indemnified Party that the Indemnifying Party elects to assume the defense of the Third Party Claim (such election to be without prejudice to the right of the Indemnified Party to dispute whether such claim is an identifiable Loss under this ARTICLE IX), then the Indemnifying Party shall have the right to defend such Third Party Claim with counsel selected by the Indemnifying Party (who shall be reasonably satisfactory to the Indemnified Party), by all appropriate proceedings, to a final conclusion or settlement at the discretion of the Indemnifying Party in accordance with this Section 9.4(b).    The Indemnifying Party shall have full control of such defense and proceedings, including any compromise or settlement thereof; *provided* that the Indemnifying Party shall not enter into any settlement agreement without the written consent of the Indemnified Party (which consent shall not be unreasonably withheld, conditioned or delayed); *provided further*, that such consent shall not be required if (i) the settlement agreement contains a complete and unconditional general release by the third party asserting the claim to all Indemnified Parties affected by the claim and (ii) the settlement agreement does not contain any sanction or restriction upon the conduct of any business by the Indemnified Party or its Affiliates. If requested by the Indemnifying Party, the Indemnified Party agrees, at the sole cost and expense of the Indemnifying Party, to cooperate with the Indemnifying Party and its counsel in contesting any Third Party Claim which the Indemnifying Party elects to contest, including the making of any related counterclaim

HATLE_0003389

against the Person asserting the Third Party Claim or any cross complaint against any Person. The Indemnified Party may participate in, but not control, any defense or settlement of any Third Party Claim controlled by the Indemnifying Party pursuant to this Section 9.4(b), and the Indemnified Party shall bear its own costs and expenses with respect to such participation.

(c)     If the Indemnifying Party does not notify the Indemnified Party that the Indemnifying Party elects to defend the Indemnified Party pursuant to Section 9.4(b), then the Indemnified Party shall have the right to defend, and be reimbursed for its reasonable cost and expense (but only if the Indemnified Party is actually ultimately determined to be entitled to indemnification hereunder) in regard to the Third Party Claim with counsel selected by the Indemnified Party (who shall be reasonably satisfactory to the Indemnifying Party), by all appropriate proceedings, which proceedings shall be prosecuted diligently by the Indemnified Party. In such circumstances, the Indemnified Party shall defend any such Third Party Claim in good faith and have full control of such defense and proceedings; *provided, however,* that the Indemnified Party may not enter into any compromise or settlement of such Third Party Claim if indemnification is to be sought hereunder, without the Indemnifying Party's consent (which consent shall not be unreasonably withheld, conditioned or delayed). The Indemnifying Party may participate in, but not control, any defense or settlement controlled by the Indemnified Party pursuant to this Section 9.4(c), and the Indemnifying Party shall bear its own costs and expenses with respect to such participation.

(d)     Any claim by an Indemnified Party on account of Losses that does not result from a Third Party Claim (a "*Direct Claim*") will be asserted by giving the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than thirty (30) days after the Indemnified Party becomes aware of such Direct Claim. Such notice by the Indemnified Party will describe the Direct Claim in reasonable detail, will include copies of all available material written evidence thereof and will indicate the estimated amount, if reasonably practicable, of damages that has been or may be sustained by the Indemnified Party. The Indemnifying Party will have a period of twenty (20) days within which to object or accept in writing such Direct Claim. Any such objection is called a "*Notice of Claim Dispute.*" If the Indemnifying Party does not so respond within such twenty (20) day period, the Indemnifying Party will be deemed to have rejected such claim, in which event the Indemnified Party will be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement. Copies of each Notice of Claim Dispute shall be sent to Company and the Escrow Agent. If Company and Contributor fail to resolve any objection contained in such Notice of Claim Dispute within twenty (20) days after the date the Notice of Claim Dispute is delivered to Company, then, at the request of either Party, they shall meet in an attempt to resolve an objection described in such Notice of Claim Dispute and reach a written agreement with respect to such objection (a "*Claim Settlement Agreement*"). If Contributor and Company enter into a Claim Settlement Agreement, the objections contained in such Notice of Claim Dispute shall be deemed to be as resolved therein. If they are unable to resolve the objection described in such Notice of Claim Dispute within twenty (20) days after delivery to the recipient of such

HATLE_0003390

Notice of Claim Dispute, then Contributor and Company shall submit the objections contained in such Notice of Claim Dispute to mediation as described in Section 9.5.

