# EXHIBIT A-1

## EXHIBIT A

**Limited Liability Company Agreement of CorrLine International, LLC**

HATLE_0003397

*Execution Version*

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## CORRLINE INTERNATIONAL, LLC

### a Texas Limited Liability Company

**Dated September 20, 2012**

HATLE_0003398

**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**CORRLINE INTERNATIONAL, LLC**
**A Texas Limited Liability Company**

### TABLE OF CONTENTS

Page
No.

ARTICLE I. DEFINITIONS ...................................................................................1
    1.01    Definitions.................................................................................1
    1.02    Construction.............................................................................8

ARTICLE II. ORGANIZATION.............................................................................8
    2.01    Formation.................................................................................8
    2.02    Name........................................................................................9
    2.03    Registered Office; Registered Agent; Principal Office in the United
             States; Other Offices .................................................................9
    2.04    Purposes ..................................................................................9
    2.05    Foreign Qualification ..............................................................9
    2.06    Term ........................................................................................9
    2.07    Mergers and Exchanges ...........................................................9
    2.08    No State-Law Partnership ........................................................9

ARTICLE III. MEMBERSHIP; DISPOSITIONS OF COMMON UNITS .................10
    3.01    Members. ..................................................................................10
    3.02    Additional Members. ...............................................................10
    3.03    Liability to Third Parties. .........................................................10
    3.04    Withdrawal. .............................................................................10
    3.05    Lack of Authority. ...................................................................10
    3.06    Information; Treatment of Confidential Information. ..................10

ARTICLE IV. CAPITALIZATION ..........................................................................11
    4.01    Common Units. .......................................................................11
    4.02    Capital Contributions. .............................................................12
    4.03    Unit Certificate. ......................................................................12
    4.04    Initial Capital Contributions; Subsequent Capital Contributions. ....13
    4.05    Interest; Withdrawal of Contributions. .....................................14
    4.06    Capital Accounts. ....................................................................14

ARTICLE V. ALLOCATIONS AND DISTRIBUTIONS.............................................14
    5.01    Allocations. .............................................................................14
    5.02    Distributions............................................................................17

ARTICLE VI. MANAGEMENT................................................................................18
    6.01    Management by Managers.........................................................18

HATLE_0003399

| | | |
|---|---|---|
| 6.02 | Actions by Managers; Delegation of Authority and Duties | 19 |
| 6.03 | Number and Term of Office. | 19 |
| 6.04 | Election of Managers. | 19 |
| 6.05 | Vacancies. | 19 |
| 6.06 | Removal; Resignation.  Subject to Section 6.04, | 19 |
| 6.07 | Meetings. | 20 |
| 6.08 | Fiduciary Duties. | 21 |
| 6.09 | Action by Written Consent or Telephone Conference. | 21 |
| 6.10 | Compensation. | 21 |
| 6.11 | Conflicts of Interests; Competitive Opportunities. | 21 |
| 6.12 | Officers. | 22 |
| 6.13 | Annual Budget and Business Plan. | 22 |
| 6.14 | Exclusive Manager Rights. | 24 |
| 6.15 | Preferred Payments to Majority Member. | 25 |

**ARTICLE VII. MEETINGS OF THE MEMBERS; VOTING OF UNITS** ... 25

| | | |
|---|---|---|
| 7.01 | Meetings. | 26 |
| 7.02 | Proxies. | 26 |
| 7.03 | Action by Written Consent or Telephone Conference. | 26 |
| 7.04 | Voting of Common Units. | 26 |
| 7.05 | Record Date and Closing of Transfer Books. | 26 |

**ARTICLE VIII. INDEMNIFICATION** ... 27

| | | |
|---|---|---|
| 8.01 | Right to Indemnification. | 27 |
| 8.02 | Advance Payment. | 28 |
| 8.03 | Indemnification of Officers, Employees, and Agents. | 28 |
| 8.04 | Appearance as a Witness. | 28 |
| 8.05 | Nonexclusivity of Rights. | 28 |
| 8.06 | Insurance. | 28 |
| 8.07 | Member Notification. | 29 |
| 8.08 | Indemnification for Breach by Member. | 29 |
| 8.09 | Savings Clause. | 29 |

**ARTICLE IX. TAXES** ... 29

| | | |
|---|---|---|
| 9.01 | Tax Returns. | 29 |
| 9.02 | Tax Elections. | 29 |
| 9.03 | "Tax Matters Partner." | 29 |
| 9.04 | Tax Classification. | 30 |

**ARTICLE X. BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS** ... 30

| | | |
|---|---|---|
| 10.01 | Maintenance of Books. | 30 |
| 10.02 | Reports. | 30 |
| 10.03 | Accounts. | 30 |

**ARTICLE XI. TRANSFERS OF MEMBERSHIP INTERESTS** ... 31

| | | |
|---|---|---|
| 11.01 | Restrictions on Transfer | 31 |
| 11.02 | Permitted Transfers by Members. | 31 |

519446 000001 Active 5142887.8

HATLE_0003400

| 11.03 | Substitute Members. | 31 |
|---|---|---|
| 11.04 | Required Consent. | 32 |
| 11.05 | Right of First Refusal of Members. | 32 |
| 11.06 | Tag-Along Right. | 33 |

**ARTICLE XII. DISSOLUTION, LIQUIDATION, AND TERMINATION** ................................34

| 12.01 | Dissolution. | 34 |
|---|---|---|
| 12.02 | Liquidation and Termination. | 34 |
| 12.03 | Deficit Capital Accounts. | 35 |
| 12.04 | Certificate of Termination. | 36 |

**ARTICLE XIII. GENERAL PROVISIONS** ................................36

| 13.01 | Offset. | 36 |
|---|---|---|
| 13.02 | Notices. | 36 |
| 13.03 | Entire Agreement. | 36 |
| 13.04 | Effect of Waiver or Consent. | 36 |
| 13.05 | Amendment or Modification. | 36 |
| 13.06 | Binding Effect. | 37 |
| 13.07 | Governing Law; Severability. | 37 |
| 13.08 | Further Assurances. | 37 |
| 13.09 | Notice to Members of Provisions of this Agreement; Legal Representation. | 37 |
| 13.10 | Counterparts; Signatures. | 37 |
| 13.11 | Side Letter Agreements. | 38 |

EXHIBIT A - Form of Unit Certificate
EXHIBIT B - Members Capital Contributions; Common Units
EXHIBIT C - Managers

519446 000001 Active 5142887.8

HATLE_0003401

## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## CORRLINE INTERNATIONAL, LLC
### A Texas Limited Liability Company

THIS LIMITED LIABILITY COMPANY AGREEMENT OF CORRLINE INTERNATIONAL, LLC (this *"Agreement"*), dated September 20, 2012 (the *"Effective Date"*), is executed and agreed to, for good and valuable consideration, by the Members (as defined below).

### RECITALS:

A.   The Company (as defined below) was organized on August 21, 2012, as "CorrLine International, LLC" by Milton L. Scott.

B.   Each of TriGenex of Texas, Inc., a Texas corporation (*"TriGenex"*) and The Tagos Group, LLC, a Texas limited liability company (*"Tagos,"* and together with TriGenex, the *"Members"* and each a *"Member"*) now desire to contribute certain assets to the Company in exchange for Memberships Interests ( as defined below) and enter into this Agreement.

C.   NOW, THEREFORE, for and in consideration of the Recitals and the mutual covenants, agreements and benefits to be obtained hereby, and other good and valuable consideration, the receipt and sufficiency of which the parties hereby acknowledge, the parties hereby adopt the following provisions of the Company Agreement

### ARTICLE I.
### DEFINITIONS

**1.01   *Definitions*.**   The defined terms used in this Agreement shall, unless the context otherwise requires, have the following meanings:

*"Additional Capital Contributions"* has the meaning given that term in Section 4.04(b).

*"Adjusted Capital Account"* means the capital account maintained for each Member as provided in Section 4.06, (a)(i) increased by an amount equal to the amount such Member is deemed obligated to restore under the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5) as computed on the last day of such Fiscal Year in accordance with the applicable Treasury Regulations, and (ii) the amount of any Capital Contributions agreed to be contributed by such Member under Article IV, if any, to the extent not already included under clause (a)(i); and (b) decreased by the adjustments provided for in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4)-(6).

*"Adjusted Capital Account Deficit"* means, for each Member, the deficit balance, if any, in such Member's Adjusted Capital Account.

1

**HATLE_0003402**

*"Affiliate"* means, when used with reference to a specified Person, any other Person controlling, controlled by or under common control with such particular Person.

*"Agreement"* has the meaning given that term in the preamble.

*"Annual Budget"* has the meaning given that term in <u>Section 6.14(c)</u>.

*"Approved Budget and Business Plan"* means each annual budget and business plan as proposed by the authorized officers of the Company and approved, as may be amended or otherwise modified, by the Board of Managers in accordance with this Agreement.

*"Assign"* has the meaning given that term in <u>Section 11.01</u>.

*"Assignee"* has the meaning given that term in <u>Section 11.03</u>.

*"Assignment"* has the meaning given that term in <u>Section 11.01</u>.

*"Business"* means the research, development, manufacturing, application, installation, and maintenance of corrosion mitigation products and processes, the method for providing improved adhesion of barrier coatings to metals exposed to moisture and for decontaminating metal surfaces, including but not limited to CorrX, or such products and processes related thereto, but expressly excluding diagnostic, testing, imaging (which includes without limitation the manufacture and sale of coupons), or validation methods, products or processes related thereto. For purposes of this definition, the term "CorrX" means CorrX two-step surface decontamination processes which utilize CorrX Perfecter Plus and CorrX Conditioner.

*"Capital Contribution"* means, for any Member at the particular time in question, the aggregate of the dollar amounts of any cash contributed by such Member to the capital of the Company and the fair market value of any property contributed by such Member to the capital of the Company.

*"Capital Proceeds"* means (i) all funds from the Disposition of part or all of the property of the Company and its Subsidiaries, net of actual costs incurred by the Company with third parties in consummating such Disposition, (ii) all funds from the Disposition of all or part of the outstanding Common Units in connection with a Sale of the Company, (iii) all cash of the Company and its Subsidiaries in the event of a Sale of the Company and (iv) all funds from any recapitalization of the Company.

*"Certificate"* has the meaning given that term in <u>Section 2.01</u>.

*"Code"* means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

*"Common Units"* has the meaning given that term in <u>Section 4.01(c)</u>.

*"Company"* means CorrLine International, LLC, a Texas limited liability company.

*"Confidential Information"* has the meaning given that term in <u>Section 3.06(d)</u>.

2

HATLE_0003403

*"Contributed Assets"* has the meaning given that term in Section 6.15(a).

*"Contribution Agreement"* means that certain Asset Contribution Agreement dated as of the date hereof by and between TriGenex and the Company.

*"Control"* means (including, with correlative meanings, "controlled by" and "under common control with"), with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

*"Depreciation"* means, for each Fiscal Year or part thereof, an amount equal to the depreciation, amortization or other cost recovery deductions allowable for U.S. federal income tax purposes with respect to an asset of the Company for such year or other period, except if the Gross Asset Value of an asset differs from its adjusted basis for U.S. federal income tax purposes at the beginning of such year, Depreciation shall be an amount which bears the same ratio to such Gross Asset Value as the U.S. federal income tax depreciation, amortization or other cost recovery deduction for such year bears to such adjusted tax basis, provided, however, that if the adjusted basis for U.S. federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Managers.

*"Disguised Sale Proceeds"* has the meaning given that term in Section 6.15(a).

*"Disposition"* (including the correlative terms *"Disposed"* or *"Disposition"*) means any sale, assignment, transfer, conveyance, gift, pledge, distribution, hypothecation or other encumbrance or any other disposition, whether voluntary, involuntary or by operation of law, and whether effected directly or indirectly.

*"Distributable Cash"* has the meaning given that term in Section 5.02(a).

*"Effective Date"* has the meaning given that term in the preamble.

*"Electing Members"* has the meaning given that term in Section 4.04(b)(ii).

*"Expiration Date"* has the meaning given that term in Section 11.05(b).

