**Exhibit 5**

**ENTERED**
**10/15/2014**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **CORRLINE INTERNATIONAL, LLC,** | § | **Case No. 14-32740** |
| | § | **(Chapter 7)** |
| Debtor. | § | |

### ORDER APPROVING SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES UNDER 11 U.S.C. § 363
### (Relates to Doc. No. 96 )

On September 24, 2014, the Court entered an Order Approving (I) Sale Procedure, Form of Asset Purchase Agreement and Form of Notice; and (II) Bid Protections (Doc. No. 77) ("Bid Procedures Order"). Pursuant to the Bid Procedures Order, the deadline for interested parties to submit a Qualified Bid was October 9, 2014. The Trustee received no Qualified Bids other than the Stalking Horse Bid that was approved by the Bid Procedures Order (Doc. No. 89).

The Court has considered the Trustee's Emergency Motion for Approval of Sale of Assets Free and Clear of Liens, Claims, Interests and Encumbrances Under 11 U.S.C. § 363 (the "Motion"). Based on the law and facts alleged in the Motion, the evidence and arguments of counsel presented at the sale hearing, and the entire record in this bankruptcy case, the Court finds that the relief requested in the Motion is in the best interests of the bankruptcy estate and its creditors, and therefore should be granted.

ACCORDINGLY, IT IS HEREBY FOUND AND DETERMINED:[1]

### Jurisdiction and Venue

A.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. The Motion is a core proceeding under 28 U.S.C. § 157(b). Venue is proper in the Court under 28 U.S.C. §§ 1408 and 1409.

B.      The statutory predicates for the relief sought in the Motion are 11 U.S.C. §§ 105(a) and 363. The Motion is governed procedurally by Federal Rule of Bankruptcy Procedure 6004.

---

[1] The findings of fact and the conclusions of law stated herein shall constitute the Court's findings of fact and conclusions of law under Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to this proceeding under Rule 9014. To the extent any finding of fact shall later be determined to be a conclusion of law, it shall be so deemed, and to the extent that any conclusion of law shall later be determined to be a finding of fact, it shall be so deemed.

## Notice

C.     As evidenced by the certificates of service filed with the Court, and based on the representations of the Trustee and counsel, proper and timely notice of the Bid Procedures Order, Auction, Motion and the sale hearing has been provided to all parties entitled to notice thereof, in compliance with the applicable provisions of the United States Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the local rules and orders of the Court. Such notice constitutes good and sufficient notice under the particular circumstances. No other notice need be given for the granting of the relief requested in the Motion or entry of this Order.

D.     A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities, including (a) all parties on the master service list maintained in this bankruptcy case, (b) the Office of the United States Trustee, (c) known creditors of the Debtor holding liens or security interests in the Assets, (d) all potential purchasers previously identified by the Trustee, (e) all applicable federal, state, and local regulatory or taxing authorities, recording offices, or any governmental entity that have a reasonably known interest in the relief requested in the Motion, and (f) all entities who have filed a notice of appearance and request for service of papers in this bankruptcy case.

## The Sale Transaction

E.     The Trustee, as "Seller", and The Tagos Group, LLC, as "Purchaser", entered into an Asset Purchase Agreement (the "Asset Purchase Agreement"), which contemplates the sale of substantially all of the Debtor's assets (the "Assets") to Purchaser pursuant to the terms and conditions thereof. A copy of the Asset Purchase Agreement is attached as **Exhibit 1**. The Asset Purchase Agreement requires the sale of the Assets to be free and clear of all liens, claims, interests, and other encumbrances of any kind whatsoever other than Permitted Liens (as defined in the Asset Purchase Agreement) (collectively, "Encumbrances").

F.     The Asset Purchase Agreement was (and the transaction documents and related instruments contemplated therein will be) negotiated, proposed, and entered into by and between the Trustee and Purchaser without collusion, in good faith, and from arm's length bargaining positions. Neither the Trustee nor Purchaser has engaged in any conduct that would cause or permit the application of 11 U.S.C. § 363(n) to the sale, including voiding the Asset Purchase Agreement or the transaction documents and related instruments contemplated thereunder.

G.     The Trustee is authorized to sell the Assets to Purchaser for $550,000.00 ("Purchase Price"), pursuant to the terms of the Asset Purchase Agreement. The sale shall be free and clear of all liens, claims, interests, and encumbrances pursuant to 11 U.S.C. § 363(f).

H.     The Tagos Group, LLC as Purchaser under the Asset Purchase Agreement shall be allowed to receive conveyance of the Assets to its wholly owned subsidiary, TGS Solutions, LLC, in the same manner and with the same protections as the Purchaser as described hereunder and in the Asset Purchase Agreement.

I.     Neither the Trustee nor the Purchaser has engaged in any conduct that would cause or permit the application of 11 U.S.C. § 363(n) to the sale.  The Purchaser qualifies as a good faith purchaser in accordance with 11 U.S.C. § 363(m), and, as such, is entitled to all of the protections afforded thereunder.  The Purchaser will be acting in good faith within the meaning of § 363(m) in closing the sale transaction contemplated by this Order.

J.     The terms and conditions of the Asset Purchase Agreement and the Purchase Price to be paid to the Trustee (a) are fair and reasonable; (b) constitute the highest and best offer for the Assets; (c) will provide a greater recovery for the Debtor's creditors than would be provided by any other practical available alternative; and (d) constitute reasonably equivalent value and fair consideration for the Assets.

K.     The sale of the Assets is in the best interest of the estate, its creditors, and all parties in interest.  The Trustee has demonstrated good, sound, and sufficient business purpose and justification, and it is a prudent exercise of her business judgment to sell the Assets on the terms and conditions set forth in this Order and the Asset Purchase Agreement.

L.     The Trustee is authorized to consummate the sale of the Assets free and clear of all liens, claims, interests and encumbrances as set forth herein because one or more of the standards enumerated in 11 U.S.C. § 363(f) have been satisfied.  All parties with Encumbrances in the Assets who did not object to the Motion or the Bid Procedures Order and the relief requested therein, or who withdrew their objections to the sale, are deemed to have consented pursuant to § 363(f)(2).  All parties with Encumbrances in the Assets, who did object to the Motion or the Bid Procedures and the relief requested and have not withdrawn their objections therein fall within one or more of the other subsections of § 363(f) and are adequately protected by having their Encumbrances attach to the net proceeds of the transactions with the same validity, enforceability, priority, force and effect that they now have as against the Assets, subject to the rights, claims, defenses, and objections, if any, of the Trustee and all parties-in-interest with respect to such Encumbrances.

M.     Except as specifically set forth in the Asset Purchase Agreement, the closing of the sale contemplated in this Order will not subject the Purchaser to any debts, liabilities, obligations, commitments, responsibilities, or claims of any kind or nature whatsoever, whether known or unknown, contingent or liquidated, or otherwise, existing as of the closing, of or against the Debtor, the bankruptcy estate, or any other person by reason of such transfer based on any legal or equitable theory, including liabilities based on any theory of antitrust law or *de facto* merger or successor or transferee liability.

ACCORDINGLY, THE COURT ORDERS THAT:

## General Provisions

1.     All parties in interest have had a reasonable opportunity to object to the relief requested in the Motion.  Parties that filed objections but failed to appear are deemed to have waived their objections.  To the extent that such objections have not been withdrawn, waived or settled, such objections and all reservations of right included therein are overruled on the merits.

3

The parties who did not object or who withdrew their objections are deemed to have consented to the sale transaction contemplated under this Order.

## Approval of the Sale

2.       The Asset Purchase Agreement, along with the related documents and instruments contemplated therein, and all of the terms and conditions thereof are approved in their entirety.

3.       The Trustee's sale of the Assets to TGS Solutions, LLC and The Tagos Group, LLC for the Purchase Price is approved pursuant to 11 U.S.C. §§ 105(a) and 363. Any objections to the Motion and/or the Asset Purchase Agreement, that have not been withdrawn, waived, or settled are hereby denied and overruled.

4.       The Trustee is authorized and directed under 11 U.S.C. §§ 105(a) and 363 to perform her obligations under this Order and to execute such other documents and take such other actions that are reasonably necessary to effectuate the transaction contemplated by this Order.

5.       The Asset Purchase Agreement and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties in accordance with the terms thereof without further order of the Court; provided, however, that any such modification, amendment or supplement is neither material nor changes the economic substance of the transactions contemplated under the Asset Purchase Agreement.

## Transfer of the Assets Pursuant to 11 U.S.C. § 363(f)

6.       At closing, the Assets shall be transferred to TGS Solutions, LLC, free and clear of all liens, claims, interests, and encumbrances pursuant to 11 U.S.C. § 363(f).   The Encumbrances related to the Assets shall attach to the sale proceeds with the same validity, enforceability, priority, and force and effect as they had against the Assets immediately prior to the closing. Any such party holding or asserting such an Encumbrance shall file a pleading with the Court within 30 days of the entry date of this Order specifically asserting such Encumbrance and attaching supporting documentation or such Encumbrance shall be forever waived and discharged.

7.       All parties (including all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade and other creditors) holding liens or claims against the Debtor or the Assets, whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated, arising before the closing are prohibited from asserting, prosecuting, or otherwise pursuing such claims or liens against the Purchaser or the Assets.

8.       The sale of the Assets pursuant to this Order will vest TGS Solutions, LLC with valid and indefeasible title to the Assets, and will be a legal, valid, and effective transfer of the Assets, free and clear of all liens, claims, interests, and encumbrances.

## Miscellaneous Provisions

9.      The Trustee shall pay $28,810.79 of the sale proceeds to Seatex, Ltd. This payment shall be in complete and full satisfaction of any claims Seatex, Ltd. may have against the Debtor or the estate. Further, any Corrline inventory, including CorrX Prep and CorrX Wash and any previous iteration of these products in all forms of packaging, in Seatex, Ltd.'s possession are property of the bankruptcy estate and are sold to the Purchaser free and clear as part of this approved sale.

10.      Each item of the Debtor's Intellectual Property, as defined in the APA, is being sold to TGS Solutions, LLC free and clear as part of this approved sale and TGS Solutions, LLC is immediately vested with exclusive ownership and authorization to manage, register and otherwise perfect its rights in such property, including the filing of further patent registration, without further order of this Court.

11.      This Order (a) is and shall be effective as a determination that, on the closing date, all liens, claims, interests, and encumbrances have been unconditionally released, discharged, and terminated in each case as to the Assets and (b) is and shall be binding on and shall govern acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of fees, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities, who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments that reflect the Purchaser is the owner of the Assets free and clear of liens, claims, interests, and encumbrances.

12.      Neither TGS Solutions, LLC nor The Tagos Group, LLC shall have any liability or responsibility for any liability or other obligation of the Debtor or the bankruptcy estate arising under or related to the Assets. The form of transaction approved herein and represented by the Asset Purchase Agreement is a sale of assets and not a statutory merger nor a *de facto* merger. Without limiting the generality of the foregoing, neither TGS Solutions, LLC nor The Tagos Group, LLC shall be liable for any claims against the Debtor or any of its predecessors or affiliates, and neither TGS Solutions, LLC nor The Tagos Group, LLC shall have successor, transferee, or vicarious liabilities of any kind or character, whether known or unknown, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or any obligations of the Debtor arising before the closing.

13.      Absent a stay pending appeal, no person shall take any action to prevent, enjoin or otherwise interfere with consummation of the transactions contemplated in or by this Order.

14.      Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by this Order.

15.      If any person or entity that has filed financing statements, Notices of Lien or other documents or agreements evidencing a claim, lien or interest in the Assets shall not have delivered to the Trustee before the closing (in proper form for filing and executed by the

appropriate parties) termination statements, instruments of satisfaction and/or releases of all interests that the party has concerning the Debtor or the Assets then (a) the Trustee is authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the party concerning the Assets and (b) the Purchaser is authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of such claim, lien or interest in the Assets.

16.      The terms of this Order shall be binding on and inure to the benefit of TGS Solutions, LLC, The Tagos Group, LLC, the Debtor, the Trustee, the Debtor's creditors and all other parties in interest, and any successors of such parties, including any trustee or examiner appointed in this case or any subsequent or converted case of the Debtor under chapter 7 or chapter 11 of the Bankruptcy Code.