9.5    Notice of Claim Dispute. Any objection contained in a Notice of Claim Dispute not resolved in a Claim Settlement Agreement shall be resolved by submission to mediation as follows: the Notice of Claim Dispute shall be submitted to mediation pursuant to the mediation procedures promulgated by the American Arbitration Association or any successor thereto, or to any other entity offering mediation services that is acceptable to the Parties (a "*Mediator*"). No Person shall serve as a Mediator in any Dispute in which such Person has any financial or personal interest in the result of the mediation. Before accepting any appointment, the prospective Mediator shall disclose any circumstances likely to create a presumption of bias or to prevent a prompt commencement of the mediation process. Except as provided in this Section 9.5, the Parties covenant that they shall not commence any litigation against the other Party without complying with the procedures described in this Section 9.5. Within ten (10) days of the selection of the Mediator, each Party participating in the mediation shall submit a letter setting forth a concise description of its position with regard to the issues that need to be resolved ("*Position Statement*"). The Mediator shall have the right to schedule a pre-mediation conference and the Parties participating in the mediation shall attend unless otherwise mutually agreed. The mediation shall be commenced within ten (10) days following the submittal of all Position Statements and shall be concluded within fifteen (15) days from the commencement of the mediation unless the Parties participating in the mediation mutually agree to extend the mediation period. The mediation shall be held in Harris County, Texas or such other place as is mutually acceptable to the Parties participating in the mediation.

(a)    Conduct of Mediation. The Mediator has discretion to conduct the mediation in the manner in which the Mediator believes is most appropriate for reaching a settlement of the Notice of Claim Dispute. The Mediator is authorized to conduct joint and separate meetings with the Parties participating in the mediation and to make oral and written recommendations for settlement. Whenever necessary, the Mediator may also obtain expert advice concerning technical aspects of the Notice of Claim Dispute, provided the Parties agree to and do assume the expenses of obtaining such advice pursuant to Section 9.5(b). The Mediator shall not have the authority to impose a settlement on the Parties participating in the mediation.

(b)    Binding Arbitration. If mediation pursuant to this Section 9.5 is not successful in resolving any Notice of Claim Dispute, such Notice of Claim Dispute shall be resolved by submission to arbitration as follows: Contributor and Company shall select a single arbitrator from the American Arbitration Association ("*AAA*") in Houston, Texas (an "*Arbitrator*") (or, if they cannot agree upon a selection, Contributor and Company shall each select an Arbitrator, and the two Arbitrators so selected shall choose a third Arbitrator who has knowledge of the industry and business of the Contributor and who shall act as the Arbitrator to resolve the dispute). The Arbitrator shall resolve the objection contained in the Notice of Claim Dispute pursuant to the Commercial Arbitration Rules of the AAA as promptly as possible and a decision by the Arbitrator as to the resolution of such objection (the "*Arbitrator's Decision*") shall be (absent an agreement of the parties regarding an error that is manifest) conclusive and binding upon the parties for purposes of this Agreement. The Arbitrator's Decision shall be (i) in

HATLE_0003391

writing and (ii) non-appealable and incontestable by Company and Contributor and each of their respective Affiliates and successors and not subject to collateral attack for any reason. The Arbitrator shall have the ability to allocate fees and costs payable to the AAA based on the Arbitrator's assessment of the relative responsibility of the parties.

(c)    Expenses of Mediation; Arbitration. All expenses of the related to any dispute under this Section 9.5 including, without limitation, the fees and costs charged by the Mediator or Arbitrator and the expenses of any witnesses or the cost of any proof or expert advice produced at the direct request of the Mediator or Arbitrator shall be borne equally by the Parties unless they agree otherwise. Each Party shall bear its own attorneys' fees and costs in connection with such resolution of disputes pursuant to this Section 9.5.