*"Fiscal Year"* means the taxable year of the Company which shall be the calendar year, unless otherwise required by the Code.

*"GAAP"* means generally accepted accounting principles in the United States, applied by the Company on a consistent basis.

*"Gross Asset Value"* shall mean, with respect to any Company asset, such asset's adjusted basis for federal income tax purposes, except as follows:

(i) the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the fair market value of such asset on the date of contribution as determined by the Board of Managers;

3

HATLE_0003404

(ii)     the Gross Asset Values of all Company assets shall be adjusted to equal their respective fair market values, immediately before the occurrence of the following events: (1) the acquisition of additional Common Units in the Company by any new or existing Member in exchange for a more than de minimis Capital Contribution; (2) the grant of an interest in the Company (other than a de minimis interest) to any new or existing Member as consideration for the provision of services to or for the benefit of the Company; (3) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for a Membership Interest if the Managers reasonably determine in good faith that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members; and (4) the liquidation of the Company within the meaning of Treasury Regulation section 1.704-1(b)(2)(ii)(g);

(iii)     the Gross Asset Value of any Company asset distributed to any Member shall be the fair market value of such asset on the date of distribution.

(iv)     the Gross Asset Value of an asset shall be adjusted by Depreciation taken into account with respect to such asset for purposes of computing Net Profit and Net Loss; and

(v)     the Gross Asset Value of Company assets shall be adjusted at such other times as required in the applicable Treasury Regulations.

*"Guaranteed Payment"* has the meaning given that term in <u>Section 6.15(b)</u>.

*"Initial Period"* has the meaning given that term in <u>Section 6.14(a)</u>.

*"Interested Manager"* means, with respect to all Interested Matters, any Manager who has a material financial interest in, or who serves as a director, manager or officer of any Person, including any Affiliate of such Manager, with which the Company has a transaction, contract, or other arrangement. For purposes of this Agreement, a Manager has a "material financial interest" if such Manager has, directly or indirectly, through business, investment or family:

(i)     an existing or potential ownership or investment interest in any Person with which the Company has a transaction, contract, or other arrangement;

(ii)     a compensation arrangement with the Company or with any Person with which the Company has a transaction, contract, or other arrangement;

(iii)     an existing or potential ownership or investment interest in, or compensation arrangement with, any Person with which the Company is negotiating a transaction, contract, or other arrangement; or

(iv)     an existing or potential ownership or investment interest in, or compensation arrangement with, any Person whose business or operation has been or will be directly affected by a decision or action of the Company.

*"Interested Matter"* means, with respect to any Member or Manager, any matter arising from (i) the entry into any actual contract or transaction agreement between the Company and any Member, Manager or Affiliate thereof, and (ii) an alleged material breach by the Company of any

519446 000001 Active 5142887.8

actual contract or transaction agreement between the Company and any Member, Manager or Affiliate thereof, including without limitation, the Contribution Agreement and Service Agreement. Interested Matters shall include without limitation, the Company's exercise of any right to enforce any agreement against any Member, Manager or Affiliate thereof that is a counterparty to any such contract or transaction agreement or settle any dispute arising under or relating thereto.

*"Liens"* means and includes security interests, mortgages, liens, pledges, charges, restrictions, options, rights of first refusal, restrictions of any kind, any agreement to provide any of the foregoing and all other encumbrances.

*"Liquidity Threshold"* means the average one-month revenue of the Company calculated for the most recent three-month period ended.

*"Majority Managers"* has the meaning given that term in <u>Section 6.04(a)</u>.

*"Majority Member"* means TriGenex of Texas, Inc., a Texas corporation and its Affiliates and transferees.

*"Managers"* means the Majority Managers and Minority Managers, and includes all Persons hereafter elected as managers of the Company as provided in this Agreement, but does not include any Person who has ceased to be a manager of the Company.

*"Member"* means any Person executing this Agreement as of the date hereof as a member of the Company or hereafter admitted as a member of the Company as provided in this Agreement, but does not include any Person who has ceased to be a member of the Company.

*"Member Budget and Business Plan"* has the meaning given that term in <u>Section 6.14(e)(ii)</u>.

*"Member Nonrecourse Debt"* means any nonrecourse debt of the Company (or portions thereof) for which any Member or related person (within the meaning of Treasury Regulations Section 1.752-4(b)) bears the economic risk of loss.

*"Member Nonrecourse Debt Minimum Gain"* has the same meaning as Partner Nonrecourse Debt Minimum Gain set forth in Treasury Regulations Section 1.704-2(i)(2).

*"Member Nonrecourse Deductions"* means with respect to any Member Nonrecourse Debt, the amount of deductions, losses and expenses equal to the net increase during the year in Member Nonrecourse Debt Minimum Gain with respect to such Member Nonrecourse Debt, reduced (but not below zero) by proceeds of such Member Nonrecourse Debt distributed during the year to the Members who bear the economic risk of loss for such debt, as determined in accordance with applicable Treasury Regulations.

*"Membership Interest"* means the interest of a Member in the Company, including, without limitation, rights to distributions (liquidating or otherwise), rights or access to information, and to consent or approve any action.

5

HATLE_0003406

"*Membership Percentage Interest*" means the percentage interest of a Member in the company calculated by dividing (i) the Common Units held of record by such Member by (ii) the total number of Common Units outstanding.

"*Minimum Gain*" means with respect to Company Nonrecourse Liabilities, the amount of gain that would be realized by the Company if it Disposed of (in a taxable transaction) all properties that are subject to Company Nonrecourse Liabilities in full satisfaction of such liabilities, computed in accordance with applicable Treasury Regulations.

"*Minority Managers*" has the meaning given that term in Section 6.04(b).

"*Minority Member*" means The Tagos Group, LLC, a Texas limited liability company and its Affiliates and transferees.

"*Net Profit*" and "*Net Loss*" mean, for each taxable year or other period, an amount equal to the Company's taxable income or loss for the year or other period, determined in accordance with Section 703(a) of the Code (including all items of income, gain, loss or deduction required to be stated separately under Section 703(a)(1) of the Code), with the following adjustments:

(i) any income of the Company which is exempt from federal income tax and not otherwise taken into account in computing Net Profit and Net Loss will be added to taxable income or loss;

(ii) any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Section 705(a)(2)(B) expenditures under Regulations Section 1.704-1(b)(2)(iv)(*i*), and not otherwise taken into account in computing Net Profit and Net Loss, will be subtracted from taxable income or loss;

(iii) gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the Gross Asset Value of the property, notwithstanding that the adjusted tax basis of the property differs from its Gross Asset Value;

(iv) in lieu of depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there will be taken into account Depreciation for the taxable year or other period;

(v) to the extent an adjustment to the adjusted tax basis of any asset pursuant to Section 734(b) of the Code is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of such asset and shall be taken into account for purposes of computing Net Profit or Net Loss; and

(vi) any items which are specially allocated under Section 5.01(b) or Section 5.01(c) will not be taken into account in computing of Net Profit and Net Loss.

6

HATLE_0003407

The amounts of the items of the Company's income, gain, loss or deduction available to be specially allocated pursuant to Section 5.01(b) or Section 5.01(c) shall be determined by applying rules analogous to those set forth in subparagraphs (i) through (v) above

*"New Units"* has the meaning given that term in Section 4.04(b)(i).

*"Non-Electing Member"* has the meaning given that term in Section 4.04(b)(ii).

*"Non-Interested Manager"* means, with respect to an Interested Matter, any Manager of the Company who is not an Interested Manager.

*"Non-Selling Member"* has the meaning given that term in Section 11.05.

*"Notice Date"* has the meaning given that term in Section 4.04(b)(ii).

*"Offered Units"* has the meaning given that term in Section 11.05 and Section 11.06.

*"Permitted Transferee"* means (a) as to a Member that is an individual, such Member's spouse or any of such Member's parents, brothers, sisters or natural or legally adopted descendants, or an entity whose only owners or beneficiaries are such Member and/or one or more of such Member's spouse or any of the Member's parents, brothers, sisters or natural or legally adopted descendants and (b) as to a Member other than an individual, its Affiliates.

*"Person"* means an individual, partnership, joint venture, association, corporation, trust, estate, limited liability company, limited liability partnership or any other legal entity.

*"Preferred Payment"* has the meaning given that term in Section 6.15.

*"Proceeding"* has the meaning given that term in Section 8.01.

*"Proposed Budget and Business Plan"* has the meaning given that term in Section 6.14(b).

*"Pro Rata"* means, with respect to any particular provision of this Agreement requiring the application of that term, the ratio determined by dividing (a) the number of Common Units held by a Member or holder of Common Units to whom that provision applies, by (b) the aggregate number of Common Units held by all Members to whom that provision applies.

*"Purchase Notice"* has the meaning given that term in Section 11.05(b).

*"Regulatory Allocations"* has the meaning given that term in Section 5.01(c).

*"Required Interest of Members"* means one or more Members having among them more than 50% of the outstanding Common Units.

*"Right of First Refusal"* has the meaning given that term in Section 11.05.

*"Sale Notice"* has the meaning given that term in Section 11.05(a).

*"Sale of the Company"* means either (a) a sale or transfer (directly or indirectly) of all or

7

HATLE_0003408

substantially all of the assets of the Company to a Person not an Affiliate of the Company or any of the Members, or (b) a merger, consolidation, stock sale, recapitalization or other similar transaction as a result of which the holders of the voting securities of the Company outstanding immediately prior to such transaction will no longer have beneficial ownership of at least fifty percent (50%) of the total outstanding voting power of the Company following consummation of such transaction (with respect to clauses (a) or (b) whether in a single transaction or series of related transactions).

"*Selling Member*" has the meaning given that term in Section 11.05 and Section 11.06.

"*Subsidiary*" means, with respect to any Person, (a) any other Person of which fifty percent (50%) or more of the equity interests or other interests entitled to vote in the election of directors or comparable Persons performing similar functions are at the time owned or controlled, directly or indirectly through one or more Subsidiaries, by such Person or (b) any other Person whose assets, or portions thereof, are consolidated with the net earnings of such Person and are recorded on the books of such Person for financial reporting purposes in accordance with GAAP.

"*Tag-Along Notice*" has the meaning given that term in Section 11.06.

"*Tagging Member*" has the meaning given that term in Section 11.06.

"*TBOC*" means the Texas Business Organizations Code, as amended from time to time and any successor statute, as amended from time to time.

"*Treasury Regulations*" (or any abbreviation thereof used in this Agreement) means temporary or final Treasury Regulations promulgated under the Internal Revenue Code.

"*Unit*" means a unit or share of the Membership Interests in the Company, including a Common Unit.

"*Unit Certificate*" means a certificate issued by or on behalf of the Company in accordance with this Agreement, substantially in the form of Exhibit A hereto, or such other form as may from time to time be adopted by the Managers, evidencing ownership of the Common Units.

Other terms defined herein have the meanings so given them.

**1.02    *Construction*.**  Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter.  All references to Articles and Sections refer to Articles and Sections of this Agreement, and all references to Exhibits are to Exhibits attached hereto, each of which is made a part hereof for all purposes.  The use in this Agreement of the term "*including*" means "*including, without limitation.*"

**ARTICLE II.
ORGANIZATION**

**2.01    *Formation*.**  Subject to the provisions of this Agreement, the Company was organized as a Texas limited liability company under the name "CorrLine International, LLC"

8

**HATLE_0003409**

upon the filing of the Certificate of Formation (as amended from time to time, the *"Certificate"*) under and pursuant to the TBOC, and the issuance of a certificate of formation for the Company by the Secretary of State of Texas on August 21, 2012.

**2.02** *Name*. The name of the Company is "CorrLine International, LLC" and all Company business must be conducted in that name or such other names that comply with applicable law as the Managers may select from time to time.

**2.03** *Registered Office; Registered Agent; Principal Office in the United States; Other Offices*. The registered office of the Company required by the TBOC to be maintained in the State of Texas shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Managers may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate or such other Person or Persons as the Managers may designate from time to time in the manner provided by law. The principal office of the Company in the United States shall be at such place as the Managers may designate from time to time, which need not be in the State of Texas. The Company shall maintain records in the principal office as required by the Section 3.151 of the TBOC and shall keep the street address of such principal office at the registered office of the Company in the State of Texas. The Company may have such other offices as the Managers may designate from time to time.