17.      In the absence of a stay pending appeal, with respect to the transactions approved and authorized herein, TGS Solutions, LLC and The Tagos Group, LLC, as a purchaser in good faith within the meaning of 11 U.S.C. § 363(m), shall be entitled to the protections of § 363(m) in the event this Order or any authorization contained herein is reversed or modified on appeal.

18.      The Trustee shall serve a copy of this Order on all creditors and parties in interest within 5 business days of the entry date of this Order and file a certificate of service with the Court.

19.      For good cause shown, this Order shall be effective and enforceable immediately on its entry by the Court, notwithstanding Fed. R. Bankr. P. 6004(h) or other applicable law or procedural rules.

**Dated: October 14, 2014.**

**Honorable Jeff Bohm**
**Chief United States Bankruptcy Judge**

6

**Approved as to form:**

/s/ Aaron J. Power
Joshua W. Wolfshohl
State Bar No. 24038592
Aaron J. Power
Porter Hedges LLP
State Bar. No. 24058058
1000 Main Street, 36th Floor
Houston, Texas 77002
(713) 226-6000
(713) 228-1331 (fax)
**Counsel to Eva S. Engelhart, Trustee**

/s/ Peter Johnson
Peter Johnson
State Bar No. 10778400
Law Offices of Peter Johnson
Eleven Greenway Plaza, Suite 2820
Houston, Texas 77046
(713) 961-1200

**Counsel to The Tagos Group, LLC**

7

**Exhibit 1**

**Asset Purchase Agreement**

**ASSET PURCHASE AGREEMENT**

**by and among**

**THE TAGOS GROUP, LLC,**

AS PURCHASER

**and**

**EVA S. ENGELHART, CHAPTER 7 TRUSTEE
FOR THE BANKRUPTCY ESTATE OF CORRLINE INTERNATIONAL, LLC.,**

AS SELLER

NSJ000.09

**EXHIBIT 1**

## TABLE OF CONTENTS

Page

**ARTICLE I**          **DEFINITIONS** ................................................................................................ 1

**ARTICLE II**         **PURCHASE AND SALE OF ASSETS** ........................................................ 5
2.1          Purchase and Sale of Assets ........................................................................ 5
2.2          Excluded Assets ........................................................................................... 6
2.3          Assumed Liabilities ...................................................................................... 7
2.4          Excluded Liabilities ..................................................................................... 7

**ARTICLE III**        **GOOD FAITH DEPOSIT** ............................................................................ 8

**ARTICLE IV**         **PURCHASE PRICE; CLOSING** ................................................................. 8
4.1          Purchase Price .............................................................................................. 8
4.2          Payment of Purchase Price ........................................................................... 8
4.3          Closing .......................................................................................................... 9
4.4          Seller's Deliveries ........................................................................................ 9
4.5          Purchaser's Deliveries .................................................................................. 9

**ARTICLE V**          **REPRESENTATIONS AND WARRANTIES OF SELLER** ........................... 11
5.1          Organization and Authority .......................................................................... 11
5.2          Capacity; Enforceability .............................................................................. 11
5.3          Brokers' Fees ............................................................................................... 12

**ARTICLE VI**         **REPRESENTATIONS AND WARRANTIES OF PURCHASER** ................... 12
6.1          Organization ................................................................................................. 12
6.2          Due Authorization ........................................................................................ 12
6.3          No Conflict ................................................................................................... 12
6.4          Governmental Authorities; Consents ........................................................... 13
6.5          Financial Confirmation ................................................................................ 13
6.6          Brokers ......................................................................................................... 13

**ARTICLE VII**        **INTERIM COVENANTS OF SELLER** ......................................................... 13
7.1          Maintenance and Operation .......................................................................... 13

**ARTICLE VIII**       **CLOSING CONDITIONS** ............................................................................ 13
8.1          Closing Conditions ....................................................................................... 13
8.2          Conditions to the Obligation of Seller ......................................................... 13
8.3          Conditions to the Obligation of Purchaser ................................................... 14

**ARTICLE IX**         **POST-CLOSING COVENANTS** .................................................................. 15
9.1          Post-Closing Access ..................................................................................... 15
9.2          Records After the Closing ............................................................................ 15
9.3          Further Assurances ....................................................................................... 15

**ARTICLE X**          **TERMINATION** .......................................................................................... 15
10.1         Right of Termination .................................................................................... 15
10.2         Effect of Termination ................................................................................... 16

NSJ000.09

*Bid Version*

| | | |
|---|---|---|
| **ARTICLE XI** | **BANKRUPTCY** | **16** |
| 11.1 | Bankruptcy Filing | 16 |
| 11.2 | Stalking Horse Provisions | 17 |
| | | |
| **ARTICLE XII** | **MISCELLANEOUS** | **18** |
| 12.1 | Fees and Expenses | 18 |
| 12.2 | Notices, Etc. | 18 |
| 12.3 | Amendments, Waivers, Etc. | 19 |
| 12.4 | Assignment; Binding Agreement | 19 |
| 12.5 | Entire Agreement | 19 |
| 12.6 | No Third Party Beneficiaries | 19 |
| 12.7 | Governing Law; Venue | 19 |
| 12.8 | Waiver of Jury Trial | 20 |
| 12.9 | Severability | 20 |
| 12.10 | Headings | 20 |
| 12.11 | Counterparts; Facsimiles | 20 |
| 12.12 | Interpretation | 20 |

**EXHIBITS**

| | |
|---|---|
| Exhibit A | Form of Bill of Sale and Assignment and Assumption Agreement |
| Exhibit B | Form of Secretary's Certificate of Purchaser |
| Exhibit C | Status Chart on Patents-Buskop Law firm |

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "*Agreement*"), dated SEPTEMBER 9, 2014 (the "*Effective Date*"), is by and among EVA ENGELHART, CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATE OF CORRLINE INTERNATIONAL, LLC., a Texas limited liability company ("*CorrLine*") and The Tagos Group, LLC, a TEXAS LIMITED LIABILITY COMPANY ("*Purchaser*"). Purchaser and Seller may each be referred to herein as a "*Party*" or collectively as the "*Parties*".

## WITNESSETH:

WHEREAS, CorrLine was engaged in the business of research, development, manufacturing, application, installation, and maintenance of corrosion mitigation products and processes, the method for providing improved adhesion of barrier coatings to metals exposed to moisture and for decontaminating metal surfaces, including but not Limited to CorrX, or such products and processes related thereto (the "*Business*");

WHEREAS, CorrLine was subject of an involuntary petition (the "*Case*") under chapter 7 of title 11 of the United States Code (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "*Bankruptcy Court*"). The involuntary petition was granted on August 20, 2014 and EVA ENGELHART was appointed as Chapter 7 Trustee ("*Seller*");

WHEREAS, subject to the terms and conditions of this Agreement and pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and the applicable Federal Rules of Bankruptcy Procedure, Seller desires to sell and assign to Purchaser, and Purchaser desires to purchase and assume from Seller, certain assets and liabilities of such Seller as further described in this Agreement.

NOW, THEREFORE, in consideration of the recitals and the mutual representations, warranties, covenants and agreements set forth herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Purchaser and Seller hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1.    **Definitions**. Unless otherwise defined elsewhere in this Agreement, the following terms shall have the meanings specified in this Article I:

"*Affiliate*" shall mean, with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such first Person. For purposes hereof, the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"*Agreement*" has the meaning set forth in the preamble of this Agreement.

"*Assigned Permits*" has the meaning as set forth in Section 1.2

"*Assumed Liabilities*" has the meaning as set forth in Section 1.4.

"*Bankruptcy Code*" has the meaning set forth in the recitals of this Agreement.

*Bid Version*

"*Bankruptcy Court*" has the meaning set forth in the recitals of this Agreement.

"*Bidding Procedures Order*" has the meaning set forth in Section 10.2.

"*Bill of Sale*" has the meaning set forth in Section 3.4(a).

"*Break-Up Fee*" has the meaning set forth in Section 10.4.

"*Business*" has the meaning set forth in the recitals of this Agreement.

"*Business Day*" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banks located in the State of Texas are authorized or obligated by law or other governmental action to close.

"*Case*" has the meaning set forth in the recitals of this Agreement.

"*CorrLine*" has the meaning set forth in the preamble of this Agreement.

"*Closing*" means the consummation of the Transactions contemplated by this Agreement pursuant to the terms and conditions hereof.

"*Closing Date*" has the meaning set forth in Section 3.3.

"*Closing Payment*" has the meaning set forth in Section 3.2(b).

"*Consigned Property*" has the meaning set forth in Section 1.2(c).

"*Contract*" means any contract, agreement, license, sublicense, lease, sublease, subcontract, note, indenture, commitment, memorandum of understanding or purchase order, whether written or oral, and each amendment, supplement, or modification (whether written or oral) thereto in each Case as currently in effect.

"*Current Tax Year*" shall mean the tax year in which this transaction closes.

"*Deposit*" has the meaning set forth in in Section 2.1.

"*Effective Date*" has the meaning set forth in the preamble of this Agreement.

"*Excluded Assets*" has the meaning set forth in Section 1.3.

"*Excluded Liabilities*" has the meaning set forth in Section 1.5.

"*Governmental Authority*" means any government or political subdivision thereof or any authority, agency, commission, tribunal, ministry, board, bureau, court, tribunal or other body, domestic or foreign, exercising any administrative, taxing, regulatory or other governmental or quasi-governmental function.

"*Intellectual Property*" means any and all of the following in any jurisdiction: (a) trademarks and service marks, including trademarks filed by CorrLine for the following : "CorrLine", "CorrLine CorrX", "Making Corrosion History", "Corrosion is the Enemy, Not an Industry", and "Coating Edge Technology" and all filings, applications and registrations and the goodwill connected with the use of and symbolized by the foregoing; (b) copyrights, including all applications and registrations, and works of

*Bid Version*

authorship, whether or not copyrightable; (c) trade secrets and confidential know-how; (d) patents and patent applications, including but not limited to CorrX coatings and procedures as well as the patents in all stages as listed in the following summary prepared by CorrLine counsel Buskop Law Firm, the current status of such patents are further described in Exhibit C attached hereto and incorporated herein by reference:

| File No. | Serial No. | Filing Date | Mark/Title | Application Type | Reg. No. Patent No. | Reg. Date Issue Date | Status |
|---|---|---|---|---|---|---|---|
| 2004.000 | | | CONSULTATION | GENERAL FILE | | | N/A |
| 2004.001 | 61/591,028 | January 26, 2012 | TREATMENT FOR PROVIDING IMPROVED ADHESION OF BARRIER COATINGS TO METALS | PROVISIONAL PATENT APPLICATION | | | Expired – See 2004.001A |
| 2004.001A | 13/750,445 | January 25, 2013 | TREATMENT KIT FOR CLEANING SUBSTRATE SURFACES FOR REMOVAL OF WATER AND NON-WATER SOLUBLE OXIDES AND IONIC COMPOUNDS "POWDER KIT" | UTILITY PATENT APPLICATION | | | Filed Response to 1st Non Final Office Action on February 18, 2014 |
| 2004.002 | 13/359,108 | January 26, 2012 | METHOD FOR PROVIDING IMPROVED ADHESION OF BARRIER COATINGS TO METALS | UTLITY PATENT APPLICATION | | | Application Abandoned – See 2004.003 |
| 2004.003 | 14/057,817 | October 18, 2013 | METHOD FOR PASSIVATING SUBSTRATE SURFACES | UTLITY PATENT APPLICATION (CONTINUATION IN PART OF 2004.002) | | | First Action Prediction: 26 Months |
| 2004.004 | N/A | N/A | POSSIBLE LITIGATION WITH CORRBAN TECHNOLOGIES INC. REGARDING CORRX PRODUCT | LITIGATION | | | N/A |
| 2005.005 | | | TREATMENT KIT FOR CLEANING SUBSTRATE SURFACES FOR REMOVAL OF WATER AND NON-WATER SOLUBLE OXIDES AND IONIC COMPOUNDS "LIQUID KIT" | UTLITY PATENT APPLICATION (DIVISIONAL APPLICATION OF 2004.001A) | | | Received Signed Retention Letter – Waiting on Signed Documents & Approval to File from Client |

*Bid Version*

(e) email addresses, websites, URLS, and internet domain name registrations and access to CorrLine's website, Vimeo site, LinkedIn site, and any other websites representing CorrLine or sharing CorrLine content; (f) all intellectual property as defined in the Asset Contribution Agreement between TriGenex of Texas Inc and CorrLine International, LLC restated as all intellectual property rights, statutory or common Law, worldwide, including (a) trademarks, service marks, trade dress, slogans, logos and all goodwill associated therewith, and any applications or registrations for any of the foregoing; (b) copyrights and any applications or registrations for any of the foregoing; and (c) patents, all confidential know-how, trade secrets and similar proprietary rights in confidential inventions, discoveries, improvements, processes, techniques, devices, methods, patterns, formulae, specifications, and lists of suppliers, vendors, customers, and distributors; and (g) all marketing material including but not limited to letterhead, presentations, pamphlets, videos and displays related to the Business, CorrLine, or products and services of CorrLine; (h) all other intellectual property and intellectual property rights and assets, and all rights, interests and protections that are associated with, similar to, or required for the exercise of, any of the foregoing.