9.6    No Special, Consequential or Punitive Damages. NOTWITHSTANDING ANYTHING HEREIN CONTAINED TO THE CONTRARY, NONE OF THE PARTIES TO THIS AGREEMENT SHALL HAVE ANY OBLIGATION WITH RESPECT TO THIS AGREEMENT, OR OTHERWISE IN CONNECTION HEREWITH, FOR ANY SPECIAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES.

9.7    Waiver of Other Representations. EXCEPT FOR AND WITHOUT ANY LIMITATION WHATSOEVER ON THOSE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT OR IN ANY CERTIFICATE OR WRITTEN STATEMENT FURNISHED, OR TO BE FURNISHED TO COMPANY PURSUANT TO THIS AGREEMENT OR IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY: (A) NONE OF CONTRIBUTOR, NOR ANY OF ITS AFFILIATES OR REPRESENTATIVES, HAS MADE OR IS MAKING ANY REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF EACH COMPANY, ITS BUSINESS OR ANY OF ITS ASSETS, LIABILITIES OR OPERATIONS; (B) COMPANY SHALL HAVE INSPECTED, OR WAIVED (AND UPON CLOSING SHALL BE DEEMED TO HAVE WAIVED) ITS RIGHT TO INSPECT, THE ASSETS FOR ALL PURPOSES AND SATISFIED ITSELF AS TO THEIR PHYSICAL AND ENVIRONMENTAL CONDITION; AND (C) COMPANY IS RELYING SOLELY UPON ITS OWN INSPECTION OF THE ASSETS, AND COMPANY SHALL ACCEPT ALL OF THE SAME IN THEIR "AS IS," "WHERE IS" CONDITION.

9.8    Exclusive Remedy and Release. Except as otherwise provided herein, the indemnification and remedies set forth in this ARTICLE IX shall, from and after the Closing, constitute the sole and exclusive remedies of the Parties with respect to any breach of representation or warranty contained in this Agreement; *provided* that nothing in this Section 9.8 shall prevent either Party from seeking injunctive or equitable relief in pursuit of its indemnification claims under this ARTICLE IX.

## ARTICLE X
## MISCELLANEOUS

10.1    Notices. All notices and other communications between the Parties shall be in writing and shall be deemed to have been duly given when (i) delivered in person, (ii) five (5) days after posting in the United States mail having been sent registered or certified mail

HATLE_0003392

return receipt requested or (iii) delivered by telecopy and promptly confirmed by delivery in person or post as aforesaid in each case, with postage prepaid, addressed as follows:

> If to Company, to:
>
> CorrLine International, LLC.
> 8 E Greenway Plaza
> Suite 1340
> Houston, TX 77046
> Attention: Milton L. Scott
> Telephone : (713) 625-7537
> Fax: (713) 750-7071
>
> If to Contributor, to:
>
> TriGenex of Texas, Inc.
> 20523 Whiteberry Court
> Humble, Texas 77346-1338
> Telephone: (281) 733-2655
> Fax: (866) 868-9095
> Attention: Loren L. Hatle

or to such other address or addresses as the Parties may from time to time designate in writing.

     10.2   Assignment.  Except as provided below, no Party shall assign this Agreement or any part hereof without the prior written consent of the other Party. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns. The foregoing notwithstanding, Company shall be permitted to assign this Agreement to one or more Affiliates if it deems appropriate for Tax purposes; *provided, however*, that such assignment shall not release Company from its obligations under this Agreement. Any assignment or attempted assignment in violation of the foregoing will be null and void.

     10.3   Rights of Third Parties. Except for the provisions of ARTICLE IX, which are intended to be enforceable by the Persons respectively referred to therein, nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give any Person, other than the Parties, any right or remedies under or by reason of this Agreement.

     10.4   Expenses. Except as otherwise expressly provided herein or as otherwise agreed by the Parties, each Party shall bear its own expenses incurred in connection with this Agreement and the transactions contemplated hereby whether or not such transactions shall be consummated, including all fees of its legal counsel, financial advisers and accountants.

     10.5   Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any facsimile copies hereof or signature hereon shall, for all purposes, be deemed originals.

HATLE_0003393

10.6 <u>Entire Agreement</u>. This Agreement (together with the Disclosure Schedules and exhibits to this Agreement) constitute the entire agreement among the Parties and supersede any other agreements, whether written or oral, that may have been made or entered into by or among any of the Parties or any of their respective Affiliates relating to the transactions contemplated hereby.