**2.04** *Purposes*. Subject to any restrictions set forth in this Agreement, the purposes of the Company are those set forth in the Certificate and include, without limitation, any other business or activity that now or hereafter may be necessary, incidental, proper, advisable or convenient to accomplish such purposes and that is not forbidden by the law of the jurisdiction in which the Company engages in the Business.

**2.05** *Foreign Qualification*. Prior to the Company's conducting business in any jurisdiction other than Texas, the Managers shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Managers, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. At the request of the Managers, each Member shall execute, acknowledge, swear to, and deliver all certificates and other instruments conforming to this Agreement that are necessary or appropriate to qualify, continue, and/or terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

**2.06** *Term*. The Company commenced on the date the Secretary of State of Texas issued a certificate of formation for the Company and shall continue in existence for the period fixed in the Certificate for the duration of the Company, or such earlier time as this Agreement may specify.

**2.07** *Mergers and Exchanges*. Subject to the requirements of Sections 6.01, the Company may be a party to (a) a merger, (b) an exchange or acquisition of the type described in Section 10.051 of the TBOC or (c) a conversion of the type described in Section 10.101 of the TBOC.

**2.08** *No State-Law Partnership*. The Members intend that the Company not be a

9

partnership (including, without limitation, a limited partnership) or joint venture for any purposes other than federal and state tax purposes, and this Agreement may not be construed to suggest otherwise.

## ARTICLE III.
## MEMBERSHIP; DISPOSITIONS OF COMMON UNITS

**3.01** *Members.* The Members of the Company are set forth on Exhibit B hereto. Exhibit B shall be updated by the Company from time to time to reflect the appropriate list of Members holding Membership Interests.

**3.02** *Additional Members.* Additional Persons may be admitted to the Company as Members and Common Units may be created and issued to those Persons and to existing Members on such terms as directed by the Managers and subject to Section 4.04. The terms of admission or issuance must specify the number of Common Units applicable thereto and may provide for the creation of different classes or groups of Members and having different rights, powers, and duties. The Managers shall reflect the creation of any new class or group in an amendment to this Agreement indicating the different rights, powers, and duties, and such an amendment need be executed only by the Managers. Such admission is effective only after the new Member has executed and delivered to the Managers a document including the new Member's address for notice purposes and its agreement to be bound by this Agreement.

**3.03** *Liability to Third Parties.* No current or former Member or Manager shall be liable for the debts, obligations, or liabilities of the Company, including under a judgment decree or order of a court.

**3.04** *Withdrawal.* The Members acknowledge and agree that care has been taken in this Agreement to provide for a fair and just payment in liquidation of the Membership Interests of all Members and agree that irreparable damage would occur to the Company if any Member withdrew or brought an action in any court of law or equity to dissolve or liquidate the Company. Accordingly, as a condition precedent to the issuance and subsequent transfer of any Membership Interest, each Member shall be conclusively deemed to have waived and renounced such Member's right to withdraw or retire from the Company, to seek a court decree of dissolution for the Company or to seek the appointment by a court of a liquidator for the Company, except in accordance with this Agreement; provided that nothing contained in this Section 3.04 or any other provision of this Agreement to the contrary shall restrict the ability of any Member to exercise any of its rights granted pursuant to Section 11.05.

**3.05** *Lack of Authority.* No Member (other than an individual Member acting as a Manager or officer of the Company) has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company.

**3.06** *Information; Treatment of Confidential Information.*

(a) In addition to the other rights specifically set forth in this Agreement, except as expressly prohibited by applicable law or by contract, each Member is entitled to all information to which that Member is entitled to have access pursuant to Section 3.153 of the TBOC under the

10

HATLE_0003411

circumstances and subject to the conditions therein stated.

(b)     The Members acknowledge that, from time to time, they may receive Confidential Information from or regarding the Company, the release of which may be damaging to the Company or Persons with which it does business. Each Member shall hold in strict confidence any Confidential Information it receives regarding the Company and shall not use, publish, disseminate, distribute or otherwise disclose all or any portion of the Confidential Information to any Person other than another Member or a Manager without the prior written approval of the Company, except for disclosures (i) required by law or pursuant to a judicial process, (ii) to advisers or representatives of the Member or Persons to which that Member's Common Units may be disposed as permitted by this Agreement, but only if the recipients have agreed to be bound by the provisions of this Section 3.06(b) or (iii) of information that a Member also has received from a source independent of the Company that such Member reasonably believes obtained that information without breach of any obligation of confidentiality.  The Members acknowledge that breach of the provisions of this Section 3.06(b) may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both.  Accordingly, the Members agree that the provisions of this Section 3.06(b) may be enforced by specific performance.

(c)     In the event that a Member receives either a request to disclose any Confidential Information under the terms of a subpoena or order issued by a court or other governmental or regulatory authority or advice of legal counsel that disclosure is required under applicable law or regulatory inquiry, such Member agrees that it shall, to the extent permitted by law or regulatory inquiry (i) promptly notify the Company of the existence and terms of, and the circumstances attendant to, such request or advice, (ii) consult with the Company as to the advisability of taking legally available steps to resist or narrow any such request or to otherwise eliminate the need for such disclosure and (iii) if disclosure is required, cooperate with the Company to obtain a protective order or other reliable assurance that confidential treatment will be accorded to such portion of the Confidential Information as is required to be disclosed.

(d)     For purposes of this Section 3.06, the term *"Confidential Information"* means and refers to information and materials belonging to the Company that are confidential and proprietary to the Company, including, without limitation, certain customer lists, pricing policies, operational procedures, sources of supply, methods, formulae, processes, software programs, hardware configurations, know-how, computer programs and access codes, technological information, information relating to the cost of its products and services, marketing strategies, financial statements and projections, and any other confidential and proprietary information that any Person knows or should know that the Company regards the information to be Confidential Information. Confidential Information shall not include any knowledge or information that any Person already knows as of the date of this Agreement, that is already known to the general public as of the date of this Agreement or that becomes known to the general public after the date of this Agreement through no breach of such Person's confidentiality obligations.

## ARTICLE IV.
## CAPITALIZATION

**4.01**     ***Common Units.*** As of the date hereof, the Company shall have one (1) class of Membership Interests consisting of 1,000,000 authorized Common Membership Interests (the

11

**HATLE_0003412**

*"Common Units"*), with 55,000 Common Units issued to the Majority Member pursuant to the terms set forth in the Contribution Agreement and 45,000 Common Units issued to the Minority Member, in each case as described on <u>Exhibit B</u>. The Managers shall have the authority to create and issue new classes of Membership Interests of the Company from time to time in their sole discretion.

**4.02** *Capital Contributions.* Each Capital Contribution shall be made by means of the issuance of Common Units or in connection with the ownership of such Common Units. Common Units may be issued to such Persons, for such consideration and on such terms as the Managers may from time to time determine. Capital contributed in connection with the Common Units may consist of money paid, labor performed, or property received by the Company, as well as any other consideration permitted under the TBOC and any such amounts received by the Company therefore will be treated as a Capital Contribution.

**4.03** *Unit Certificate.*

(a)     Upon a Person becoming a Member in accordance with the terms of this Agreement, the Company may issue one or more Unit Certificates in the name of such Person evidencing the number of Common Units being so issued. No fractional Common Units shall be issued. Unless a Member otherwise elects, such Member shall receive one Unit Certificate in a denomination equal to the number of all of its Common Units, but a Member may request that Unit Certificates be issued in smaller denominations. No Unit Certificate shall be valid for any purpose unless countersigned by a duly authorized officer of the Company.

(b)     The Company shall cause to be kept a registrar in which the Company will provide for the registration and transfer of Common Units. The Managers may appoint any Person, who may but need not be an officer of the Company, as transfer agent for registering Common Units and any transfers thereof as herein provided. Upon surrender for registration of transfer or exchange of any Unit Certificate, and subject to the other provisions of this Agreement, the Managers will cause to be issued in the name of the holder or designated transferee, as required pursuant to the Member's instructions, one or more Unit Certificates, evidencing the same number of Common Units as the Unit Certificate so surrendered. Every Unit Certificate surrendered for registration of transfer or exchange shall be duly endorsed or accompanied by a written instrument of transfer in form satisfactory to the Managers duly executed by the holder thereof or such holder's duly authorized attorney.

(c)     The Company will be entitled to treat the record owner of Common Units as the Member in whose name the Unit Certificate is issued and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Common Units on the part of any other Person, regardless of whether it shall have actual or other notice thereof, except as otherwise provided under the TBOC or other applicable law. Without limiting the generality of the foregoing, when a Person (such as a broker, dealer, bank, trust company or clearing corporation, or an agent of any of the foregoing) is acting as a nominee, agent or in some other representative capacity for another Person in acquiring or holding Common Units, as between the Company on the one hand and such Persons on the other, such representative (i) shall be the Member of record and beneficially and (ii) shall be bound by this Agreement and shall have the obligations of a Member as provided herein.

12

HATLE_0003413

(d)     The Company may, in its sole discretion, issue a new Unit Certificate in the place of any Unit Certificate theretofore issued by it, alleged to have been lost or destroyed, under such conditions as the Managers may, in their discretion, may require, including a requirement that the owner of the lost or destroyed certificate, or its legal representative, give the Company such statement under oath or other evidence of such loss or destruction, and a bond in form, amount and with such surety as the Managers may prescribe or determine.  A new Unit Certificate may be issued without requiring any bond when, in the sole discretion of the Managers, it is proper so to do.

### 4.04     *Initial Capital Contributions; Subsequent Capital Contributions.*

(a)     As of the Effective Date (or as otherwise set forth in Exhibit B), each Member has contributed to the Company the cash, property, or services having an agreed or deemed value set forth as the Capital Contribution of such Member as set forth in the Contribution Agreement, solely with respect to the Majority Member, or as described on Exhibit B.  The amount or deemed amount of each Member's contribution as set forth on Exhibit B shall be recorded by the Members as a contribution to the capital of the Company.  In return for each such contribution, each Member shall have received the number of Common Units of the Company set forth opposite each Member's name on Exhibit B.

(b)     The Managers may issue and sell additional Units.  The Members of the Company shall have the first right to make additional Capital Contributions ("*Additional Capital Contributions*") and to purchase such additional Units, as follows:

(i)     In the event the Company desires to issue and sell Units (the "*New Units*") pursuant to Section 4.04(b), each Member shall have a preemptive right to purchase such number of New Units necessary for such Member to maintain its Membership Percentage Interest.  Each Member's preemptive share of the additional New Units shall be equal to the ratio of (a) the number of Common Units that such Member holds immediately prior to the issuance of such New Units to (b) the total number of Common Units of the Company outstanding immediately prior to the issuance of the New Units.

(ii)     If the Company issues any such New Units, it shall give each Member written notice of such issuance, describing the price and the terms and conditions upon which the Company will issue the New Units.  Each Member shall have ten (10) days from the giving of such notice (the "*Notice Date*") to exercise its preemptive right to purchase New Units for the price and upon the terms and conditions specified in the notice by giving written notice to the Company and stating therein the quantity of New Units to be purchased.  Notwithstanding the foregoing, the Company shall not be required to offer or sell such New Units to any Member who would cause the Company to be in violation of applicable federal or state securities laws by virtue of such offer or sale.  In the event that any Member has not exercised its preemptive rights to acquire New Units (a "*Non-Electing Member*"), the Members who have timely exercised their preemptive rights in full (such Members, the "*Electing Members*") shall have the right to acquire on a pro rata basis (based on the number of Common Units owned by the Electing Members) the New Units not subscribed for by the Non-Electing Members.  If all of the New Units are not subscribed for by the Members, then the Company may sell

13

HATLE_0003414

such unsubscribed for New Units to such other persons as the Managers shall determine, provided that such sales of New Units are on the same terms as set forth in the notice by the Company and such sale to a Non-Member is consummated no more than sixty (60) days after the Notice Date.