"*Law*" or "*Laws*" means all federal, state, local or foreign laws, legislation, statutes, constitutions, rules, regulations, codes, edicts, orders, judgments, decrees, ordinances, or legally-binding directives, guidance or pronouncements of any Governmental Authority.

"*Liens*" has the meaning set forth in Section 1.2.

"*Owned Tangible Property*" has the meaning set forth in Section 1.2(b).

"*Party*" and "*Parties*" have the meanings set forth in the preamble of this Agreement.

"*Permit*" means a license, permit, certificate, exemption, franchise, approval, consent, registration, filing, accreditation or other authorization issued, granted or otherwise made available by or under the authority of any Governmental Authority or under any Law and which is required for the operation of the Business.

"*Person*" means any individual, company, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, trust, estate, association, organization, Governmental Authority or other legal entity.

"*Prevailing Bidder*" has the meaning set forth in Section 10.3.

"*Purchase Price*" has the meaning set forth in Section 3.1.

"*Purchased Assets*" has the meaning set forth in Section 1.2.

"*Purchaser*" has the meaning set forth in the preamble of this Agreement.

"*Sale Order*" has the meaning set forth in Section 10.3.

"*Seller*" and "*Seller*" have the meanings set forth in the preamble of this Agreement.

"*Taxes*" means federal, state, local, foreign and other income, sales, use, transfer, ad valorem, franchise, withholding, payroll, property, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest or penalties thereon.

*Bid Version*

"*Transactions*" means the purchase and sale of the Purchased Assets, the assignment and assumption of the Assumed Liabilities, the execution and delivery of this Agreement and the other Transaction Documents, the related events and transactions contemplated hereby and thereby and the performance by the Parties of their respective covenants and obligations hereunder and thereunder.

"*Transaction Documents*" means this Agreement, the agreements and documents listed in Sections 3.4 and 3.5 of this Agreement and any other agreement, instrument, notice or other document contemplated by this Agreement.

"*Transfer*" has the meaning set forth in Section 1.2.

## PURCHASE AND SALE OF ASSETS

1.2.   **Purchase and Sale of Assets.** At the Closing, Seller will sell, assign, transfer, convey and deliver ("*Transfer*") to Purchaser, free and clear of all liens, claims, options, warrants, charges, security interests, pledges, mortgages or other encumbrances whatsoever ("*Liens*"), and Purchaser will purchase and accept from Seller, on the terms and subject to the conditions hereinafter set forth, all of the rights, title and interests of Seller in and to all assets own by the Seller that are not Excluded Assets (hereinafter defined) under this Agreement, including but not limited to the following assets (collectively, the "*Purchased Assets*"):

(a)   the *Intellectual Property* owned by CorrLine, whether or not issued, abandoned or pending, (the "*Purchased Intellectual Property*");

(b)   all furniture, equipment, including all I CorrLine's testing equipment, spray and mixing equipment, and personal protective equipment, furnishings, supplies, fixtures, materials, inventory, tools, computer hardware, computer equipment, and other tangible personal property owned by Seller which is used in the Business, including as set forth in (collectively, the "*Owned Tangible Property*");

(c)   all goods, parts, supplies, devices, instruments, tools, apparatus, merchandise or similar articles, including component parts and accessories, maintained, held or stored by Seller on consignment or similar arrangement, which relate to the Business (collectively, the "*Consigned Property*");

(d)   All CorrLine inventory, CorrX Prep and CorrX Wash, and any previous iterations of this product in all forms of packaging. This includes all inventory held at Seatex Ltd, 445 Texas 36, Rosenburg, TX 77471, CorrLine Office, 2245 Texas Drive, Suite 300, Sugar Land, TX 77479, or held by any member, manager, officer, or employee of CorrLine.

(e)   all Contracts of Seller used in the Business, including, but not limited to the Seller's rights under non-competition agreements with former officers, employees and their agents;

(f)   all of Sellers rights to access marketing materials including, but not limited to, printed materials, website, linkedin and vimeo;

(g)   all customer lists and potential customer target list;

(h)   all telephone numbers and facsimile numbers;

*Bid Version*

(i)     the corporate seals, organizational documents, articles of incorporation, certificates of formation, bylaws, company agreements, minute books, stock books, Tax records and returns, books of account or other records having to do with the corporate organization of Seller;

(j)     all assumed names and trade names of Seller;

(k)     any membership interests, partnership interests, capital stock or other form of ownership interest in any direct or indirect subsidiary of any of the Seller or any right to acquire such ownership interests;

(l)     all deposits, credits, advances, prepayments and rebates that relate to the Purchased Assets or to other Excluded Assets;

(m)     all rights, demands, claims, causes of action, rights of recovery, credits, allowances, rebates, recoupment or rights of setoff or subrogation or defenses of Seller against any Person;

(n)     all of Seller' additional property, assets, capital stock, rights, claims, causes of action, Contracts, records, goodwill and other intangibles relating to the Business other than the Purchased Assets;

(o)     all assets, properties and rights of Seller and Seller' Affiliates used in or relating to their respective businesses other than the Business;

(p)     all books, records and other documents, or copies thereof, whether in hard copy, electronic or other format, that (i) relate to employees or employee-related or employee benefit-related files or records and any other books and records which Seller are prohibited from disclosing or transferring to Purchaser under applicable Law and are required by applicable Law to retain in their possession, (ii) cannot be transferred under Laws relating to privacy or health, (iii) Seller are not permitted to transfer pursuant to confidentiality agreements with others, or (iv) relate to assets, liabilities or obligations retained by Seller, including the Excluded Assets, Excluded Liabilities and any accounts receivable of Seller; and

(q)     all of Seller' rights under the Transaction Documents and the other agreements, certificates and instruments to be executed in connection with, or pursuant to, this Agreement.

(r)     to the extent available, all books and records relating exclusively to the Purchased Assets, including equipment maintenance and warranty information;

(s)     to the extent legally assignable, the rights of Seller to manufacturers' warranties and indemnities to the extent relating to the Purchased Assets, other than warranties and indemnities relating to any Excluded Assets; and

(t)     to the extent legally assignable and subject to subsequent acceptance by Purchaser in its sole discretion and applicable requirements of transfer, all Permits of Seller used in the Business related to the Purchased Assets (collectively the "Assigned Permits").

1.3.     **Excluded Assets.** Other than the Purchased Assets described in Section 1.2, Purchaser expressly understands and agrees that it is not purchasing or acquiring, and Seller are not selling or assigning, any other assets, properties, rights or interests of Seller of any nature, and all such other assets,

*Bid Version*

properties, rights and interests are expressly excluded from the Purchased Assets (collectively, the "*Excluded Assets*") and nothing herein shall be deemed to Transfer any of the Excluded Assets to Purchaser. Purchaser expressly acknowledges that certain Excluded Assets may be physically located at and within the Facility as of Closing, and Purchaser acknowledges that any such Excluded Assets remain assets of Seller and no right, title or interest therein shall pass to Purchaser by reason of any Transaction Document or otherwise. The Excluded Assets include, but are not limited to, the following assets, properties, rights and interests of Seller:

(a)  all cash and cash equivalents, bank accounts, investments, investment accounts, securities and certificates of deposit;

(b)  all accounts receivable, notes receivable, negotiable instruments, chattel paper and other receivables together with any fees or charges accrued thereon;

(c)  all motor vehicles, aircraft, boats and yachts;

(d)  all leased or licensed equipment, machinery and other tangible, including copiers, printers, telephone systems, paper shredding bins, water systems, water coolers, ice machines and gas tanks;

(e)  all Permits issued to Seller and used in the Business that are not Assigned Permits;

(f)  all insurance policies and all rights to applicable claims and proceeds thereunder, including claims arising under chapter 5 of title 11 of the Bankruptcy Code;

1.4.  **Assumed Liabilities.** Subject to the terms and conditions set forth herein, Purchaser shall assume and agree to pay, perform and discharge when due all liabilities and obligations arising out of or relating to the Purchased Assets on or after the Closing (collectively, the "*Assumed Liabilities*"), including the following:

(a)  all liabilities and obligations for Taxes relating to the Purchased Assets and the Assumed Liabilities for any taxable period ending after the Closing Date; and

(b)  all other liabilities and obligations arising out of or relating to Purchaser's ownership and operation of the Purchased Assets on or after the Closing.

1.5.  **Excluded Liabilities.** Purchaser shall not assume and shall not be responsible to pay, perform or discharge any of the following liabilities or obligations of Seller (collectively, the "*Excluded Liabilities*"):

(a)  any liabilities or obligations arising out of or relating to Seller' ownership and operation of the Purchased Assets prior to the Closing;

(b)  any liabilities or obligations relating to or arising out of the Excluded Assets; and

(c)  any liabilities or obligations for (i) Taxes relating to the Purchased Assets and the Assumed Liabilities for any taxable period ending on or prior to the Closing Date and (ii) any other Taxes of Seller for any taxable period.

*Bid Version*

## ARTICLE II
## DEPOSIT

2.1.    On the Effective Date, Purchaser shall deposit with EVA ENGELHART, Trustee, a good faith deposit in the amount of FIFTY-FIVE THOUSAND Dollars ($55,000.00) (the "*Deposit*") which shall be held in trust by EVA ENGELHART, Trustee. If the Transactions are consummated by Purchaser in accordance with the terms of this Agreement and the other Transaction Documents, the Deposit will be applied against the Purchase Price in the manner provided in Section 3.2(b).

(a)    If this Agreement is terminated pursuant to Section 9.1(a), Section 9.1(b), Section 9.1(d), Section 9.1(e), Section 9.1(f) or Section 9.1(g), the Deposit shall be refunded to Purchaser.

(b)    If this Agreement is terminated pursuant to Section 9.1(c), the Deposit shall be paid to Seller.

(c)    If this Agreement is not terminated pursuant to Section 9.1(a), Section 9.1(d), Section 9.1(e), Section 9.1(f) or Section 9.1(g) and Seller have otherwise fulfilled the covenants and obligations of Seller to be performed under this Agreement, and the Transactions are not consummated as a result of the wrongful failure by Purchaser to consummate the Closing, the Deposit shall be paid to Seller as a non-completion fee.

(d)    If this Agreement is not terminated pursuant to Section 9.1(a), Section 9.1(d), Section 9.1(e), Section 9.1(f) or Section 9.1(g) and Purchaser has otherwise fulfilled all of the covenants and obligations of Purchaser to be performed under this Agreement and the other Transaction Documents and the Transactions are not consummated solely as a result of the wrongful failure of Seller to consummate the Closing, the Deposit shall be refunded to Purchaser as Purchaser's sole and exclusive remedy therefor.

Except for a refund of the Deposit to Purchaser as expressly provided in this Section 2.1, in no event shall Seller be liable for damages of any kind for failure to consummate the Transactions.