10.7 <u>Disclosure Schedules</u>. Unless the context otherwise requires, all capitalized terms used in the Disclosure Schedules shall have the respective meanings assigned in this Agreement. No reference to or disclosure of any item or other matter in the Disclosure Schedules shall be construed as an admission or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed in the Disclosure Schedules. No disclosure in the Disclosure Schedules relating to any possible breach or violation of any agreement or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. The inclusion of any information in the Disclosure Schedules shall not be deemed to be an admission or acknowledgment by Contributor, in and of itself, that such information is material to or outside the ordinary course of the business of the Contributor or required to be disclosed on the Disclosure Schedules. The disclosure of an item in one section of the Disclosure Schedules as an exception to a particular representation or warranty qualifies the referenced representation or warranty to the extent specified therein and such other representations and warranties contained in the Agreement (regardless of whether or not such representation or warranty contains a reference to such disclosure schedules) to the extent a matter in such section of the Disclosure Schedules is disclosed in such a way as to make its relevance to the information called for by such other representation or warranty readily apparent on its face.

10.8 <u>Amendments</u>. This Agreement may be amended or modified in whole or in part, and terms and conditions may be waived, only by a duly authorized agreement in writing which makes reference to this Agreement executed by each Party.

10.9 <u>Publicity</u>. All press releases or other public communications of any nature whatsoever relating to the transactions contemplated by this Agreement, and the method of the release for publication thereof, shall be subject to the prior written consent of Company and Contributor, which consent shall not be unreasonably withheld, conditioned or delayed by such Party; *provided, however*, that nothing herein shall prevent a Party from publishing such press releases or other public communications as is necessary to satisfy such Party's obligations at Law or under the rules of any stock or commodities exchange after consultation with the other Party.

10.10 <u>Severability</u>. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect. The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

HATLE_0003394

10.11   Governing Law; Jurisdiction.

(a)   This Agreement shall be governed and construed in accordance with the Laws of the State of Texas, without regard to the Laws that might be applicable under conflicts of Laws principles.

(b)   The Parties agree that the appropriate, exclusive and convenient forum for any disputes between any of the Parties hereto arising out of this Agreement or the transactions contemplated hereby shall be in any state or federal court in Houston, Texas, and each of the Parties hereto irrevocably submits to the jurisdiction of such courts solely in respect of any legal proceeding arising out of or related to this Agreement. The Parties further agree that the Parties shall not bring suit with respect to any disputes arising out of this Agreement or the transactions contemplated hereby in any court or jurisdiction other than the above specified courts. The Parties further agree, to the extent permitted by Law, that a final and nonappealable judgment against a Party in any action or proceeding contemplated above shall be conclusive and may be enforced in any other jurisdiction within or outside the United States by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the fact and amount of such judgment. Except to the extent that a different determination or finding is mandated due to the applicable Law being that of a different jurisdiction, the Parties agree that all judicial determinations or findings by a state or federal court in Houston, Texas with respect to any matter under this Agreement shall be binding.

(c)   To the extent that any Party hereto has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, each such party hereby irrevocably (i) waives such immunity in respect of its obligations with respect to this Agreement and (ii) submits to the personal jurisdiction of any court described in Section 10.11(b).

THE PARTIES HERETO AGREE THAT THEY HEREBY IRREVOCABLY WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION TO ENFORCE OR INTERPRET THE PROVISIONS OF THIS AGREEMENT.

*[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]*

HATLE_0003395

IN WITNESS WHEREOF this Agreement has been duly executed and delivered by each of the Parties as of the date first above written.

**CONTRIBUTOR:**

**TRIGENEX OF TEXAS, INC.**

By: _____

Name: _LOREN L. HATLE_

Title: _CHIEF TECHNICAL OFFICER._

**COMPANY:**

**CORRLINE INTERNATIONAL, LLC**

By: _____

Name: _MILTON C. SCOTT_

Title: _Chief Executive Officer_

SIGNATURE PAGE TO ASSET CONTRIBUTION AGREEMENT