**4.05** *Interest; Withdrawal of Contributions.* No Member shall have the right to withdraw all or any part of such Member's Capital Contribution or to be paid interest in respect of its Capital Contributions. An unrepaid Capital Contribution is not a liability of the Company or of any Member.

**4.06** *Capital Accounts.* A separate capital account shall be established and maintained for each Member in the manner hereafter described in this Section 4.06. Each Member's capital account (a) shall be increased by (i) the amount of money contributed by that Member to the Company in connection with the issuance of Units, (ii) the fair market value of property contributed by that Member to the Company in connection with the issuance of Units (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Section 752 of the Code) and (iii) allocations to that Member of Net Profit and any items of income or gain specially allocated pursuant to Section 5.01(b) or Section 5.01(c), and (b) shall be decreased by (i) the amount of money distributed to that Member by the Company, (ii) the fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under Section 752 of the Code), (iii) allocations to that Member of Net Loss and any items of loss or deduction specially allocated pursuant to Section 5.01(b) or Section 5.01(c). The foregoing provisions of this Section 4.06 and the other provisions of this Agreement relating to the maintenance of capital accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Managers shall determine that it is prudent to modify the manner in which the capital accounts, or any increases or decreases thereto, the Managers may make such modification, provided that it is not likely to have a material effect on the amounts distributed to any Member pursuant to Article XII upon the dissolution of the Company. The Managers also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the capital accounts of the Members and the amount of capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Regulations Section 1.704-1(b)(2)(iv)(q) and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b). On the transfer of one or more Units, the capital account of the transferor that is attributable to those Units shall carry over to the transferee Member in accordance with the provisions of Treasury Regulations Section 1.704-1(b)(2)(iv)(l).

## ARTICLE V.
## ALLOCATIONS AND DISTRIBUTIONS

**5.01** *Allocations.*

(a) Unless otherwise specially allocated under the remaining provisions of this Section 5.01, Net Profit and Net Loss for any Fiscal Year shall be allocated among the Members in such manner as shall cause the Capital Accounts of the Members to equal, as nearly as possible, the amounts such Members would receive if all cash on hand at the end of such year were

14

HATLE_0003415

distributed to the Members in accordance with Section 5.02(b), and all assets on hand at the end of such year were sold for cash at the Gross Asset Values of such assets, all Company liabilities were satisfied to the extent required by their terms (limited, with respect to any Company Nonrecourse Liabilities and Member Nonrecourse Debt, to the Gross Asset Values of the assets securing each such liability) and any remaining cash were distributed to the Members under Section 5.02(b). The Managers shall make the foregoing allocations as of the last day of each Fiscal Year; *provided, however*, that if during any Fiscal Year of the Company there is a change in the number of Units held by any Member, the Managers shall make the foregoing allocations as of the date of each such change in a manner which takes into account the varying interests of the Members and in a manner that the Managers reasonably deem appropriate.

(b)    Notwithstanding any of the foregoing provisions of this Section 5.01 to the contrary, the following special allocations will be made in the following order and priority before allocations of Net Profit and Net Loss:

(i)    Minimum Gain Chargeback. If there is a net decrease in Minimum Gain during any taxable year or other period for which allocations are made, before any other allocation under this Agreement, each Member will be specially allocated items of Company income and gain for such period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to such Member's share of the net decrease in Minimum Gain during such period determined in accordance with Treasury Regulations Section 1.704-2(g)(2). The items to be allocated will be determined in accordance with Treasury Regulations Section 1.704-2(g). This Section 5.01(b)(i) is intended to comply with the minimum gain chargeback requirements of the Treasury Regulations, and should be interpreted consistently with the Treasury Regulations subject to all exceptions provided therein.

(ii)    Member Nonrecourse Debt Minimum Gain Chargeback. Notwithstanding any other provision of this Section 5.01 (other than Section 5.01(b)(i), which shall be applied first), if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any taxable year or other period for which allocations are made, any Member with a share of such Member Nonrecourse Debt Minimum Gain (determined under Treasury Regulations Section 1.704-2(i)(5)) as of the beginning of the period will be specially allocated items of Company income and gain for such period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to such Member's share of the net decrease in the Member Nonrecourse Debt Minimum Gain during such period determined in accordance with Treasury Regulations Section 1.704-2(i). This Section 5.01(b)(ii) is intended to comply with the partner nonrecourse debt minimum gain chargeback requirements of the Treasury Regulations, and should be interpreted consistently with the Treasury Regulations subject to all exceptions provided therein.

(iii)    Loss Limitation. The Losses allocated pursuant to Section 5.01 shall not exceed the maximum amount of losses and deductions that can be allocated to a Member without causing or increasing a deficit balance in the Member's Adjusted Capital Account. If, at the end of any Fiscal Year, as a result of the allocations otherwise provided for in this Section 5.01, the Adjusted Capital Account balance of any Member

shall become negative, all items of Net Loss otherwise allocable to such Member for such year, to the extent such items would have caused such negative balance, shall instead be allocated to Members having positive Adjusted Capital Account balances remaining at such time in proportion to such balances.

(iv)     Qualified Income Offset.   A Member who unexpectedly receives any adjustment, allocation or distribution described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6) which causes or increases an Adjusted Capital Account Deficit of such Member will be specially allocated items of Company income and gain in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible. No Net Loss or item of deduction or loss shall be allocated to a Member if such allocation would cause or increase an Adjusted Capital Account Deficit with respect to such Member.  Any Net Loss or item of deduction or loss that may not be allocated to a Member pursuant to the preceding sentence shall instead be allocated to the other Members to the extent that such allocation would not cause or increase an Adjusted Capital Account Deficit with respect to such other Members.

(v)     Member Nonrecourse Deductions.   Notwithstanding anything to the contrary in this Agreement, any Member Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which the Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

(vi)     Code Section 754 Adjustments.   To the extent an adjustment to the adjusted tax basis of any Company asset under Code Sections 734(a) or 743(b) is required to be taken into account in determining Capital Accounts under Treasury Regulations Section 1.704-1(b)(2)(iv)(m), the amount of the adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis), and the gain or loss will be specifically allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted under Treasury Regulations Section 1.704-1(b)(2)(iv)(m).

(c)     Curative Allocations.   The allocations set forth in Section 5.01(b) (the *"Regulatory Allocations"*) are intended to comply with certain requirements of Treasury Regulations Sections 1.704-1(b) and 1.704-2.  The Regulatory Allocations may affect results which would be inconsistent with the manner in which the Members intend to divide Company distributions. Accordingly, the Managers are authorized to divide other allocations of Net Profit and Net Loss and other items among the Members, to the extent that they exist, so that the net amount of the Regulatory Allocations and these special curative allocations to each Member is zero.  The Managers will have discretion to accomplish this result in any reasonable manner which is consistent with Code Section 704 and the related Treasury Regulations.

(d)     Section 704(c). Each Member's distributive share of income, gain, loss, deductions and credit with respect to any asset of the Company which has a Gross Asset Value which differs

16

HATLE_0003417

from its adjusted tax basis shall be allocated among the Members in a manner which takes into account such difference in accordance with Section 704(c) of the Code, and the principles thereof, in a manner determined by the Managers; provided, however, the Managers shall adopt the "remedial allocation" method as defined in Treasury Regulation Section 1-704-3(d).

**5.02** *Distributions.* The Managers from time to time shall determine the amount of cash available for distribution and make cash distributions to the Members in accordance with the provisions of this Section 5.02.

(a) Tax Distributions. Notwithstanding Section 5.02(b), at least fifteen (15) days prior to the dates that estimated income tax is due for individual or corporate taxpayers (*i.e.*, on or before April 1, June 1, September 1, and December 1 of each fiscal year) and assuming the Company has taxable income and sufficient working capital (as determined by the Managers) to make the distributions contemplated by this Agreement and subject to any limitations on such distributions contained in any credit facility or other agreement to which the Company is a party, cash distributions shall be made to each Member in the positive amount equal to the difference between X minus Y, where "X" is the sum of (I) an estimate of such Member's tax liability arising solely in respect of its ownership of a Membership Interest for such quarterly tax period (which tax liability, for the purposes of this Section 5.02(a), shall be calculated to equal the product of (1) an estimate of such Member's share of the Company's taxable income for such quarterly tax period, as reasonably estimated by the Company in good faith or reflected in such Member's K-1 from the Company for such taxable year, multiplied by (2) the combined maximum federal and applicable state and local income tax rates applicable to individual taxpayers who reside in the State of Texas for such taxable year, taking into account, if applicable, the deduction of state and local income taxes for federal income tax purposes and whether any portion of such taxable income qualifies for the reduced rates applicable to long term capital gains), plus (II) the sum of all tax liabilities of such Member (calculated as provided in (I)) for all prior quarterly tax periods since the admission of the Member to the Company; and "Y" is the sum of all distributions made by the Company to such Member pursuant to Section 5.02 as of the end of the quarterly tax period for which the calculation in "X"(I) is being made since the admission of the Member to the Company. The aggregate amount of distributions made by the Company to a Member pursuant to this Section 5.02(a) shall be deemed the *"Advance Amount"*. If, at any time that the Managers authorize a distribution to the Members pursuant to Section 5.02(b) and at such time a Member's Advance Amount is positive, (i) the Company shall be entitled to withhold such Member's distribution up to an amount equal to the Advance Amount (with such Advance Amount being reduced by the amount so withheld) and (ii) the Company shall be entitled to distribute such withheld amount to the Members (after also applying clause (i) to those Members having positive Advance Amounts) so that, to the maximum extent possible, each Member shall have received the amount of distributions that such Member would have received if distributions had been made solely in accordance with Section 5.02(b).

(b) Distributions. The Managers, in their sole discretion, may determine the extent, if any, to which the Company's cash on hand exceeds the Liquidity Threshold ("*Distributable Cash*") and make quarterly cash distributions to the holders of Common Units pro rata to the Members with respect to their Common Units in accordance with their respective Membership Percentage Interests.

17

HATLE_0003418

(c)    <u>Withholding</u>. To the extent that the Company is required by applicable law to withhold or to make tax payments (including with respect to state composite tax filings) on behalf of or with respect to any Member, the Company may withhold such amounts and make such tax payments as so required. All tax payments made on behalf of a Member shall, at the Company's option, (i) be promptly paid to the Company by the Member on whose behalf such payments were made, or (ii) be repaid by reducing the amount of current or future distributions which would otherwise have been made to such Member, or if such distributions are not sufficient for that purpose, by so reducing the proceeds of liquidation otherwise payable to such Member. Whenever the Company selects option (ii) pursuant to the preceding sentence for repayment of a tax payment by the Company, for all other purposes of this Agreement, such Member shall be treated as having received all distributions unreduced by the amount of such tax payment. Each Member shall furnish to the Company from time to time all such information as is required by applicable law or otherwise reasonably requested by the Company (including certificates in the form prescribed by the Code and applicable regulations or applicable state, local or foreign law, and, if necessary, any such additional documentation certifying that a Member has complied with its reporting obligations under Chapter 4 of Subtitle A of the Code to permit the Company to ascertain whether and in what amount withholding is required of such Member. Notwithstanding the foregoing, (i) the Company shall have no liability to any Member for failure to request or obtain such information from a Member or for withholding or failing to withhold in respect of any Member who has not furnished such information to the Company and (ii) no Member shall be required to disclose its tax returns or any other information that such Member has determined in its sole discretion is confidential. The Company shall notify each Member of any taxes paid or withheld by the Company from amounts otherwise distributable to such Member as soon as reasonably practicable after such taxes are paid or withheld.

## ARTICLE VI.
## MANAGEMENT

### 6.01   *Management by Managers*.

(a)    Except for situations in which the approval of the Members is required by this Agreement or by nonwaivable provisions of applicable law (including the TBOC), (i) the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Managers, which shall be referred to herein as the *"Board of Managers," "Board,"* or the *"Managers"*; and (ii) the Managers may make all decisions and take all actions for the Company not otherwise provided for in this Agreement.