## ARTICLE III
## PURCHASE PRICE; CLOSING

3.1.    **Purchase Price.**  In consideration for the Transfer by Seller to Purchaser of the Purchased Assets, Purchaser shall pay and deliver, or cause to be paid and delivered on Purchaser's behalf, to Seller an aggregate price determined as a result of duly concluded bankruptcy auction of FIVE HUNDRED FIFTY THOUSAND DOLLARS ($550,000) (the "*Purchase Price*"), plus the assumption of the Assumed Liabilities. The Purchase Price shall be paid as provided in Section 3.2 and allocated to the Purchased Assets pursuant to an order of the Bankruptcy Court regarding the same.

3.2.    **Payment of Purchase Price.**  Purchaser shall pay and deliver to Seller the following:

(a)    the Deposit shall be paid to Seller in accordance with Section 2.1; and

(b)    the Purchase Price less the amount of the Deposit (such net amount, the "*Closing Payment*"), shall be paid by Purchaser to EVA ENGELHART, Trustee, at the Closing by wire transfer of immediately available funds, which Closing Payment shall be held pending further order of the Bankruptcy Court regarding the allocation of the Purchase Price.

*Bid Version*

3.3. **Closing.** Unless this Agreement is otherwise terminated as provided herein, the Closing will take place on the third (3rd) Business Day after the Sale Order entered by the Bankruptcy Court approving the sale of the Purchased Assets to Purchaser becomes final and non-appealable, or on such other date or at such other time and place as may be mutually agreed by Seller and Purchaser (the "*Closing Date*"), which Closing shall occur at the offices of Porter Hedges, LLP, 1000 Main Street, 36th Floor, Houston, Texas 77002, or, if mutually agreed by the Parties, remotely by the exchange of counterpart signature pages by facsimile or other electronic means (including portable document format). All proceedings to be taken and all documents to be executed and delivered by the Parties at the Closing shall be deemed to have been taken, executed and delivered simultaneously and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered. The Closing shall be effective as of 12:01 a.m. (Central time) on the Closing Date.

3.4. **Seller' Deliveries.** At the Closing, Seller shall deliver or cause to be delivered to Purchaser each of the following items, all in form and substance reasonably satisfactory to Purchaser:

(a) a Bill of Sale and Assignment and Assumption Agreement substantially in the form attached hereto as Exhibit A (the "*Bill of Sale*"), duly executed by the requisite Seller and dated the Closing Date;

(b) such other instruments of sale, assignment, assumption and Transfer as Purchaser and Seller may reasonably deem necessary or desirable to evidence and effect the Transfer of the Purchased Assets to, and assumption of the Assumed Liabilities by, Purchaser, duly executed by the requisite Seller and dated the Closing Date; and,

(c) such other documents, certificates and instruments reasonably necessary or appropriate to fully consummate the Transactions, duly executed by the requisite Seller and dated the Closing Date.

3.5. **Purchaser's Deliveries.** At the Closing, Purchaser shall deliver or cause to be delivered to Seller each of the following items, all in form and substance reasonably satisfactory to Seller:

(a) the Closing Payment, by wire transfer of immediately available funds to the bank account(s) designated by EVA ENGELHART, Trustee, therefor;

(b) the Bill of Sale, duly executed by Purchaser and dated the Closing Date;

(c) such other instruments of sale, assignment, assumption and Transfer as Purchaser and Seller may reasonably deem necessary or desirable to evidence and effect the Transfer of the Purchased Assets to, and assumption of the Assumed Liabilities by, Purchaser, duly executed by Purchaser and dated the Closing Date;

(d) a certificate of Purchaser, substantially in the form of Exhibit B, duly executed by the Secretary or Assistant Secretary thereof and dated the Closing Date, certifying (i) the resolutions of Purchaser authorizing the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the Transactions by Purchaser, (ii) the certificate of formation or similar organizational document of Purchaser, (iii) the bylaws or similar company agreement of Purchaser, in each Case as being correct and complete and then in full force and effect, and (iv) the incumbency of the officers of Purchaser executing the Transaction Documents;

*Bid Version*

       (e)    such other documents, certificates and instruments reasonably necessary or appropriate to fully consummate the Transactions, duly executed by Purchaser and dated the Closing Date.

      3.6.   **Condition of Assets.** **AS A MATERIAL PART OF THE CONSIDERTAION FOR SELLER ENTERING INTO THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS PURCHASER EXPRESSLY ACKNOWLEDGES, REPRESENTS, WARRANTS AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER EXPRESSLY SET FORTH IN ARTICLE IV AND TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ALL OF THE PURCHASED ASSETS AND ASSUMED LIABILITIES ARE CONVEYED TO PURCHASER, AND PURCHASER IS ACCEPTING THE SAME, AS OF THE CLOSING DATE ON AN "AS IS, WHERE IS" BASIS "WITH ALL FAULTS" AND WITHOUT ANY OTHER REPRESENTATION OR WARRANTY, AND NEITHER SELLER NOR ANY AFFILIATE OR REPRESENTATIVE OF SELLER HAVE MADE, AND SELLER AND SELLER' AFFILIATES AND REPRESENTATIVES DO NOT MAKE, AND EXPRESSLY DISCLAIM AND SPECIFICALLY NEGATE, ANY AND ALL OTHER REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS, CONDITIONS AND GUARANTEES OF ANY KIND OR CHARACTER WHATSOEVER WITH RESPECT TO THE PURCHASED ASSETS, BUSINESS AND ASSUMED LIABILITIES, WHETHER STATUTORY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, INCLUDING ALL REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS, CONDITIONS AND GUARANTEES WITH RESPECT TO: (A) THE USE, VALUE, INCOME POTENTIAL, EXPENSES, MAINTENANCE, OPERATION, TRANSFERRABILITY, DESCRIPTION, LOCATION, CHARACTERISTICS OR CONDITION OF THE PURCHASED ASSETS OR ANY PORTION THEREOF, INCLUDING AS TO QUALITY, SUITABILITY, TENANTABILITY, HABITABILITY, MERCHANTABILITY, DESIGN OR FITNESS FOR ANY SPECIFIC PURPOSE OR A PARTICULAR PURPOSE, GOOD AND WORKMANLIKE CONSTRUCTION, ACCURACY, QUIET ENJOYMENT, TITLE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS AND WARRANTIES ARISING FROM A COURSE OF DEALING, USAGE OR TRADE PRACTICE; (B) THE NATURE, QUALITY OR CONDITION OF THE PURCHASED ASSETS, INCLUDING THE SURFACE OR SUBSURFACE THEREOF, THE WATER, SOIL AND GEOLOGY, INCLUDING THE EXISTENCE OF ANY ENVIRONMENTAL HAZARDS OR TOXIC SUBSTANCES OR CONDITIONS, WHETHER OR NOT OBVIOUS, VISIBLE OR APPARENT; (C) THE SUITABILITY OF THE PURCHASED ASSETS FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER MAY CONDUCT THEREON; (D) THE COMPLIANCE OF OR BY THE PURCHASED ASSETS OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, INCLUDING THE ENVIRONMENTAL CONDITION OF THE OWNED REAL PROPERTY AND THE PRESENCE OF, ABSENCE OF OR CONTAMINATION BY HAZARDOUS MATERIALS, OR THE COMPLIANCE OF THE OWNED REAL PROPERTY WITH ALL REGULATIONS OR LAWS PERTAINING TO HEALTH, SAFETY OR THE ENVIRONMENT, INCLUDING THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT, THE RESOURCE CONSERVATION AND RECOVERY ACT, THE CLEAN WATER ACT, THE TEXAS HEALTH AND SAFETY CODE AND THE TEXAS WATER CODE, EACH AS MAY BE AMENDED FROM TIME TO TIME, AND INCLUDING ANY AND ALL REGULATIONS, RULES OR POLICIES PROMULGATED THEREUNDER; (E) THE PRESENCE OF ANY ENDANGERED OR THREATENED SPECIES ON THE OWNED REAL PROPERTY, AS WELL AS THE SUITABILITY OF THE OWNED REAL PROPERTY AS HABITAT FOR ANY OF THOSE SPECIES; (F) THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY**

*Bid Version*

ASSUMED LIABILITIES; (G) THE TRUTH ACCURACY OR COMPLETENESS OF ANY
MATERIALS, FINANCIAL INFORMATION OR OPERATING DATA OR OTHER
INFORMATION DELIVERED OR MADE AVAILABLE TO PURCHASER IN CONNECTION
WITH THE TRANSACTIONS (INCLUDING DILIGENCE MATERIALS PROVIDED TO
PURCHASER); OR (H) OTHERWISE WITH RESPECT TO THE PURCHASED ASSETS,
BUSINESS OR ASSUMED LIABILITIES. WITHOUT LIMITING THE FOREGOING, SELLER
DO NOT WARRANT OR REPRESENT THAT ANY LICENSED MATERIALS OR SERVICES
WILL MEET PURCHASER'S DATA PROCESSING OR OTHER REQUIREMENTS, ACHIEVE
ANY INTENDED RESULTS, BE COMPATIBLE OR WORK WITH ANY OTHER SOFTWARE,
APPLICATIONS, SYSTEMS OR SERVICES, OR THAT THE USE THEREOF WILL BE
UNINTERRUPTED OR ERROR-FREE OR MEET ANY PERFORMANCE OR RELIABILITY
STANDARDS. PURCHASER FURTHER EXPRESSLY ACKNOWLEDGES, REPRESENTS,
WARRANTS AND AGREES THAT, HAVING BEEN GIVEN THE OPPORTUNITY TO
INSPECT, INVESTIGATE AND EXAMINE THE PURCHASED ASSETS, BUSINESS AND
ASSUMED LIABILITITES, PURCHASER IS PURCHASING THE PURCHASED ASSETS AND
ASSUMING THE ASSUMED LIABILITITES SOLELY PURSUANT TO ITS OWN
INDEPENDENT INVESTIGATION, EXAMINATION, STUDY, INSPECTION AND
KNOWLEDGE THEREOF, AND PURCHASER IS RELYING SOLELY ON INSPECTIONS OF
THE PURCHASED ASSETS AND DETERMINATIONS OF THE VALUE OF THE
PURCHASED ASSETS AND USES TO WHICH THE PURCHASED ASSETS MAY BE PUT AS
MADE BY PURCHASER AND PURCHASER'S OWN AGENTS, EMPLOYEES, ATTORNEYS,
CONSULTANTS, CONTRACTORS AND OTHER PROFESSIONAL ADVISORS OR
REPRESENTATIVES, AND PURCHASER IS NOT RELYING UPON ANY
REPRESENTATIONS OR STATEMENTS OF ANY KIND (WHETHER ORAL, WRITTEN,
EXPRESS, IMPLIED OR OTHERWISE) WHICH MAY HAVE BEEN MADE OR MAY BE
MADE (OR PURPORTEDLY MADE) OR ANY INFORMATION WHICH MAY HAVE BEEN
PROVIDED OR MAY BE PROVIDED (OR PURPORTEDLY PROVIDED) BY OR ON BEHALF
OF SELLER OR ANY OF SELLER' AFFILIATES, AGENTS, EMPLOYEES, ATTORNEYS,
CONSULTANTS, CONTRACTORS OR OTHER PROFESSIONAL ADVISORS OR
REPRESENTATIVES. The acknowledgements and agreements of Purchaser set forth in this Section
shall be set forth in the Bill of Sale and shall survive the Closing and shall not be merged therein.

## ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby make the following representations and warranties to Purchaser:

4.1.     **Authority.**  Subject to ARTICLE X and any orders of the Bankruptcy Court, all
corporate or equivalent action on the part of Seller necessary for the authorization, execution and delivery
of this Agreement and the other Transaction Documents, and the performance of all obligations of Seller
hereunder and thereunder, has been taken.

4.2.     **Capacity; Enforceability.**  Subject to ARTICLE X and any orders of the Bankruptcy
Court,

(a)     Seller have full power and authority to execute and deliver this Agreement and
the other Transaction Documents and to consummate the Transactions contemplated hereby and
thereby; and

(b)     this Agreement and the other Transaction Documents have been duly and validly
executed and delivered by the requisite Seller and (assuming the due authorization, execution,

*Bid Version*

and delivery by the other Parties hereto) constitute a valid and legally binding obligation of Seller, enforceable against Seller in accordance with their terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws of general application affecting enforcement of creditors' rights generally and (ii) as limited by Laws relating to the availability of specific performance, injunctive relief or other equitable remedies and except that the provisions of this Agreement and the other Transaction Documents will only be enforceable to the extent approved by the Bankruptcy Court.