(b)    Notwithstanding anything to the contrary contained herein, the Company shall not do, perform or authorize any of the following actions without having received the unanimous approval of the Managers:

    (i)    Any Disposition of (whether by merger, sale of equity, recapitalization or otherwise) or sale of any material asset of the Company in whole or in part; or

    (ii)    Undertake any capital project not approved or specified in the most recent Approved Budget and Business Plan of the Company, other than such capital projects which in the aggregate costs do not exceed more than ten percent (10%) of the current

18

HATLE_0003419

Approved Budget and Business Plan for the Fiscal Year corresponding to such Approved Budget and Business Plan.

**6.02** *Actions by Managers; Delegation of Authority and Duties.*

(a)     In managing the business and affairs of the Company and exercising its powers, the Managers shall act (i) collectively through meetings and written consents pursuant to Sections 6.07 or 6.09 or (ii) through officers to whom authority and duties have been delegated pursuant to Section 6.12(a) (but subject to Section 6.14).

(b)     Any Person dealing with the Company, other than a Member, may rely on the authority of any Manager or officer in taking any action in the name of the Company without inquiry into the provisions of this Agreement or compliance herewith, regardless of whether that action actually is taken in accordance with the provisions of this Agreement.

(c)     There shall be no committees of the Managers.

**6.03** *Number and Term of Office.* Subject to Section 6.04, the number of Managers of the Company shall be five, subject to change from time to time by action of the Members. Each Manager shall hold office for the term for which he or she is elected and thereafter until his or her successor shall have been elected and qualified, or until his or her earlier death, resignation or removal. Unless otherwise provided in the organizational documents of the Company, Managers need not be Members or residents of the State of Texas.

**6.04** *Election of Managers.* The Members shall elect Managers as follows:

(a)     The Majority Member shall be entitled to appoint, remove or replace three (3) Managers (the *"Majority Managers"*) at each meeting or pursuant to each consent of the Members for the election of Managers.

(b)     The Minority Member shall be entitled to appoint, remove or replace two (2) Managers (the *"Minority Managers"*) at each meeting or pursuant to each consent of the Members for the election of Managers.

(c)     On the Effective Date, the initial Majority Managers and Minority Managers shall be those persons identified on Exhibit C to this Agreement.

**6.05** *Vacancies.* Subject to Section 6.04, any vacancy occurring for any reason in the number of Managers shall be filled by the same Member or Members that appointed the Manager who created the vacancy. A Manager elected to fill a vacancy shall be elected for the unexpired term of the predecessor in office.

**6.06** *Removal; Resignation.* Subject to Section 6.04, any Manager who was appointed by a specified Member or Members may be removed during his or her term of office, either with or without cause, by, and only by, the approval of the Member or Members that initially appointed such Manager. Any vote to remove a Manager may be given at a special meeting of the Members or by an action by written consent for that purpose. A Manager may resign at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or, if no time

19

HATLE_0003420

is specified, at the time of its receipt by the remaining Managers. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

### 6.07   *Meetings.*

(a)     Except as otherwise required by Section 6.07(f), law or provided in the Certificate or as otherwise set forth in this Agreement, a majority of the total number of Managers fixed by, or in the manner provided in, the Certificate or this Agreement, shall constitute a quorum for the transaction of business of the Managers, and the act of a majority of the Managers present at a meeting at which a quorum is present shall be the act of the Managers; provided, however, that with respect to both quorum and the act of a majority, at least one Manager constituting such quorum or act of the Managers shall at all times include a Minority Manager. ***For the avoidance of doubt, one of the three Managers constituting a quorum or taking any action at a meeting or by consent shall be a Minority Manager.*** A Manager who is present at a meeting of the Managers at which action on any Company matter is taken shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the Person acting as secretary of the meeting before the adjournment thereof or shall deliver such dissent to the Company immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Manager who voted in favor of such action. All meetings of the Board of Managers shall be presided over by the chairman of the meeting, who shall be a Person designated by a majority of the Managers present at the meeting. The chairman of any meeting of the Managers shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as determined by him to be in order.

(b)     Meetings of the Managers may be held at such place or places as shall be determined from time to time by resolution of the Managers. At all meetings of the Managers, business shall be transacted in such order as shall from time to time be determined by resolution of the Managers. Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened. A Manager may waive any notice requirement hereunder in writing delivered to the Company at any time.

(c)     In connection with any annual meeting of Members at which Managers were elected, the Managers may, if a quorum is present, hold its first meeting for the transaction of business immediately after and at the same place as such annual meeting of the Members. Notice of such meeting at such time and place shall not be required.

(d)     Regular meetings of the Managers shall be held at such times and places as shall be designated from time to time by resolution of the Managers. Regular meetings shall occur no less frequently than once per calendar quarter.

(e)     Special meetings of the Managers may be called by any Manager on at least 48 hours notice to each other Manager. Such notice shall state the purpose or purposes of, and the business to be transacted at, such meeting, and no other business may be conducted at such meeting without the approval of all the Managers attending such meeting. Each Member shall have the right to invite one or more Persons employed by such Member or its Affiliates to attend

20

any meeting of the Managers as an observer; provided that, prior to the attendance by such observer, the observer shall agree with the Company to be bound by confidentiality restrictions no less restrictive than those contained in Section 3.06.

(f)     A Member, a Manager or any Affiliate of either may lend money to, act as surety for or transact other business with the Company and (subject to applicable law) shall have the same rights and obligations with respect to any such transaction as a person who is not a Member or Manager, except that this Section 6.07(f) shall not be construed to relieve a Manager from any of his responsibilities under law or this Agreement. Notwithstanding anything herein to the contrary, any such transaction between the Company and a Member, Manager or Affiliate thereof (an "*Interested Matter*") shall be on an arms' length basis; provided, however, that (i) no Interested Manager shall be permitted to vote on any Interested Matter, (ii) a majority of the Non-Interested Managers shall constitute a quorum with respect to any Interested Matter, and (iii) the Board of Managers shall act by the affirmative vote of a majority of the Non-Interested Managers with respect to any Interested Matter.

**6.08     *Fiduciary Duties.*** In addition to any duties imposed by law, each Manager shall act in the best interests of all Members.

**6.09     *Action by Written Consent or Telephone Conference.***

(a)     Any action required or permitted to be taken at any annual or special meeting of Managers or any committee may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the requisite number of Managers that would be necessary to authorize or take such action at a meeting of the Board of Managers.

(b)     The Managers may participate in and hold a meeting by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the basis that the meeting is not lawfully called or convened.

**6.10     *Compensation.*** The Managers may receive compensation for their services as may be designated from time to time by the unanimous approval of the Managers. The Managers shall be entitled to be reimbursed for reasonable out-of-pocket costs and expenses incurred in the course of their service hereunder.

**6.11     *Conflicts of Interests; Competitive Opportunities.*** Subject to the other express provisions of this Agreement (including without limitation, those set forth in Section 3.06), no Manager or Member may, nor may any Affiliate of any Manager or Member, (i) engage in or possess any interest in other investments, business ventures or Persons of any nature or description, independently or with others, similar or dissimilar to, or that competes with, the investments or Business of the Company, or (ii) provide advice and other assistance to any such investment, business venture or Person. Any Manager or Member may engage in any business opportunity that is not prohibited by this Section 6.11, and no Manager or Member shall be

21

HATLE_0003422

obligated to present any such business opportunity to the Company; provided that such opportunity is not of a character that, if presented to the Company, could be pursued by the Company in furtherance of the Business, or would be deemed to be competitive with the Business, and no Manager or Member shall have the right to pursue for its own account (individually or as a partner or a fiduciary) or to recommend to any other Person any such investment opportunity.

### 6.12    *Officers.*

(a)    The Managers may, from time to time, designate one or more Persons to be officers of the Company.  No officer need be a resident of the State of Texas, a Member, or a Manager. Subject to Section 6.13, any officers so designated shall have such authority and perform such duties as the Managers may, from time to time, delegate to them.  The Managers may assign titles to particular officers.  Unless the Managers decide otherwise, if the title is one commonly used for officers of a business corporation formed under the TBOC, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made to such officer by the Managers pursuant to the third sentence of this Section 6.12(a).  Each officer shall hold office until his successor shall be duly designated and shall qualify or until his death or until he shall resign or shall have been removed in the manner hereinafter provided.  Any number of offices may be held by the same Person.  The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Managers.

(b)    Any officer may resign as such at any time.  Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Managers.  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.  Any officer may be removed as such, either with or without cause, by the Managers whenever in their judgment the best interests of the Company will be served thereby; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the Person so removed.  Designation of an officer shall not of itself create contract rights.  Any vacancy occurring in any office of the Company (other than Manager) may be filled by the Managers.

### 6.13    *Annual Budget and Business Plan.*

(a)    Initial Budget.  As of the Effective Date, the Managers have agreed upon an initial budget for the Company covering the operations of the Company from the Effective Date through December 31, 2012, which is the end of the applicable Fiscal Year (the "*Initial Period*").

(b)    Subsequent Approved Budgets and Business Plans.  For each Fiscal Year ending after the end of the Initial Period, the authorized officers of the Company, as applicable, shall prepare a proposed budget and business plan (the "*Proposed Budget and Business Plan*") at least forty-five (45) days prior to the beginning of the applicable Fiscal Year, which shall address, for the Proposed Budget and Business Plan period, projected revenues, operating expenses, EBITDA, business development plans and such other business activities as shall be necessary and appropriate with respect to the Company and the Business.

(c)    Annual Budgets.  Each Proposed Budget and Business Plan shall include a fixed

22

**HATLE_0003423**

budget (the *"Annual Budget"*) in accordance with the Company's proposed business activities fore each such Fiscal Year, subject to the Proposed Budget and Business Plan becoming an Approved Budget and Business Plan in accordance with Section 6.13(e).

(d)     Participation in the Development of the Proposed Budget and Business Plan. In preparing the Proposed Budget and Business Plan, the authorized officers of the Company, as applicable may be advised by the Board of Managers.

(e)     Submission of Proposed Budget and Business Plan for Approval by Board of Managers. The authorized officers of the Company, as applicable, shall submit the Proposed Budget and Business Plan to the Board of Managers. The Board of Managers shall review the Proposed Budget and Business Plan, including the Annual Budget included in such Proposed Budget and Business Plan.

(i)     If the Proposed Budget and Business Plan receives the approval of the Board of Managers, such Proposed Budget and Business Plan shall become an Approved Budget Business Plan for such Fiscal Year; provided, however, that such newly Approved Budget and Business Plan may be amended from time to time in accordance with Section 6.13(f).

(ii)     If the Board of Managers fails to approve the Proposed Budget and Business Plan within fifteen (15) days of the submission of such Proposed Budget and Business Plan to the Board of Managers, then each Member may, within ten (10) days after the earlier of the end of such fifteen (15)-day period or the date on which the Board of Managers rejects the Proposed Budget and Business Plan, submit its own proposed business plan (a *"Member Budget and Business Plan"*) to the Board of Managers for approval. If, within twenty (20) days after the submission of a Member Budget and Business Plan, the Board of Managers approves any Member Budget and Business Plan or any other Proposed Budget and Business Plan, such Member Budget and Business Plan or other Proposed Budget and Business Plan shall become an Approved Budget and Business Plan. If the Board of Managers fails to approve any Member Budget and Business Plan or other Proposed Budget and Business Plan within such twenty (20)-day period, then Approved Budget and Business Plan for the year immediately ended shall serve as the Approved Budget and Business Plan for such new Fiscal Year; provided, however, that such most recently adopted Approved Budget and Business Plan may be amended from time to time in accordance with Section 6.13(f).

(f)     Modification of Approved Budget and Business Plan.

(i)     Each Member and the authorized officers, as applicable, shall have the right from time to time to request that the Board of Managers review the Company's operating results and business prospects, the progress to date of the Company's capital projects, any changes in the requirements for such projects, and the then current market conditions for the Business, to consider whether the then current Approved Budget and Business Plan should be amended.

(ii)     In the event that any material milestone set forth in, or any other material

23

HATLE_0003424

provision of, the Approved Budget and Business Plan is not achieved or is achieved earlier than contemplated under the Approved Budget and Business Plan, or the occurrence of any event having a material effect on the assets, business, operations, earnings, prospects, properties or condition (financial or otherwise) of the Company, each Member and the authorized officers, as applicable, shall have the right to require that the then current Approved Budget and Business Plan be reviewed by the Board of Managers to consider whether the then current Approved Budget and Business Plan should be amended.