4.3.     **Delivery of Purchased Assets.** Seller shall provide in the Sale Order a provision that orders any prior officer, director or employee of Corrline to deliver any of the Purchased Assets in their possession or control to Purchaser. Such Sale Order shall also provide that Purchaser is a "good faith" purchaser and entitled to the protection of 11 U.S.C.§363(m).

4.4.     **Broker's Fees** Seller does not have any liability to pay any fee, commission, bonus or other compensation to any broker, finder or investment banker retained by or on behalf of Seller in connection with the Transactions for which Purchaser could become liable.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby makes the following representations and warranties to Seller:

5.1.     **Organization.** Purchaser is a LIMITED LIABILITY COMPANY duly organized, validly existing and in good standing under the Laws of State of Texas and has all requisite power and authority to own, operate and lease the properties and assets now owned, operated and leased by it and to carry on its business as currently conducted.

5.2.     **Authorization.** Purchaser has all requisite power and authority to execute and deliver this Agreement and the other Transaction Documents and to perform its obligations hereunder and thereunder. The execution and delivery by Purchaser of this Agreement and the other Transaction Documents and the performance of its obligations hereunder and thereunder have been duly and validly authorized by Purchaser, and no other action on the part of Purchaser is necessary. This Agreement and each Transaction Document has been duly and validly executed and delivered by Purchaser and is, or will be upon execution thereby, a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except as the enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium and other Laws of general application affecting enforcement of creditors' rights generally and (ii) Laws relating to the availability of specific performance, injunctive relief or other equitable remedies and except that the provisions of this Agreement and the other Transaction Documents will only be enforceable to the extent approved by the Bankruptcy Court.

5.3.     **No Conflict.** The execution and delivery of this Agreement and the other Transaction Documents by Purchaser and the consummation by it of the Transactions contemplated hereby and thereby does not and will not violate any provision of, or result in the breach of, any applicable Law, the certificate of incorporation, bylaws, or equivalent organizational documents of Purchaser, or any agreement, indenture or other instrument to which Purchaser is a party or by which Purchaser may be bound, or of any order, writ, injunction, judgment or decree applicable to Purchaser, or violate, terminate or result in the termination of any such agreement, indenture or instrument, or result in the creation of any Lien upon any of the properties or assets of Purchaser or constitute an event which, after notice or lapse of time or both, would result in any such violation, breach, acceleration, termination or creation of a Lien or result in a violation or revocation of any required Permit from any Governmental Authority or other

*Bid Version*

Person, except to the extent that the occurrence of any of the foregoing would not have a material adverse effect on the ability of Purchaser to enter into and perform its obligations under this Agreement and the other Transaction Documents.

5.4. **Governmental Authorities; Consents.** Other than Bankruptcy Court approval, no material consent, approval or authorization of, or designation, declaration or filing with, any Governmental Authority or other third party is required on the part of Purchaser with respect to Purchaser's execution or delivery of this Agreement or the other Transaction Documents or the consummation of the Transactions.

5.5. **Financial Confirmation.** Purchaser has the financial wherewithal and presently available funds to make payment of the Purchase Price and fully perform its obligations under this Agreement and the other Transaction Documents, and the Closing is not conditioned or contingent on Purchaser obtaining third-party financing, and in performance of all such obligations, Purchaser will comply with any applicable Law.

5.6. **Broker's Fees.** Purchaser does not have any liability to pay any fee, commission, bonus or other compensation to any broker, finder or investment banker retained by or on behalf of Purchaser in connection with the Transactions for which any Seller could become liable.

5.7. **Good Faith.** Purchaser is a "good faith" purchaser as such term is used in the Bankruptcy Code and court decisions thereunder. Purchaser is entitled to protections of section 363(m) of the Bankruptcy Code with respect to the Purchased Assets. Purchaser has negotiated and entered into this Agreement in good faith.

5.8. **"As Is, Where Is".** Except as specifically set forth in ARTICLE IV, Seller make no representations or warranties with respect to the Purchased Assets and Assumed Liabilities, and Purchaser acknowledges that it has conducted such investigations and made such inquiries as it has deemed necessary or desirable to satisfy itself as to the condition, operations, and prospects of the Purchased Assets and Assumed Liabilities.

## ARTICLE VI
## INTERIM COVENANTS

Until the Closing Date or the sooner termination of this Agreement:

6.1. **Maintenance and Operation.** Subject to ARTICLE X and any orders of the Bankruptcy Court, Seller shall use commercially reasonable efforts to maintain the Purchased Assets in a manner consistent with the practices employed during the pendency of the Cases or any other bankruptcy proceedings of Seller.

## ARTICLE VII
## CLOSING CONDITIONS

7.1. **Closing Conditions.** Subject to ARTICLE X and Seller' right to consummate a Transfer of the Purchased Assets to a third party buyer other than Purchaser, Purchaser and Seller each covenant and agree to use commercially reasonable efforts to obtain the satisfaction of the conditions to Closing set forth in this ARTICLE VIII.

7.2. **Conditions to the Obligation of Seller.** The obligation of Seller to consummate the Transactions and to take any other action required to be taken by Seller, or any of them, at the Closing or

thereafter is subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived in writing by Seller in whole or in part:

(a) All representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects (except that any such representation or warranty that is qualified by a reference to materiality shall be, to the extent so qualified, true and correct in all respects) as of the Closing Date as if made on the Closing Date (unless such representation or warranty is expressly made as of an earlier date, in which Case as of such date). Purchaser shall have performed and complied in all material respects with all the covenants, conditions and agreements contained in this Agreement required to be performed and complied with by it at or prior to the Closing.

(b) All documents and other items described in Section 3.5 required to have been delivered by Purchaser to Seller under this Agreement at or prior to the Closing shall have been delivered, to the reasonable satisfaction of Seller.

(c) No court of competent jurisdiction or any other Governmental Authority shall have issued an order, decree or ruling or taken any action restraining, enjoining or otherwise prohibiting or making illegal the Transactions, or seeking to obtain damages or impose penalties in respect thereof.

(d) The Bankruptcy Court shall have entered the Sale Order approving the sale of the Purchased Assets to Purchaser which order shall not have been rendered ineffective by any court of competent jurisdiction and such Sale Order has become final and not subject to appeal.

7.3. **Conditions to the Obligation of Purchaser.** The obligation of Purchaser to consummate the Transactions and to take any other action required to be taken by Purchaser at the Closing or thereafter is subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived in writing by Purchaser in whole or in part:

(a) All representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects (except that any such representation or warranty that is qualified by a reference to materiality shall be, to the extent so qualified, true and correct in all respects) as of the Closing Date as if made on the Closing Date (unless such representation or warranty is expressly made as of an earlier date, in which Case as of such date). Seller shall have performed and complied in all material respects with all of their covenants, conditions and agreements contained in this Agreement required to be performed and complied with by them at or prior to the Closing.

(b) All documents and other items described in Section 3.4 required to have been delivered by Seller to Purchaser under this Agreement at or prior to the Closing shall have been delivered, to the reasonable satisfaction of Purchaser.

(c) No court of competent jurisdiction or any other Governmental Authority shall have issued an order, decree or ruling or taken any action restraining, enjoining or otherwise prohibiting or making illegal the Transactions, or seeking to obtain damages in respect thereof.

(d) The Bankruptcy Court shall have entered the Sale Order approving the sale of the Purchased Assets to Purchaser which order shall not have been rendered ineffective by any court of competent jurisdiction and such Sale Order has become final and not subject to appeal.

*Bid Version*

## ARTICLE VIII
## POST-CLOSING COVENANTS

8.1.    **Post-Closing Access.**

(a)     Purchaser acknowledges that, subsequent to the Closing, Seller may need access to information, documents or computer data in the control or possession of Purchaser for purposes of (i) concluding the Transactions, (ii) pursuing the administration of and legal actions in the Case or other Bankruptcy proceedings of Seller, (iii) for audits, investigations, compliance with governmental requirements, regulations and requests, and (iv) the prosecution or defense of third party claims. Accordingly, Purchaser agrees that upon reasonable notice, during normal business hours it will make available to Seller and their representatives, including counsel and accountants, commercially reasonable access to, and the right to make copies of, such documents and information as may be reasonably available relating to the Purchased Assets and Assumed Liabilities.

(b)     Purchaser acknowledges that, as of the Closing, certain Excluded Assets may be in possession of officers and employees of the Seller. In the event that Purchaser is prevented from possession of any of the Purchased Assets, Seller agrees to take possession of such Purchased Assets and deliver them to the Purchaser.

8.2.    **Records After the Closing.** After the Closing, Purchaser shall keep and preserve all documents, computer data, and other records and information of Seller existing as of the Closing and which constitute a part of the Purchased Assets for a period of five (5) years, or longer if required to do so under applicable federal or Texas Law. In the event that any patient medical records remain at the Facility, Purchaser shall comply with all patient privacy and other applicable Laws.

8.3.    **Further Assurances.** From time to time after the Closing, each Party shall, without further consideration, execute and deliver or cause to be executed and delivered to the other Parties such additional instruments, and shall take such other action, as the other Parties may reasonably request to carry out the Transactions in accordance with this Agreement and the Transaction Documents or any order of the Bankruptcy Court.

## ARTICLE IX
## TERMINATION

9.1.    **Right of Termination.** Subject to the provisions of this Agreement, this Agreement may be terminated at any time prior to the Closing as follows:

(a)     by the mutual agreement of Purchaser and Seller;

(b)     by Purchaser, if Seller have breached any representation, warranty or covenant in this Agreement such that the condition in Section 7.3(a) cannot be satisfied, *provided*, that Purchaser has notified Seller in writing of the breach and if curable the breach shall have continued without cure for ten (10) Business Days after the notice of breach, and such breach has not been waived by Purchaser;

(c)     by Seller, if Purchaser has breached any representation, warranty or covenant in this Agreement such that the conditions in Section 7.2(a) cannot be satisfied, *provided*, that Seller have notified Purchaser in writing of the breach and if curable the breach shall have continued

*Bid Version*

without cure for ten (10) Business Days after the notice of breach, and such breach has not been waived by Seller;

(d) by Purchaser or Seller, if any court of competent jurisdiction or any other Governmental Authority shall have issued an order, decree or ruling or taken any other action restraining, enjoining or otherwise prohibiting the Transactions, and such order, decree, ruling or action shall be final and non-appealable;

(e) by Purchaser or Seller, in the event that the Bankruptcy Court issues any order, writ, judgment, decree or injunction approving or permitting the consummation of a Transfer of the Purchased Assets to a third party buyer other than Purchaser, *provided,* that Purchaser is not designated as a back-up to such third party buyer; or

(f) by Purchaser or Seller, upon consummation of a Transfer of the Purchased Assets to a third party buyer other than Purchaser;

(g) by Purchaser or Seller, if the Bankruptcy Court determines not to enter the Sale Order approving the Transfer of the Purchased Assets to Purchaser.

9.2. **Effect of Termination.** A right of termination under Section 9.1 may be exercised by Purchaser or Seller, as the Case may be, by giving written notice thereof to the other Parties at any time prior to the Closing. If Purchaser or Seller, as the Case may be, terminate this Agreement under Section 9.1, this Agreement shall terminate and become void, the Transactions shall be abandoned and the obligations and liabilities of the Parties shall terminate, as of the date of such termination, except that (i) the obligations set forth in Section 2.1, Section 10.4 and Section 11.1 shall survive any such termination and (ii) other than as set forth in Section 2.1 and Section 10.4 and subject to Section 11.3, no exercise by a Party of its right to terminate under Section 9.1 shall prejudice such Party's rights against the other Party for a breach occurring prior to any such termination of a representation, warranty or covenant (but only to the extent such breach would result in a failure of the condition set forth in Section 7.2(a), in the Case of a breach by Purchaser, or Section 7.3(a), in the Case of a breach by Seller).