      (iii)     Upon such request or requirement pursuant to <u>Sections 6.13(f)(i) or (ii)</u>, the Board of Managers shall, at the next scheduled meeting of the Board of Managers, or at a special meeting called for such purpose, review the then current Approved Budget and Business Plan and determine whether such amendment is necessary or appropriate. If the Board of Managers approves such amendment to the Approved Budget and Business Plan, such amendment shall become an approved amendment to the Approved Budget and Business Plan, and the authorized officers, as applicable, shall implement the amended Approved Budget and Business Plan as promptly as commercially practicable; provided, however, that any failure of the Board of Managers to approve any amendment to the Approved Budget and Business Plan shall, subject to this <u>Section 6.13(i),</u> shall result in the continuation of such Approved Budget and Business Plan without the proposed amendment.

      (g)    <u>Expenditures</u>. All operating expenditures and all capital expenditures of the Company shall be made in accordance with the Annual Budget as set forth in the applicable Approved Budget and Business Plan (each as may be modified or updated in accordance with this Section 6.13) for the Fiscal Year in which such expenditures are made.

      **6.14**    ***Exclusive Manager Rights.***  Notwithstanding anything to the contrary contained herein, no officer of the Company shall have the authority to do any of the following without the prior consent of a majority of the Managers:

      (a)    create, authorize or issue, or grant any options, warrants, or other rights to purchase or obtain, any securities of the Company;

      (b)    create any holding companies or any Subsidiaries;

      (c)    voluntarily initiate any liquidation, dissolution or winding up of the Company or any of its Subsidiaries, or permit the commencement of a proceeding for bankruptcy, insolvency, receivership or similar action against the Company or any of its Subsidiaries;

      (d)    change the Business or enter into any new line of business;

      (e)    sell, dispose of (whether by merger, sale of stock, recapitalization or otherwise) any Subsidiary or sell any material asset of the Company or any of its Subsidiaries in whole or in part;

      (f)    incur any indebtedness in excess of one hundred thousand dollars ($100,000) in aggregate;

24

HATLE_0003425

(g)　　pay any dividends on, or make any distributions with respect to, the securities of the Company;

(h)　　acquire any assets (other than in the ordinary course of business) or make any investments in, or acquire the securities of, any Person;

(i)　　hire or terminate any officer of the Company;

(j)　　enter into any employment, service or consultancy agreement or any other material contacts;

(k)　　change the auditors of the Company;

(l)　　modify the Approved Budget and Business Plan of the Company;

(m)　　undertake any capital project not approved or specified in the then current Approved Budget and Business Plan, other than such capital projects which in the aggregate do not exceed fifty thousand dollars ($50,000.00) for the Fiscal Year; or

(n)　　enter into any agreement to do any of the foregoing.

**6.15**　　*Preferred Payments to Majority Member.*　At least monthly, the Company shall make cash payments (each, a *"Preferred Payment"*) to the Majority Member in an amount equal to 10% of the gross revenue of the Company collected from customers during the previous month just ended, until a cumulative amount equal to $1,500,000.00 has been returned to the Majority Member in full under this <u>Section 6.15</u> (exclusive of any other payments made to the Majority Member under <u>Article V</u> hereof).　For U.S. federal income tax purposes and state and local tax purposes, where applicable, each Preferred Payment shall be characterized as follows:

(a)　　<u>Consideration on Disguised Sale.</u>　Twenty percent (20%) of each Preferred Payment, or $300,000.00 of the $1,500,000.00 to be paid to the Majority Member under this <u>Section 6.15</u> (the *"Disguised Sale Proceeds"*), shall be treated as an amount paid to the Majority Member in consideration for its contribution of certain property (the *"Contributed Assets"*) to the Company as further described in the Contribution Agreement.　The Members acknowledge and agree that the Company's receipt of the Contributed Assets followed by the Company's payment of the Disguised Sale Proceeds shall be treated by the Company as a disguised sale under Section 707(a)(2)(B) of the Code and reported consistently therewith.

(b)　　<u>Guaranteed Payment.</u>　Eighty percent (80%) of each Preferred Payment, or $1,200,000.00 of the $1,500,000.00 to be paid to the Majority Member under this <u>Section 6.15</u> (the *"Guaranteed Payment"*), shall be treated as an amount paid to the Majority Member in consideration for its performance of services to the Company.　The Members acknowledge and agree that the Guaranteed Payments shall be treated by the Company as payments made to a partner for services under Section 707(c) of the Code and reported consistently therewith.

**ARTICLE VII.**
**MEETINGS OF THE MEMBERS; VOTING OF UNITS**

25

HATLE_0003426

**7.01** *Meetings.*

(a)     All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or without the State of Texas as shall be specified or fixed in the notices or waivers of notice thereof; provided that any Member may participate in any such meeting by means of conference telephone or similar communications equipment.

(b)     An annual meeting of the Members, for the election of the Managers and for the transaction of such other business as may properly come before the meeting, shall be held on such date and at such time as the Managers shall fix and set forth in the notice of the meeting, which date shall be within 13 months subsequent to the last annual meeting of the Members.

(c)     Special meetings of the Members for any proper purpose or purposes may be called at any time by any Manager, or a Required Interest of the Members on at least 48 hours notice to each Member. Such notice shall state the purpose or purposes of, and the business to be transacted at, such meeting, and no other business may be conducted at such meeting without the approval of all Members attending such meeting.

(d)     Each Member shall have the right to invite one or more Persons employed by such Member or its Affiliates to attend any meeting of the Managers as an observer; provided that, prior to the attendance by such observer, the observer shall agree with the Company to be bound by confidentiality restrictions no less restrictive than those contained in <u>Section 3.06</u>.

**7.02** *Proxies.* A Member may vote either in person or by proxy executed in writing by such Member.

**7.03** *Action by Written Consent or Telephone Conference.*

(a)     Any action required or permitted to be taken at any annual or special meeting of the Members may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing, setting forth the action so taken, is signed by all of the Members.

(b)     The Members may participate in and hold a meeting by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

**7.04** *Voting of Common Units.* At each meeting of the Members or otherwise in connection with any matter submitted to the Members for a vote, each outstanding Common Unit, standing in the Member's name on the transfer books and records of the Company, shall be entitled to one vote on each such matter submitted to vote.

**7.05** *Record Date and Closing of Transfer Books.* The Managers shall fix in advance a date as the record date for any determination of Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, or entitled to receive a distribution by the Company or, in order to make a determination of Members for any other proper purpose, such date

26

**HATLE_0003427**

in any case to be not more than sixty (60) days and, in case of a meeting of Members, not less than ten (10) days prior to the date on which the particular action requiring such determination of Members is to be taken. If no record date is fixed for the determination of Members entitled to notice of or to vote at a meeting of Members, or Members entitled to receive a distribution by the Company, the date on which the notice of the meeting is mailed or the date on which the resolution of the Managers declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided herein, such determination shall apply to any adjournment thereof.

Unless a record date shall have previously been fixed or determined pursuant to this Section 7.05, whenever action by Members is proposed to be taken by consent in writing without a meeting of Members, the Managers may fix a record date for the purpose of determining Members entitled to consent to that action, which record date shall not precede, and shall not be more than ten (10) days after, the date upon which the resolution fixing the record date is adopted by the Managers. If no record date has been fixed by the Managers and the prior action of the Managers is not required by the TBOC, the record date for determining Members entitled to consent to action in writing without meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office, its principal place of business, or an officer or agent of the Company having custody of the books in which proceedings of meetings of Members are recorded. Delivery shall be by hand or by certified or registered mail, return receipt requested. If no record date shall have been fixed by the Managers and prior action of the Managers is required by the TBOC, the record date for determining Members entitled to consent to action in writing without a meeting shall be at the close of business on the date on which the Managers adopt a resolution taking such prior action.

**ARTICLE VIII.**
**INDEMNIFICATION**

**8.01** *Right to Indemnification.* Subject to the limitations and conditions as provided in this Article VIII, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative (hereinafter a *"Proceeding"*), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she, or a Person of whom he or she is the legal representative, is or was a Manager or Member of the Company or while a Manager of the Company is or was serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be indemnified by the Company to the fullest extent permitted by the TBOC, as the same exist or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorneys' fees) actually incurred by such Person in connection with such Proceeding, and indemnification under this Article VIII shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity

27

**HATLE_0003428**

hereunder. The rights granted pursuant to this Article VIII shall be deemed contract rights, and no amendment, modification or repeal of this Article VIII shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any such amendment, modification or repeal. IT IS EXPRESSLY ACKNOWLEDGED THAT THE INDEMNIFICATION PROVIDED IN THIS ARTICLE VIII COULD INVOLVE INDEMNIFICATION FOR NEGLIGENCE OR UNDER THEORIES OF STRICT LIABILITY.

**8.02** *Advance Payment.* The right to indemnification conferred in this Article VIII shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a Person of the type entitled to be indemnified under Section 8.01 who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such Person in advance of the final disposition of a Proceeding, shall be made only upon delivery to the Company of a written affirmation by such Person of his or her good faith belief that he has met the standard of conduct necessary for indemnification under this Article VIII and a written undertaking, by or on behalf of such Person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified Person is not entitled to be indemnified under this Article VIII or otherwise.

**8.03** *Indemnification of Officers, Employees, and Agents.* The Company, by adoption of a resolution of the Managers, may indemnify and advance expenses to an officer, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to current or former Managers and Members under this Article VIII; and, the Company may indemnify and advance expenses to Persons who are not or were not Managers, officers, employees or agents of the Company but who are or were serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against him and incurred by him in such a capacity or arising out of his status as such a Person to the same extent that it may indemnify and advance expenses to Managers under this Article VIII.

**8.04** *Appearance as a Witness.* Notwithstanding any other provision of this Article VIII, the Company may pay or reimburse expenses incurred by a Manager in connection with his appearance as a witness or other participation in a Proceeding at a time when he is not a named defendant or respondent in the Proceeding.

**8.05** *Nonexclusivity of Rights.* The right to indemnification and the advancement and payment of expenses conferred in this Article VIII shall not be exclusive of any other right which a Manager, Member or other Person indemnified pursuant to Section 8.03 may have or hereafter acquire under any law (common or statutory), provision of the Certificate or this Agreement, agreement, vote of Members or disinterested Managers or otherwise.

**8.06** *Insurance.* The Company shall purchase and maintain insurance, at its expense, to protect itself and any Person who is or was serving as a Manager, Member, officer, employee or agent of the Company or is or was serving at the request of the Company as a Manager, director,

28

HATLE_0003429

officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under this Article VIII.

**8.07** *Member Notification.* Any indemnification of or advance of expenses to a Manager or Member in accordance with this Article VIII shall be promptly reported in writing to the Members.

**8.08** *Indemnification for Breach by Member.* To the fullest extent permitted by law, each Member shall indemnify the Company, each Manager and each other Member and hold them harmless from and against all losses, costs, liabilities, damages, and expenses (including, without limitation, costs of suit and attorney's fees) they incur on account of any breach by that Member of this Agreement.

**8.09** *Savings Clause.* If this Article VIII or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Manager or any other Person indemnified pursuant to this Article VIII as to costs, charges and expenses (including attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative to the full extent permitted by any applicable portion of this Article VIII that shall not have been invalidated and to the fullest extent permitted by applicable law.

## ARTICLE IX.
## TAXES

**9.01** *Tax Returns.* The Managers shall cause to be prepared and timely filed all necessary federal and state income tax returns and any other tax returns required to be filed for the Company, including making the elections described in Section 9.02. Each Member shall furnish to the Managers, upon a Manager's written request, all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed. Within 75 days of the close of each of the Company's tax years, the Company shall issue to each Member a draft Schedule K-1 (and any comparable state or local tax form) reasonably estimating such Member's allocation of income or loss for the previous tax year based on all information available at such time. The Company shall issue to the Members a correct and complete Schedule K-1 (and any comparable state or local tax form) within 30 days of the required filing deadline for the Company's income tax returns (including any valid extensions for filing).