## ARTICLE X
## BANKRUPTCY

10.1. **Bankruptcy Filing.** The Parties acknowledge that the Seller is a Debtor Estate under the under the Bankruptcy Code in Bankruptcy Court. PURCHASER AND SELLER ACKNOWLEDGE THAT THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS AND THE CONSUMMATION OF THE TRANSACTIONS ARE EXPRESSLY SUBJECT TO AND CONDITIONED ON BANKRUPTCY COURT APPROVAL, AND THAT THE PROVISIONS OF THIS AGREEMENT WILL ONLY BE ENFORCEABLE TO THE EXTENT APPROVED BY THE BANKRUPTCY COURT.

10.2. **Possible Auction.** Purchaser acknowledges that in connection with the Cases and related bankruptcy proceedings Seller contemplate that there may be an auction for the Purchased Assets, and that the Bankruptcy Court may ultimately approve a sale to a third party buyer other than Purchaser. If Seller, in their sole discretion, determine that an auction should be conducted, Seller will file a motion seeking a Bankruptcy Court order approving bidding procedures (the "*Bidding Procedures Order*") that will govern any such auction, as well as related matters such as payment of the Break-Up Fee.

10.3. **Sale Order.** Seller will seek an order from the Bankruptcy Court (the "*Sale Order*") authorizing the Transfer of the Purchased Assets, pursuant to Section 363 of the Bankruptcy Code, to the

*Bid Version*

bidder with the offer that Seller determine to be the highest and best offer for the Purchased Assets (the "*Prevailing Bidder*"). Seller will use commercially reasonable efforts to obtain entry of the Sale Order (a) as soon as reasonably practicable following the date hereof if no auction is conducted or (b) as soon as reasonably practicable following the completion of an auction if an auction is conducted. Seller will request that the Sale Order contain standard bankruptcy sale provisions, including language providing that the Prevailing Bidder is a purchaser in good faith for fair value within the meaning of Section 363(m) of the Bankruptcy Code and entitled to the protection of Section 363(m) of the Bankruptcy Code. Seller will further request that the Sale Order provide that the consideration for the Purchased Assets set forth herein, if Purchaser is the Prevailing Bidder, constitutes reasonably equivalent value and fair consideration. The Sale Order shall provide Seller' and their trustees' authority to complete the Transfer of the Purchased Assets and consummation of the Transactions and contain a provision that any prior officer, director or employee of Corrline is directed to deliver any of the Purchased Assets in their possession or control to Purchaser on demand. Seller will request that the Sale Order provide that if the Prevailing Bidder is not a successor to Seller and, to the maximum extent permitted by applicable Law, will not be subject to successor liability. Purchaser, if the Prevailing Bidder, shall promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of funding and performance by Purchaser of its obligations under this Agreement and the other Transaction Documents and demonstrating that Purchaser is a good faith buyer under the Bankruptcy Code. Upon the entry of the Sale Order, Purchaser, if the Prevailing Bidder, shall use commercially reasonable efforts to take all steps necessary to consummate the Transactions in accordance with this Agreement and the other Transaction Documents. Purchaser acknowledges that this Agreement and the Transaction Documents may be modified from time to time during Bankruptcy Court hearings or otherwise during the sale process.

10.4.    **Stalking Horse Provisions.** Purchaser acknowledges that in connection with the Cases and related bankruptcy proceedings Seller contemplate that there may be an auction for the Purchased Assets, and that the Bankruptcy Court may ultimately approve a sale to a third party buyer other than Purchaser. Purchaser may be designated as the stalking horse bidder in any such auction. Subject to Bankruptcy Court approval, in the event that Purchaser is not the Prevailing Bidder in an auction for the Purchased Assets, if designated as the stalking horse bidder, Purchaser would be entitled to certain "stalking horse" protections which include reimbursement of actual and documented (to Seller' reasonable satisfaction) out-of-pocket expenses incurred by Purchaser in connection with the negotiation of this Agreement and the other Transaction Documents (the "*Break-Up Fee*"). If Purchaser receives a Break-Up Fee as approved by the Bankruptcy Court, Purchaser may not claim any additional damages based upon, resulting from or relating to the negotiation, execution, performance, non-performance or breach of, or otherwise related to or arising from, this Agreement, the other Transaction Documents or the Transactions. As a condition of payment and upon receipt of the Break-Up Fee, Purchaser hereby irrevocably and unconditionally releases, quits and forever discharges Seller and Seller' Affiliates and representatives of and from any and all claims, causes of action or other assertions of liability of any nature arising out of, based upon, resulting from or relating to the negotiation, execution, performance, non-performance or breach of, or otherwise related to or rising out of, this Agreement, the other Transaction Documents or the Transactions. Notwithstanding the foregoing, if designated as the stalking horse bidder Purchaser will not be entitled to any Break-Up Fee and will be deemed to have waived its right to seek any Break-Up Fee if this Agreement is terminated pursuant to Section 9.1(a), Section 9.1(c), Section 9.1(d), or Section 9.1(g). A Break-Up Fee shall only be payable from the sale proceeds upon the consummation of a sale of the Purchased Assets to a third party buyer other than Purchaser. If Purchaser is not designated as the stalking horse bidder, Purchaser shall not be entitled to the Break-Up Fee or any other claim for reimbursement of expenses.

*Bid Version*

### ARTICLE XI
### MISCELLANEOUS

11.1.   **Charges and Expenses.** Except as expressly provided in the Bidding Procedures Order' with respect to payment of the Break-Up Fee and in <u>Section 10.4</u>, each Party will pay its own fees, expenses and disbursements and those of its agents, representatives, financial advisors, accountants and counsel, including all fees and commissions, incurred in connection with the negotiation, execution, delivery and performance of this Agreement and the other Transaction Documents, and any amendments hereto or thereto, and the consummation of the Transactions.

11.2.   **Notices, Etc.** All notices, requests, demands or other communications required by or otherwise with respect to the Transaction Documents shall be in writing and shall be deemed to have been duly given to any Party when delivered in person, sent by registered or certified mail (postage prepaid) or sent by a nationally recognized overnight courier service that provides a receipt of delivery, in each Case to the following addresses:

> IF TO PURCHASER:
>
> Nick Doskey, Controller and Treasurer
> The Tagos Group, LLC
> 8 Greenway Plaza, Suite 910
> Houston, Texas 77046
> Telephone: 713.625.7520
> Email: ndoskey@tagosgroup.com
>
> *and with a copy to*:
>
> Peter Johnson
> Law Offices of Peter Johnson
> 11 Greenway Plaza, Suite 2820
> Houston, Texas 77046
> Telephone: 713-961+1200
> Facsimile: 713-961-0941
> Email: pjohnson@pjlw.com
>
> IF TO SELLER:
>
> EVA ENGELHART, Trustee
> Ross, Banks, May, Cron & Cavin, PC
> 2 Riverway, Suite 700
> Houston, Texas 77056-1918
> Telephone: 713.626.1200
> **E-mail:** eengelhart@rossbanks.com
>
> *and with copies to*:
>
> Joshua Wolfshohl
> Porter Hedges LLP
> 1000 Main Street, 36th Floor
> Houston, Texas 77002
> Telephone: 713-226-6695

*Bid Version*

Email: jwolfshohl@porterhedges.com

or to such other address as such Party shall have designated by notice so given to each other Party in accordance with this Section 11.2.

11.3. **Limitation.** In no event shall Seller be liable to Purchaser or any other Person for any special, incidental, exemplary, indirect, consequential or punitive damages or for specific performance of this Agreement.

11.4. **Amendments, Waivers, Etc.** This Agreement may not be amended, changed, supplemented, waived or otherwise modified except by an instrument that is both (a) in writing signed by Purchaser and Seller and (b) approved by the Bankruptcy Court. The failure of any Party hereto to exercise any right, power or remedy provided under this Agreement or otherwise available in respect of this Agreement at Law or in equity, or to insist upon compliance by any other Party hereto with its obligations hereunder, and any custom or practice of the Parties at variance with the terms of this Agreement, shall not constitute a waiver by such Party of its right to exercise any such or other right, power or remedy or to demand such compliance.

11.5. **Assignment; Binding Agreement.** Purchaser shall not have the right to assign this Agreement without the prior written consent of Seller. This Agreement shall be binding upon and inure to the benefit of each of the Parties and their respective successors and permitted assigns. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties hereto any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement.

11.6. **Entire Agreement.** This Agreement and the other Transaction Documents, including the Exhibits and Schedules attached hereto and thereto, embody the entire agreement and understanding between the Parties relating to the subject matter hereof and thereof and supersede all prior and contemporaneous agreements, understandings, representations and warranties, both oral and written, relating to such subject matter. There are no representations, warranties or covenants by the Parties hereto relating to such subject matter other than those expressly set forth in this Agreement.

11.7. **No Third Party Beneficiaries.** This Agreement and the other Transaction Documents are not intended to be for the benefit of, and shall not be enforceable by or confer any legal or equitable right, benefit, claim or remedy of any nature on, any Person that is not a party hereto.

11.8. **Governing Law; Venue.** Except to the extent governed by Bankruptcy Law, this Agreement and the other Transaction Documents and all disputes hereunder and thereunder shall be governed by and construed and enforced in accordance with the internal laws of the State of Texas, without regard to principles of conflict of laws, and without reference to any rules of construction regarding the party responsible for the drafting of this Agreement. The Bankruptcy Court shall have exclusive jurisdiction of any action or proceeding relating to, or arising under or in connection with, this Agreement and the Transaction Documents and the Parties each consent to personal jurisdiction of the Bankruptcy Court and waive any objection to the Bankruptcy Court's jurisdiction. Any action or proceeding not subject to the subject matter jurisdiction of the Bankruptcy Court and relating to, or arising under or in connection with, this Agreement and the Transaction Documents shall be instituted in any state court within Harris County, Texas, or the federal courts having jurisdiction over such county and the Parties hereby submit to such jurisdiction. Service of any summons and complaint or other process in any such action or proceeding may be made by registered or certified mail directed to the Parties as set forth in Section 11.2, and service so made shall be deemed to be completed upon the earlier of actual

receipt or three (3) days after the same shall have been posted as aforesaid, the Parties hereby waive personal service of any such action or proceeding.

11.9. **Waiver of Jury Trial.** **EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 11.9</u>.**

11.10. **Severability.** Any term or provision of this Agreement that is illegal, invalid or unenforceable in any situation in any jurisdiction shall not affect the legality, validity or enforceability of the remaining terms and provisions of this Agreement or the legality, validity or enforceability of the offering term or provision in any other situation or in any other jurisdiction.

11.11. **Headings.** The name assigned this Agreement and the section captions and headings used herein are for convenience of reference only and shall not affect the interpretation or construction of this Agreement.

11.12. **Counterparts; Facsimiles.** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one instrument. Each counterpart may consist of a number of copies each signed by less than all, but together signed by all, the parties hereto. A signed copy of this Agreement delivered by facsimile, email or other electronic means shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

11.13. **Interpretation.** For purposes of this Agreement, unless the context otherwise requires or unless otherwise specified (a) the words "include" "includes" and "including" mean "including, without limitation," (b) the terms "hereof," "herein," and "herewith" and words of similar import shall be construed to refer to this Agreement as a whole (including all of the Exhibits and Schedules hereto) and not to any particular provision of this Agreement, and Article, Section, paragraph, Exhibit and Schedule references are to the Articles, Sections, paragraphs, Exhibits and Schedules of this Agreement, (c) the masculine gender shall also include the feminine and neutral genders, and vice versa, (d) provisions shall apply, when appropriate, to successive events and transactions, (e) all capitalized terms defined herein are equally applicable to both the singular and plural forms of such terms, and (f) references to a statute, rule or regulation mean such statute, rule or regulation as amended from time to time and includes any successor legislation thereto and any rules or regulations promulgated thereunder.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have caused this Asset Purchase Agreement to be duly executed as of the Effective Date.

**PURCHASER:**

THE TAGOS GROUP, LLC, a Texas Limited Liability Company

By:_____

NAME: Milton L. Scott
TITLE: CHAIRMAN, CEO AND AUTHORIZED AGENT

**SELLER:**

_____

EVA ENGELHART, CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATE OF CORRLINE INTERNATIONAL, LLC.