**9.02** *Tax Elections.* The Company shall make any election the Managers may deem appropriate and in the best interests of the Members, provided that to the extent such election could adversely affect the Minority Member disproportionately to the effect on the Members, the Manager must receive the Minority Member's consent, which consent shall not be unreasonably withheld or delayed.

**9.03** *"Tax Matters Partner."* Tagos is designated as the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Code and shall serve in that capacity until it is

519446 000001 Active 5142887.8

HATLE_0003430

removed and replaced by a Required Interest of Members. The tax matters partner shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6223 of the Code. The tax matters partner shall inform each other Member of all significant matters that may come to its attention in its capacity as "tax matters partner" by giving notice thereof on or before the fifth day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity. The tax matters partner may not take any action contemplated by Sections 6222 through 6232 of the Code without the consent of a Required Interest of Members and the Minority Member, but this sentence does not authorize the tax matters partner to take any action left to the determination of an individual Member under Sections 6222 through 6232 of the Code.

**9.04** *Tax Classification.* The Members and the Managers intend that the Company shall be treated as a "partnership" for U.S. federal, state and local income tax purposes and shall not take any action to cause the Company to be treated as a corporation for such purposes without the unanimous consent of the Members.

## ARTICLE X.
## BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS

**10.01** *Maintenance of Books.* The Company shall keep books and records of accounts and shall keep minutes of the proceedings of its Members and its Managers. The books of account for the Company shall be maintained on a GAAP basis in accordance with the terms of this Agreement, except that the capital accounts of the Members shall be maintained in accordance with Section 4.06. The calendar year shall be the accounting year of the Company.

**10.02** *Reports.* The Company, at its sole cost, shall deliver to each Member:

(a)     as soon as practicable, but in any event within one hundred twenty (120) calendar days after the end of each Fiscal Year, consolidated balance sheets of the Company and its Subsidiaries, if any, as of the end of such Fiscal Year, and consolidated statements of income and consolidated statements of cash flows of the Company and its Subsidiaries, if any, for such Fiscal Year, prepared in accordance with GAAP;

(b)     within thirty (30) calendar days of the end of each month, consolidated balance sheets of the Company and its Subsidiaries, if any, as of the end of such month, and consolidated statements of income and consolidated statements of cash flows of the Company and its Subsidiaries, if any, for such month prepared in accordance with GAAP, all in reasonable detail; and

(c)     such other operational reports and other information as reasonably requested by the Members.

**10.03** *Accounts.* The Managers shall establish and maintain one or more separate bank and investment accounts and arrangements for Company funds in the Company name with financial institutions and firms that the Managers determine. The Managers may not commingle the Company's funds with the funds of any Member or Manager.

## ARTICLE XI.

30

HATLE_0003431

## TRANSFERS OF MEMBERSHIP INTERESTS

**11.01** *Restrictions on Transfer.* No Member shall have the right, and each Member hereby waives such Member's right under the TBOC and at law, to sell, exchange, convey, transfer, assign, partition (with a spouse or otherwise), give, pledge or hypothecate (hereinafter "*Assign*", if used in the context of a verb, and "*Assignment*" if used in the context of a noun) all or any portion of such Member's Membership Interest except in compliance with the terms of this Agreement. No Member shall have the right to effect an Assignment of all or any part of such Member's Membership Interest to any Person until (i) the provisions of this Section 11.01, Section 11.02 and Section 11.04 have been complied with and (ii) the unanimous written consent of the Managers shall have been obtained, which shall not be unreasonably withheld. In the event of any Assignment of a Membership Interest or any rights hereunder (whether permitted or not permitted), such Membership Interest shall be and remain subject to all terms and provisions of this Agreement. No Assignment of any Member's Membership Interest, although otherwise valid, shall be recognized by the Company until and unless the provisions of this Article XI have been satisfied and there shall have been delivered to the Managers a dated and written notification of such Assignment (i) executed by both the Member effecting such Assignment and the Person to whom such Membership Interest is Assigned, (ii) if such Person is to become a substituted member pursuant to the provisions of Section 11.03, containing the acceptance by such Person of all of the terms and provisions of this Agreement and (iii) containing a representation that such Assignment was made in accordance with all applicable laws and governmental regulations and all requirements of this Agreement; further, the Company shall not recognize for any purpose any purported Assignment of such Membership Interest unless and until all reasonable costs or expenses reasonably incurred by the Company in connection with the Assignment of such Member's Membership Interest have been paid in full by the transferor and/or transferee, including, but not limited to, (i) the costs of preparing an acceptance of this Agreement and (ii) the costs and fees incurred in connection with obtaining any legal opinion required pursuant to Section 11.04. If the transferor is deceased or incompetent, certified copies of any Court order or documents may be submitted in lieu of the transferee's agreement to be bound by the terms of this Agreement. The transferee of such Membership Interest shall be deemed to have assumed all the rights and obligations hereunder relating to such Membership Interest or rights so Assigned. Notwithstanding any other provision of this Agreement, no Assignment of a Membership Interest or any rights hereunder shall release the disposing Member from such Member's liabilities to the other Members, the Company or the Company's business, which such liabilities shall survive such Assignment and shall not be discharged by assumption of such liabilities by any other Person. Each transferee of a Membership Interest shall execute, acknowledge, and deliver whatever instruments or documents may be necessary to effect such Assignment on the records of the Membership.

**11.02** *Permitted Transfers by Members.* Subject to the provisions of Sections 11.01, 11.03, and 11.04, a Member shall have the right to Assign his or her Membership Interest to such Member's Permitted Transferee and each such Permitted Transferee to whom such Member's Membership Interest is Assigned shall be deemed to be an assignee of such Member and each of the Members shall be deemed to have consented to such Assignment.

**11.03** *Substitute Members.* A Permitted Transferee or other permitted assignee or transferee of a Membership Interest in accordance with this Agreement (hereinafter designated

31

HATLE_0003432

"*Assignee*") shall be entitled to receive the share of the Company capital and distributions to which such Assignee's immediate predecessor would have been entitled. The Managers shall, subject to Section 3.02, admit an Assignee of a Membership Interest as a substituted Member if the Assignee and the assignor of the Membership Interest have fully complied with the provisions of this Agreement. Upon becoming a substituted Member, such Assignee shall have all of the rights and powers of, shall be subject to all of the restrictions applicable to, shall assume all of the obligations of, and shall attain the status of, such Assignee's predecessor and shall in all respects be a Member under and pursuant to this Agreement. For the purpose of defining and ascertaining the rights and powers accruing to, the restrictions and obligations imposed upon, and the status of a substituted Member as a result of his, her or its substitution hereunder, the use of the term "*Member*" in this Agreement shall be deemed to include a substituted Member. An Assignee who receives a Membership Interest, but who is not admitted as a substituted Member, shall not be entitled to vote and the Membership Interest of such Assignee shall not be counted for voting or quorum purposes. In addition, an Assignee (or successive Assignee) shall not be entitled to Assign such Assignee's (or such successive Assignee's) Membership Interest, or any right or any part thereof, without fulfilling the conditions Sections 11.01, 11.02 and 11.04 to the same extent and in the same manner as any Member who desires to effect an Assignment of a Membership Interest.

**11.04** *Required Consent.* No Membership Interest, including the right to profits and/or distributions, may be Assigned, except upon the death of the transferring Person, in any case in which legal counsel for the Company provides a "should" level tax opinion that such Assignment or any actions in connection therewith cause the Company to be treated as a "publicly traded partnership" for federal income tax purposes. Any Person who Assigns all or any portion of such Person's Membership Interest shall promptly notify the Members of such Assignment and shall furnish the Managers with the name and address of the transferee and such other information as might be required under Code Section 6050K and the Treasury Regulations promulgated thereunder. Further, no Assignment of a Membership Interest, including the rights to profits and/or distributions, may be made if, in the written opinion of legal counsel to the Company, such Assignment would require registration of such Membership Interest with the Securities and Exchange Commission or a state securities agency and such registration has not been made, provided further, that under no circumstances shall the Company be required to obtain such registration.

**11.05** *Right of First Refusal of Members.* Except with respect to a transfer pursuant to Section 11.02, each time any Member (for purposes of this Section 11.05, the "*Selling Member*") proposes to transfer any or all of the Units standing in such Selling Member's name or owned by such Selling Member (the "*Offered Units*"), such Selling Member shall offer to the other Member (for purposes of this Section 11.05, the "*Non-Selling Member*") the right to purchase all or a part of the Offered Units (the "*Right of First Refusal*") in accordance with the following provisions.

(a)     The Selling Member shall deliver a written notice (a "*Sale Notice*") to the Company and to the Non-Selling Member setting forth an irrevocable written offer to sell all of the Offered Units which the Selling Member desires to transfer and stating (i) such Selling Member's bona fide intention to transfer the Offered Units, (ii) the name and the address of the proposed transferee, (iii) the number of Units to be transferred, and (iv) the purchase price per Unit and terms of payment for which the Selling Member proposes to transfer the Offered Units. Additionally, the Selling Member shall provide to the Non-Selling Member, to the extent

32

**HATLE_0003433**

applicable, any contract(s) or agreement(s) pertaining to the sale of the Offered Units executed by and between the Selling Member and the proposed transferee..

(b) The Non-Selling Member shall have the right to purchase the Offered Units and shall have twenty (20) days after receipt of the Sale Notice to agree to purchase all the Offered Units at the price and upon the terms specified in the Sale Notice. The Non-Selling Member shall give written notice (a *"Purchase Notice"*) to the Selling Member and the Company stating therein its intention to purchase the Offered Units to be purchased or, in lieu thereof, its intention not to purchase the Offered Units. The Non-Selling Member shall close its purchase within sixty (60) days of the delivery of the Sale Notice (the *"Expiration Date"*). If the Sale Notice provides for the payment of non-cash consideration, the Non-Selling Member, at its option, may pay the consideration in cash equal to its good faith estimate, as approved by the Board of Managers, of the present fair market value of the non-cash consideration offered.

(c) If the Non-Selling Member does not elect to purchase the Offered Units designated in the Sale Notice, then the Selling Member may transfer the Offered Units not purchased by the Non-Selling Member to the proposed transferee, provided such transfer (i) is completed within sixty (60) days after the Expiration Date and (ii) is made at the price and terms designated in the Sale Notice; provided, however, notwithstanding anything in this Section 11.05 to the contrary, upon such a transfer to the proposed transferee, the provisions of Section 11.03 shall control the rights of such proposed transferee. If the Offered Units are not so transferred within such sixty-day time period, the Sale Notice given to the Company and the Non-Selling Member shall be deemed to have expired and a new notice shall be required prior to any other or subsequent transfer of the Offered Units.

**11.06 *Tag-Along Right.*** Except with respect to a transfer pursuant to Section 11.02, if any Member (for purposes of this Section 11.06, such selling member is referred to as the *"Selling Member"*) proposes to transfer any or all of the Units standing in such Selling Member's name or owned by such Selling Member (the *"Offered Units"*), and the Non-Selling Member has not exercised its Right of First Refusal as to all of such Offered Units in accordance with Section 11.05, the Non-Selling Member (for purposes of this Section 11.06, such Non-Selling member is referred to as the *"Tagging Member"*) shall have the option to require the Selling Member to purchase, or cause the purchase of, such number of Units owned by such Tagging Member equal to the number of Units to be transferred multiplied by a fraction, (a) the numerator of which will be the number of Units held by such Tagging Member, and (b) the denominator of which will be the total number of Units held by all Members, on the terms and conditions set forth in the purchaser's offer to purchase the Offered Units. The option described herein shall be exercised by the giving of written notice (a *"Tag-Along Notice"*) of the exercise of such option to the Selling Member not more than twenty (20) days after the date of receipt by such Tagging Member of the Sale Notice sent to such Tagging Member pursuant to Section 11.05(a). The Selling Member shall, on the consummation date of the transfer and conditioned upon and contemporaneously with the transfer, purchase, or cause the purchase by the purchasers of, the Units owned by the Tagging Member upon terms and conditions the same as those of the transfer. If the Tagging Member exercises the option under this Section 11.06, and if the Selling Member has elected to purchase (rather than cause the purchase of) the Units owned by the Tagging Member, then the Selling Member must resell to the purchasers the Units so purchased contemporaneously with the transfer and upon the same terms and conditions as those of the transfer. If the Selling Member shall fail to so purchase,

33

HATLE_0003434

or cause the purchase of, the Units of the Tagging Member as provided in this Section 11.06, then the Selling Member may not consummate the transfer.