## Exhibit "A"

## Bill of Sale and Assignment and Assumption Agreement

**Date:** _____, 2014

**Seller:**     Eva S. Engelhart, Chapter 7 Trustee for the Bankruptcy Estate of CorrLine
International, LLC. CorrLine International, LLC referred to herein sometimes as
("CorrLine")

**Seller's Mailing Address:** Ross, Banks, May, Cron & Cavin, PC, 2 Riverway, Suite 700, Houston,
Texas 77056-1918

**Purchaser:**     The Tagos Group, LLC, a Texas corporation

**Purchaser's Mailing Address:**

> The Tagos Group, LLC
> c/o Milton Scott, CEO
> 8 Greenway Plaza, Suite 510
> Houston, TX 77046

**Asset Purchase Agreement:** That certain Asset Purchase Agreement dated September ____, 2014
between Seller and Purchaser.

**Purchased Assets:**

1. the *Intellectual Property* owned by CorrLine, whether or not issued, abandoned or
pending, (the *"Purchased Intellectual Property"*);

     *"Intellectual Property"* means any and all of the following in any jurisdiction: (a) trademarks and
service marks, including trademarks filed by CorrLine for the following : "CorrLine", "CorrLine CorrX",
"Making Corrosion History", "Corrosion is the Enemy, Not an Industry", and "Coating Edge Technology"
and all filings, applications and registrations and the goodwill connected with the use of and symbolized by
the foregoing; (b) copyrights, including all applications and registrations, and works of authorship, whether
or not copyrightable; (c) trade secrets and confidential know-how; (d) patents and patent applications,
including but not limited to CorrX coatings and procedures as well as the patents in all stages as listed in
the following summary prepared by CorrLine counsel Buskop Law Firm, the current status of such patents
are further described in Exhibit D attached hereto and incorporated herein by reference:

| File No. | Serial No. | Filing Date | Mark/Title | Application Type | Reg. No. Patent No. | Reg. Date Issue Date | Status |
|----------|-----------|-------------|------------|------------------|---------------------|----------------------|--------|
| 2004.0 00 | | | CONSULTATION | GENERAL FILE | | | N/A |

| File No. | Serial No. | Filing Date | Mark/Title | Application Type | Reg. No. Patent No. | Reg. Date Issue Date | Status |
|---|---|---|---|---|---|---|---|
| 2004.001 | 61/591,028 | January 26, 2012 | TREATMENT FOR PROVIDING IMPROVED ADHESION OF BARRIER COATINGS TO METALS | PROVISIONAL PATENT APPLICATION | | | Expired – See 2004.001A |
| 2004.001A | 13/750,445 | January 25, 2013 | TREATMENT KIT FOR CLEANING SUBSTRATE SURFACES FOR REMOVAL OF WATER AND NON-WATER SOLUBLE OXIDES AND IONIC COMPOUNDS "POWDER KIT" | UTILITY PATENT APPLICATION | | | Filed Response to 1st Non Final Office Action on February 18, 2014 |
| 2004.002 | 13/359,108 | January 26, 2012 | METHOD FOR PROVIDING IMPROVED ADHESION OF BARRIER COATINGS TO METALS | UTILITY PATENT APPLICATION | | | Application Abandoned – See 2004.003 |
| 2004.003 | 14/057,817 | October 18, 2013 | METHOD FOR PASSIVATING SUBSTRATE SURFACES | UTILITY PATENT APPLICATION (CONTINUATION IN PART OF 2004.002) | | | First Action Prediction: 26 Months |
| 2004.004 | N/A | N/A | POSSIBLE LITIGATION WITH CORRBAN TECHNOLOGIES INC. REGARDING CORRX PRODUCT | LITIGATION | | | N/A |
| 2005.005 | | | TREATMENT KIT FOR CLEANING SUBSTRATE SURFACES FOR REMOVAL OF WATER AND NON-WATER SOLUBLE OXIDES AND IONIC COMPOUNDS "LIQUID KIT" | UTILITY PATENT APPLICATION (DIVISIONAL APPLICATION OF 2004.001A) | | | Received Signed Retention Letter – Waiting on Signed Documents & Approval to File from Client |

(e) email addresses, websites, URLS, and internet domain name registrations and access to CorrLine's website, Vimeo site, LinkedIn site, and any other websites representing CorrLine or sharing CorrLine content; (f) all intellectual property as defined in the Asset Contribution Agreement between TriGenex of Texas Inc and CorrLine International, LLC restated as all intellectual property rights, statutory or common Law, worldwide, including (a) trademarks, service marks, trade dress, slogans, logos and all goodwill associated therewith, and any applications or registrations for any of the foregoing; (b) copyrights and any applications or registrations for any of the foregoing; and (c) patents, all confidential know-how, trade secrets and similar proprietary rights in confidential inventions, discoveries, improvements, processes, techniques, devices, methods, patterns, formulae, specifications, and lists of suppliers, vendors, customers, and distributors; and (g) all marketing material including but not limited to letterhead, presentations, pamphlets, videos and displays related to the Business, CorrLine, or products and services of CorrLine; (h) all other intellectual property and intellectual property rights and

assets, and all rights, interests and protections that are associated with, similar to, or required for the exercise of, any of the foregoing.

2. all furniture, equipment, including all CorrLine's testing equipment, spray and mixing equipment, and personal protective equipment, furnishings, supplies, fixtures, materials, inventory, tools, computer hardware, computer equipment, and other tangible personal property owned by Seller which is used in the Business, including as set forth in (collectively, the "*Owned Tangible Property*");

3. all goods, parts, supplies, devices, instruments, tools, apparatus, merchandise or similar articles, including component parts and accessories, maintained, held or stored by Seller on consignment or similar arrangement, which relate to the Business (collectively, the "*Consigned Property*");

4. All CorrLine inventory, CorrX Prep and CorrX Wash, and any previous iterations of this product in all forms of packaging. This includes all inventory held at Seatex Ltd, 445 Texas 36, Rosenburg, TX 77471, CorrLine Office, 2245 Texas Drive, Suite 300, Sugar Land, TX 77479, or held by any member, manager, officer, or employee of CorrLine.

5. all Contracts of Seller used in the Business, including, but not limited to the Seller's rights under non-competition agreements with former officers, employees and their agents;

6. all of Sellers rights to access marketing materials including, but not limited to, printed materials, website, linkedin and vimeo;

7. all customer lists and potential customer target list;

8. all telephone numbers and facsimile numbers;

9. the corporate seals, organizational documents, articles of incorporation, certificates of formation, bylaws, company agreements, minute books, stock books, Tax records and returns, books of account or other records having to do with the corporate organization of Seller;

10. all assumed names and trade names of Seller;

11. any membership interests, partnership interests, capital stock or other form of ownership interest in any direct or indirect subsidiary of any of the Seller or any right to acquire such ownership interests;

12. all deposits, credits, advances, prepayments and rebates that relate to the Purchased Assets or to other Excluded Assets;

13. all rights, demands, claims, causes of action, rights of recovery, credits, allowances, rebates, recoupment or rights of setoff or subrogation or defenses of Seller against any Person;

14. all of Seller' additional property, assets, capital stock, rights, claims, causes of action, Contracts, records, goodwill and other intangibles relating to the Business other than the Purchased Assets;

15. all assets, properties and rights of Seller and Seller' Affiliates used in or relating to their

respective businesses other than the Business;

16. all books, records and other documents, or copies thereof, whether in hard copy, electronic or other format, that (i) relate to employees or employee-related or employee benefit-related files or records and any other books and records which Seller are prohibited from disclosing or transferring to Purchaser under applicable Law and are required by applicable Law to retain in their possession, (ii) cannot be transferred under Laws relating to privacy or health, (iii) Seller are not permitted to transfer pursuant to confidentiality agreements with others, or (iv) relate to assets, liabilities or obligations retained by Seller, including the Excluded Assets, Excluded Liabilities and any accounts receivable of Seller; and

17. all of Seller' rights under the Transaction Documents and the other agreements, certificates and instruments to be executed in connection with, or pursuant to, this Agreement.

18. to the extent available, all books and records relating exclusively to the Purchased Assets, including equipment maintenance and warranty information;

19. to the extent legally assignable, the rights of Seller to manufacturers' warranties and indemnities to the extent relating to the Purchased Assets, other than warranties and indemnities relating to any Excluded Assets; and

20. to the extent legally assignable and subject to subsequent acceptance by Purchaser in its sole discretion and applicable requirements of transfer, all Permits of Seller used in the Business related to the Purchased Assets (collectively the "Assigned Permits").

**Excluded Assets:**

Other than the Purchased Assets described above, Purchaser expressly understands and agrees that it is not purchasing or acquiring, and Seller is not selling or assigning, any other assets, properties, rights or interests of Seller of any nature, and all such other assets, properties, rights and interests are expressly excluded from the Purchased Assets (collectively, the "Excluded Assets") and nothing herein shall be deemed to Transfer any of the Excluded Assets to Purchaser. Purchaser expressly acknowledges that certain Excluded Assets may be physically located at and within the Facility as of Closing, and Purchaser acknowledges that any such Excluded Assets remain assets of Seller and no right, title or interest therein shall pass to Purchaser by reason of any Transaction Document or otherwise. The Excluded Assets include, but are not limited to, the following assets, properties, rights and interests of Seller:

1. all cash and cash equivalents, bank accounts, investments, investment accounts, securities and certificates of deposit;

2. all accounts receivable, notes receivable, negotiable instruments, chattel paper and other receivables together with any fees or charges accrued thereon;

3. all motor vehicles, aircraft, boats and yachts;

4. all leased or licensed equipment, machinery and other tangible, including copiers, printers, telephone systems, paper shredding bins, water systems, water coolers, ice machines and gas

tanks;

5. all Permits issued to Seller and used in the Business that are not Assigned Permits;

6. all insurance policies and all rights to applicable claims and proceeds thereunder, including claims arising under chapter 5 of title 11 of the Bankruptcy Code;

**Assumed Liabilities.**

Subject to the terms and conditions set forth herein, Purchaser shall assume and agree to pay, perform and discharge when due all liabilities and obligations arising out of or relating to the Purchased Assets on or after the Closing (collectively, the **"Assumed Liabilities"**), including the following:

1. all liabilities and obligations for Taxes described in the Asset Purchase Agreement relating to the Purchased Assets and the Assumed Liabilities for any taxable period ending after the date hereof; and

2. all other liabilities and obligations arising out of or relating to Purchaser's ownership and operation of the Purchased Assets on or after the date hereof.

**Excluded Liabilities.**

Purchaser shall not assume and shall not be responsible to pay, perform or discharge any of the following liabilities or obligations of Seller (collectively, the **"Excluded Liabilities"**):

1. any liabilities or obligations arising out of or relating to Seller' ownership and operation of the Purchased Assets prior to the date hereof;

2. any liabilities or obligations relating to or arising out of the Excluded Assets; and

3. any liabilities or obligations for (i) Taxes relating to the Purchased Assets and the Assumed Liabilities for any taxable period ending on or prior to the Closing Date and (ii) any other Taxes of Seller as described in the Asset Purchase Agreement for any taxable period.