## ARTICLE XII.
## DISSOLUTION, LIQUIDATION, AND TERMINATION

**12.01** *Dissolution.* The Company shall dissolve and its affairs shall be wound up on the first to occur of the following:

(a) the prior written consent of a majority of the Managers; or

(b) entry of a decree of judicial dissolution of the Company under Section 11.314 of the TBOC.

**12.02** *Liquidation and Termination.* On dissolution of the Company, the Managers shall act as liquidator. The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the TBOC. The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidator shall continue to operate the Company properties. The steps to be accomplished by the liquidator are as follows:

(a) as promptly as possible after dissolution and again after final liquidation, the liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's consolidated assets, liabilities, and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable;

(b) the liquidator shall cause the notice described in Section 11.052(a)(2) of the TBOC to be mailed to each known creditor of and claimant against the Company in the manner described in such Section 11.052(a)(2);

(c) the liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company and its Subsidiaries (including, without limitation, all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(d) all remaining assets of the Company and its Subsidiaries shall be distributed to the Members as follows:

(i) the liquidator may sell any or all property, including to Members, and any resulting gain or loss from each sale shall be computed and allocated to the capital accounts of the Members as provided in Section 5.01;

(ii) with respect to all property that has not been sold, the fair market value of that property shall be determined and the capital accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the capital accounts previously would be allocated among the Members pursuant to Section 5.01 if there were a taxable

34

HATLE_0003435

disposition of that property for the fair market value of that property on the date of distribution; and

(iii)    all remaining assets of the Company shall be distributed among the Members in accordance with Section 5.02(b) without regard to the Liquidity Threshold described therein and taking into account any adjustments required under the Advance Amount calculation described in Section 5.02(a); provided, that if such distributions do not correspond to the positive capital account balances of the Members immediately prior to such distributions, then income, gain, loss, and deduction for the Fiscal Year in which the liquidation occurs shall be reallocated among the Members to cause, to the extent possible, the Members' positive capital account balances immediately prior to such distribution to correspond to the amounts to be distributed under this subsection (d)(iii).

(e)    All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this Section 12.02. The distribution of cash and/or property to a Member in accordance with the provisions of this Section 12.02 constitutes a complete return to the Member of its Capital Contributions and a complete distribution to the Member of its Membership Interests and all the Company's property and constitutes a compromise to which all Members have consented within the meaning of Section 101.154 of the TBOC. To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

(f)    If, upon winding-up of the Company, any Member has a positive Advance Amount, such Member shall make a Capital Contribution to the Company in an amount equal to the Advance Amount. Any Capital Contribution made by a Member pursuant to this Section 12.02(f) shall be distributed to the other Members in such a manner so that each Member has received the amount of distributions that such Member would have received if distributions had been made solely in accordance with Section 5.02(b).

(g)    If a Sale of the Company is structured as a sale of Units (whether a direct sale, a merger, an exchange of interests, recapitalization or other similar transaction), the amount of the aggregate purchase price to be allocated among the Members shall be determined in a manner consistent with (1) the amounts that would have been distributed to the Members if the Company had been liquidated in accordance with this Section 12.02 and (2) if the total liquidating distributions with respect to all Units had equaled the aggregate purchase price being paid for all the Units, and each Member shall cause such purchase price to be allocated among the Members in accordance with this Section 12.02(g).

**12.03    *Deficit Capital Accounts.*** Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the capital account of a Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement to all Members in proportion to their respective ownership of Units, upon dissolution of the Company such deficit shall not be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of

35

HATLE_0003436

such Member's capital account to zero.

**12.04** *Certificate of Termination.* On completion of the distribution of Company assets as provided herein, the Company is terminated, and the Managers (or such other Person or Persons as the TBOC may require or permit) shall file a Certificate of Termination with the Secretary of State of Texas, cancel any other filings made pursuant to Section 2.05, and take such other actions as may be necessary to terminate the Company.

## ARTICLE XIII.
## GENERAL PROVISIONS

**13.01** *Offset.* Whenever the Company is to pay any sum to a Member, any amounts that such Member owes the Company may be deducted from that sum before payment.

**13.02** *Notices.* Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the Person to receive it. All notices, requests, and consents to be sent to a Member must be sent to or made at the addresses set forth on Exhibit B, or such other address as that Member may specify by notice to the Company. Any notice, request, or consent to the Company must be given to the Managers at the addresses set forth in Exhibit C. Whenever any notice is required to be given by law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

**13.03** *Entire Agreement.* This Agreement, together with the Contribution Agreement and Services Agreement and all exhibits and schedules hereto and thereto, constitutes the entire agreement of the Members and their Affiliates relating to the Company and supersedes all prior contracts or agreements with respect to the subject matter hereof, whether oral or written.

**13.04** *Effect of Waiver or Consent.* A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations hereunder is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person hereunder. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the obligations hereunder, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

**13.05** *Amendment or Modification.* This Agreement may be amended, modified, supplemented, restated or waived from time to time only by a written instrument adopted by a majority of the Managers, *provided, however*, without the unanimous written approval of all Members, no such amendment or modification shall:

(a) modify any of the provisions of this Agreement regarding allocations of profits

36

HATLE_0003437

and/or losses;

    (b)    modify any of the provisions of this Agreement regarding the distributions;

    (c)    modify any of the representations made herein by any of the Members;

    (d)    modify the restrictions on transfer of any Member's Membership Interest; or

    (e)    modify this Section 13.05.

**13.06** ***Binding Effect.*** This Agreement shall be binding on and shall inure to the benefit of the Members and their respective heirs, successors and permitted assigns; *provided, however,* that the Company may not Assign any of its rights or obligations hereunder without the consent of all the Members.

**13.07** ***Governing Law; Severability.*** THESE REGULATIONS ARE GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF TEXAS, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THESE REGULATIONS TO THE LAW OF ANOTHER JURISDICTION. In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Certificate, or (b) any mandatory provision of the TBOC or (to the extent such statutes are incorporated into the TBOC) the TBOC, the application provision of the Certificate, or the TBOC shall control. If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

**13.08** ***Further Assurances.*** In connection with this Agreement and the transactions contemplated hereby, the Company and each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effect and perform the provisions of this Agreement and those transactions.

**13.09** ***Notice to Members of Provisions of this Agreement; Legal Representation.*** By executing this Agreement, each Member acknowledges that it has actual notice of (a) all of the provisions of this Agreement, and (b) all of the provisions of the Certificate. Each Member hereby agrees that this Agreement constitute adequate notice of all such provisions, including, without limitation, any notice requirement under Section 101.352 of the TBOC and Chapter 8 of the Texas Uniform Commercial Code, and each Member hereby waives any requirement that any further notice thereunder be given. Each Member has consulted, or has had full opportunity to consult, with legal counsel of such Member's choice in connection with the organization of the Company, including without limitation the preparation, negotiation, execution and delivery of this Agreement, and no Member is relying upon legal counsel for the Company or any other Member in connection therewith.

**13.10** ***Counterparts; Signatures.*** This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument. A telegram, telex,

37

HATLE_0003438

cablegram, email or similar transmission by a Member or any other Person or a photographic, photostatic, facsimile, pdf or similar reproduction of a writing signed by a Member or other Person and delivered in accordance with the provisions of this Agreement shall be regarded as signed or executed by such Member or other Person for purposes of this Agreement.

**13.11** *Side Letter Agreements*. Each Member hereby represents, warrants and covenants that it is not a party to, and shall not enter into, any agreement with any other Member or the Company regarding the Units, the Company, or the subject matter hereof.

*(Rest of Page Intentionally Left Blank)*

519446 000001 Active 5142887.8

HATLE_0003439

IN WITNESS WHEREOF, the following Members have executed and approved this Limited Liability Company Agreement as of the date first set forth above.

**MEMBERS:**

TRIGENEX OF TEXAS, INC.

By: _____
Name: _____
Title: _____

THE TAGOS GROUP, LLC

By: _____
Name: _____
Title: _____

HATLE_0003440

## EXHIBIT A

The securities represented by this Certificate have not been registered under the Securities Act of 1933, as amended, or the securities or blue sky acts of any state (collectively, the "*Acts*"), and may not be offered or sold, and no transfer of them may be made, in the absence of an effective registration statement covering such securities under all applicable Acts, or the delivery to the issuer of an opinion of counsel satisfactory to the issuer that such registrations are not required.

ORGANIZED UNDER THE LAWS OF THE STATE OF
TEXAS

### CORRLINE INTERNATIONAL, LLC

### COMMON UNIT CERTIFICATE

No. _____      Common Units

*This Certifies That* _____ *is the registered owner of _____ Common Units of Membership Interests ("Units") of CORRLINE INTERNATIONAL, LLC, a Texas limited liability company (the "Company"). The rights, preferences and limitations of the Units, including limitations on transfer, are set forth in the Limited Liability Company Agreement of the Company, as amended and restated from time to time (the "LLC Agreement"), a copy of which is on file at the principal office of the Company in Houston, Texas. The rights, preferences and limitations of the Units are set forth in the LLC Agreement, the terms of which are incorporated herein by reference.*

*In Witness Whereof, the Company has caused this Certificate to be signed by its duly authorized officers effective as of the ____ day of _____, 201__.*

_____          _____
*Secretary*                                                       *Chief Executive Officer*

[Form of Reverse Side of Certificate]

The Company will furnish to the holder and each assignee of this Certificate and the Units evidenced hereby, without charge, on written request to the Company at the Company's principal place of business, a copy of the LLC Agreement of the Company, as amended or restated from time to time.

===========================================================================

## ASSIGNMENT OF UNITS

FOR VALUE RECEIVED, the undersigned (the "Assignor") hereby assigns, conveys, sells and transfers unto

_____

[print or type name]

_____

[taxpayer identification no.]

_____

[address]

all right and interest of the Assignor in the aforementioned Units, and irrevocably constitutes and appoints any officer of the Company as its attorney-in-fact with full power of substitution to transfer the same on the books of the Company.

Date: _____, 201_.

Signature:_____

## EXHIBIT B

### Invested Capital; Common Units

|  | Initial Capital Contribution | Common Units Issued |
|---|---|---|
| TriGenex of Texas, Inc.<br>20523 Whiteberry Court<br>Humble, Texas 77346-1338<br>Telephone: 281-733-2655<br>Fax: (866) 868-9095<br>Attention: Loren L. Hatle | Intellectual Property | 55,000 |
| with a copy to: |  |  |
| Steven P. Mock & Associates<br>8211 Long Point Road, Suite C<br>Houston, Texas 77055<br>Telephone: (713) 722-7127<br>Fax: (713) 722-7881<br>Attention: Steven P. Mock |  |  |
| The Tagos Group, LLC<br>8 E Greenway Plaza<br>Suite 1340<br>Houston, TX 77046<br>Attention: Milton L. Scott | Other Consideration | 45,000 |
| with a copy to:<br>Thompson & Knight, LLP<br>333 Clay Street, Suite 3300<br>Houston, Texas 77002<br>Telephone: (713) 653-8669<br>Fax: (832) 397-8271<br>Attention: Ricky A. Raven |  |  |
| Total |  | 100,000 |

# EXHIBIT C

## Managers

### MAJORITY MANAGERS:

Christopher R. ("Kip") Knowles
8 E Greenway Plaza
Suite 1340
Houston, TX 77046

Loren L. Hatle
8 E Greenway Plaza
Suite 1340
Houston, TX 77046

Kirk Chrisman
8 E Greenway Plaza
Suite 1340
Houston, TX 77046

### MINORITY MANAGERS:

Milton L. Scott
8 E Greenway Plaza
Suite 1340
Houston, TX 77046

Rodney G. Ellis
8 E Greenway Plaza
Suite 1340
Houston, TX 77046