**Condition of Assets.**

AS A MATERIAL PART OF THE CONSIDERTAION FOR SELLER ENTERING INTO THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS PURCHASER EXPRESSLY ACKNOWLEDGES, REPRESENTS, WARRANTS AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER EXPRESSLY SET FORTH IN ARTICLE V OF THE ASSET PURCHASE AGREEMENT AND TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ALL OF THE PURCHASED ASSETS AND ASSUMED LIABILITIES ARE CONVEYED TO PURCHASER, AND PURCHASER IS ACCEPTING THE SAME, AS OF THE CLOSING DATE ON AN "AS IS, WHERE IS" BASIS "WITH ALL FAULTS" AND WITHOUT ANY OTHER REPRESENTATION OR WARRANTY, AND NEITHER SELLER NOR ANY AFFILIATE OR REPRESENTATIVE OF SELLER HAVE MADE, AND SELLER AND SELLER' AFFILIATES AND REPRESENTATIVES DO NOT MAKE, AND EXPRESSLY DISCLAIM AND SPECIFICALLY NEGATE, ANY AND ALL OTHER REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS, CONDITIONS AND GUARANTEES OF ANY KIND OR CHARACTER WHATSOEVER WITH RESPECT TO THE PURCHASED ASSETS, BUSINESS AND ASSUMED LIABILITIES, WHETHER STATUTORY, EXPRESS OR IMPLIED, AT LAW OR IN

Page 5 of 8

EQUITY, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, INCLUDING ALL REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS, CONDITIONS AND GUARANTEES WITH RESPECT TO: (A) THE USE, VALUE, INCOME POTENTIAL, EXPENSES, MAINTENANCE, OPERATION, TRANSFERRABILITY, DESCRIPTION, LOCATION, CHARACTERISTICS OR CONDITION OF THE PURCHASED ASSETS OR ANY PORTION THEREOF, INCLUDING AS TO QUALITY, SUITABILITY, TENANTABILITY, HABITABILITY, MERCHANTABILITY, DESIGN OR FITNESS FOR ANY SPECIFIC PURPOSE OR A PARTICULAR PURPOSE, GOOD AND WORKMANLIKE CONSTRUCTION, ACCURACY, QUIET ENJOYMENT, TITLE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS AND WARRANTIES ARISING FROM A COURSE OF DEALING, USAGE OR TRADE PRACTICE; (B) THE NATURE, QUALITY OR CONDITION OF THE PURCHASED ASSETS, INCLUDING THE SURFACE OR SUBSURFACE THEREOF, THE WATER, SOIL AND GEOLOGY, INCLUDING THE EXISTENCE OF ANY ENVIRONMENTAL HAZARDS OR TOXIC SUBSTANCES OR CONDITIONS, WHETHER OR NOT OBVIOUS, VISIBLE OR APPARENT; (C) THE SUITABILITY OF THE PURCHASED ASSETS FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER MAY CONDUCT THEREON; (D) THE COMPLIANCE OF OR BY THE PURCHASED ASSETS OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, INCLUDING THE ENVIRONMENTAL CONDITION OF THE OWNED REAL PROPERTY AND THE PRESENCE OF, ABSENCE OF OR CONTAMINATION BY HAZARDOUS MATERIALS, OR THE COMPLIANCE OF THE OWNED REAL PROPERTY WITH ALL REGULATIONS OR LAWS PERTAINING TO HEALTH, SAFETY OR THE ENVIRONMENT, INCLUDING THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT, THE RESOURCE CONSERVATION AND RECOVERY ACT, THE CLEAN WATER ACT, THE TEXAS HEALTH AND SAFETY CODE AND THE TEXAS WATER CODE, EACH AS MAY BE AMENDED FROM TIME TO TIME, AND INCLUDING ANY AND ALL REGULATIONS, RULES OR POLICIES PROMULGATED THEREUNDER; (E) THE PRESENCE OF ANY ENDANGERED OR THREATENED SPECIES ON THE OWNED REAL PROPERTY, AS WELL AS THE SUITABILITY OF THE OWNED REAL PROPERTY AS HABITAT FOR ANY OF THOSE SPECIES; (F) THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES; (G) THE TRUTH ACCURACY OR COMPLETENESS OF ANY MATERIALS, FINANCIAL INFORMATION OR OPERATING DATA OR OTHER INFORMATION DELIVERED OR MADE AVAILABLE TO PURCHASER IN CONNECTION WITH THE TRANSACTIONS (INCLUDING DILIGENCE MATERIALS PROVIDED TO PURCHASER); OR (H) OTHERWISE WITH RESPECT TO THE PURCHASED ASSETS, BUSINESS OR ASSUMED LIABILITIES. WITHOUT LIMITING THE FOREGOING, SELLER DO NOT WARRANT OR REPRESENT THAT ANY LICENSED MATERIALS OR SERVICES WILL MEET PURCHASER'S DATA PROCESSING OR OTHER REQUIREMENTS, ACHIEVE ANY INTENDED RESULTS, BE COMPATIBLE OR WORK WITH ANY OTHER SOFTWARE, APPLICATIONS, SYSTEMS OR SERVICES, OR THAT THE USE THEREOF WILL BE UNINTERRUPTED OR ERROR-FREE OR MEET ANY PERFORMANCE OR RELIABILITY STANDARDS. PURCHASER FURTHER EXPRESSLY ACKNOWLEDGES, REPRESENTS, WARRANTS AND AGREES THAT, HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT, INVESTIGATE AND EXAMINE THE PURCHASED ASSETS, BUSINESS AND ASSUMED LIABILITITES, PURCHASER IS PURCHASING THE PURCHASED ASSETS AND ASSUMING THE ASSUMED LIABILITITES SOLELY PURSUANT TO ITS OWN INDEPENDENT INVESTIGATION, EXAMINATION, STUDY, INSPECTION AND KNOWLEDGE THEREOF, AND PURCHASER IS RELYING SOLELY ON INSPECTIONS OF THE PURCHASED ASSETS AND DETERMINATIONS OF THE VALUE OF THE PURCHASED ASSETS AND USES TO WHICH THE PURCHASED ASSETS MAY BE PUT AS MADE BY PURCHASER AND PURCHASER'S OWN AGENTS, EMPLOYEES, ATTORNEYS, CONSULTANTS, CONTRACTORS AND OTHER PROFESSIONAL ADVISORS OR REPRESENTATIVES, AND PURCHASER IS NOT RELYING UPON ANY REPRESENTATIONS OR STATEMENTS OF ANY KIND (WHETHER ORAL,

Page 6 of 8

WRITTEN, EXPRESS, IMPLIED OR OTHERWISE) WHICH MAY HAVE BEEN MADE OR MAY BE MADE (OR PURPORTEDLY MADE) OR ANY INFORMATION WHICH MAY HAVE BEEN PROVIDED OR MAY BE PROVIDED (OR PURPORTEDLY PROVIDED) BY OR ON BEHALF OF SELLER OR ANY OF SELLER' AFFILIATES, AGENTS, EMPLOYEES, ATTORNEYS, CONSULTANTS, CONTRACTORS OR OTHER PROFESSIONAL ADVISORS OR REPRESENTATIVES.

### Consideration and Transfer:

For valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Seller, Seller does hereby sell, assign, transfer, convey and deliver ("**Transfer**") to Purchaser, free and clear of all liens, claims, options, warrants, charges, security interests, pledges, mortgages or other encumbrances whatsoever ("**Liens**"), and Purchaser does hereby purchase and accept from Seller, on the terms and subject to the conditions hereinafter set forth, all of the rights, title and interests of Seller in and to all assets owned by the Seller that are not Excluded Assets (herein defined) under this Agreement, including but not limited to the Purchased Assets, save and except the Excluded Assets.

To have and to hold the Purchased Assets to Purchaser and Purchaser's heirs, successors, and assigns forever. Seller binds Seller and Seller's heirs and successors to warrant and forever defend all and singular the Purchased Assets to Purchaser and Purchaser's heirs, successors, and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof.

Seller agrees to execute and deliver any additional documents and to perform any additional acts reasonably necessary or appropriate to carry out the intent of this bill of sale in transferring the Purchased Assets to Purchaser.

When the context requires, singular nouns and pronouns include the plural.

> Eva S. Engelhart, Chapter 7 Trustee for the Bankruptcy Estate of CorrLine International, LLC. CorrLine International, LLC referred to herein sometimes as ("CorrLine"),

> Eva S. Engelhart, Chapter 7 Trustee

> The Tagos Group, LLC, a Texas limited liability company,

> Milton L Scott, CEO

STATE OF TEXAS )

COUNTY OF HARRIS )

This instrument was acknowledged before me on _____, 2014, by Eva S. Engelhart, Chapter 7 Trustee for the Bankruptcy Estate of CorrLine International, LLC. CorrLine International, LLC referred to herein sometimes as ("CorrLine"), as the Chapter 7 Trustee on behalf of the Chapter 7 Bankruptcy Estate of CorrLine International, LLC.

Notary Public, State of Texas
My                commission                expires:

STATE OF TEXAS )

COUNTY OF HARRIS )

This instrument was acknowledged before me on _____, 2014, by Milton L Scott, as the CEO of The Tagos Group, LLC, a Texas limited liability company, on behalf of said company.

Notary Public, State of Texas
My                commission                expires:

Page **8** of **8**

**Exhibit "B"**

## CERTIFICATE OF SECRETARY

I certify that:

I am the duly qualified and acting Secretary of The Tagos Group, LLC (the "Company"), a duly organized and existing Texas Limited Liability Company.

The following is a true and correct copy of resolutions adopted by the Managers by Written Unanimous Consent of the Managers of the Company, without a meeting, on   and which consent was filed in the minute book of the Company.

RESOLVED, that the Company enter into and purchase on terms and conditions set out in that certain Asset Purchase Agreement by and between the Company as Purchaser and Eva S. Englehart, Chapter 7 Trustee for the Bankruptcy Estate of CorrLine International, LLC as Seller, all of the Purchased Assets of CorrLine International, LLC as described therein according to the terms of the agreement attached hereto as Exhibit "1" and incorporated herein by reference (the "Agreement");

RESOLVED, that a true and correct copy of the Certificate of Formation of the Corporation is attached hereto as Exhibit "2", and incorporated herein by reference;

RESOLVED, that a true and correct copy of the existing company agreement for the Company is attached hereto as Exhibit "3" and incorporated herein by reference;   .

RESOLVED, that the below listed individuals are officers of the Company and that Milton L. Scott, as CEO and Manager of the Company is authorized to execute any and all documents on behalf of the Company including the "Transaction Documents" described in the Agreement, on behalf of the Company and as its act and deed with full authority.

The resolutions are in conformity with the Certificate of Formation and Company Agreement of the Company, have not been modified or repealed, and are now in full force and effect.

Date: _____, 2014.

_____
Nick Doskey
Secretary

# CORRLINE INTERNATIONAL, LLC. – Status Chart

Provided by: Buskop Law Group, P.C.
Attorney Docket / Client No: 2004

Page 1 of
February 201

| File No. | Serial No. | Filing Date | Mark/Title | Application Type | Reg. No. Patent No. | Reg. Date Issue Date | Status |
|---|---|---|---|---|---|---|---|
| 2004.000 | | | CONSULTATION | GENERAL FILE | | | N/A |
| 2004.001 | 61/591,028 | January 26, 2012 | TREATMENT FOR PROVIDING IMPROVED ADHESION OF BARRIER COATINGS TO METALS | PROVISIONAL PATENT APPLICATION | | | Expired – See 2004.001A |
| 2004.001A | 13/750,445 | January 25, 2013 | TREATMENT KIT FOR CLEANING SUBSTRATE SURFACES FOR REMOVAL OF WATER AND NON-WATER SOLUBLE OXIDES AND IONIC COMPOUNDS "POWDER KIT" | UTILITY PATENT APPLICATION | | | Filed Response to 1st Non Final Office Action on February 18, 2014 |
| 2004.002 | 13/359,108 | January 26, 2012 | METHOD FOR PROVIDING IMPROVED ADHESION OF BARRIER COATINGS TO METALS | UTLITY PATENT APPLICATION | | | Application Abandoned – See 2004.003 |
| 2004.003 | 14/057,817 | October 18, 2013 | METHOD FOR PASSIVATING SUBSTRATE SURFACES | UTLITY PATENT APPLICATION (CONTINUATION IN PART OF 2004.002) | | | First Action Prediction: 26 Months |
| 2004.004 | N/A | N/A | POSSIBLE LITIGATION WITH CORRBAN TECHNOLOGIES INC. REGARDING CORRX PRODUCT | LITIGATION | | | N/A |
| 2005.005 | | | TREATMENT KIT FOR CLEANING SUBSTRATE SURFACES FOR REMOVAL OF WATER AND NON-WATER SOLUBLE OXIDES AND IONIC COMPOUNDS "LIQUID KIT" | UTLITY PATENT APPLICATION (DIVISIONAL APPLICATION OF 2004.001A) | | - | Received Signed Retention Letter – Waiting on Signed Documents & Approval to File from Client |



tabbies

EXHIBIT