**Exhibit 6**

2006 WL 8437743
Only the Westlaw citation is currently available.
United States District Court, S.D.
Alabama, Southern Division.

ONO'S TRADING COMPANY, LLC, et al., Plaintiffs,
v.
Stuart A. PARNELL, et al., Defendants.

CIVIL ACTION NO. 04-0706-CG-C
|
Signed 11/22/2006

**Attorneys and Law Firms**

Robert M. Galloway, Galloway, Wettermark, Everest, Rutens & Gaillard, LLP, Thomas O. Gaillard, III, Helmsing Leach Herlong Newman & Rouse P.C., Mobile, AL, for Plaintiffs.

Wesley H. Blacksher, Wesley H. Blacksher, LLC, Barre C. Dumas, Mobile, AL, for Defendants.

SLT, LLC, Mobile, AL, pro se.

## MEMORANDUM OPINION AND ORDER

Callie V. S. Granade, CHIEF UNITED STATES DISTRICT JUDGE

 *1  This cause is before the court on plaintiffs' motion and supporting documents for summary judgment as to Counts Three, Four, Six, and Eight and defendant's counterclaim alleging abuse of process (Docs. 233-237), the opposition thereto of defendant Parnell (Docs. 241, 242), and plaintiffs' reply (Doc. 246). For the reasons stated below, the court finds that plaintiffs' motion for summary judgment is due to be granted.

## FACTS

On October 22, 2003, Stuart Parnell formed Ono's Trading Company, LLC ("Ono's") for the purpose of engaging in the business of selling specialty eyewear. (Articles of Organization of Ono's Trading Company, LLC). According to the Operating Agreement, purpose of Ono's was to purchase, manufacture, market and sell a multi-focal sunglass product (polarized sunglasses with a built-in reader or multi-focal segment). Parnell claims he conceived of this product during a fishing trip in 2002 when he left his reading glasses on the dock and needed them to see to tie a knot in his fishing line. (Stuart Parnell Depo. taken on May 31, 2005 (hereinafter "First Parnell Depo.") pp. 10-11). At the outset, the lenses were manufactured by taking a relatively thick polarized lens approximately one-half inch thick and processing it to fit in a standard sunglass frame. (First Parnell Depo. pp. 14-15). Parnell filed Articles of Organization for Ono's Trading Company in October 2003. (First Parnell Depo. pp. 22; 28-30). Parnell also created at that time the Operating Agreement for Ono's. (First Parnell Depo. pp. 29-30). Those documents designated Parnell as the manager and sole member of Ono's. (Articles of Organization; Operating Agreement; First Parnell Depo. pp. 31-38).

On November 24, 2003, Parnell filed an application for Letters Patent in the United States Patent and Trademark Office ("USPTO"), Application No.: 10/720,879 entitled "Multifocal Sunglasses, Glasses, and Lenses" (hereafter "First Patent Application") in an attempt to obtain a patent on this new product. (First Patent Application). In the First Patent Application, Parnell sought a patent on the specialty sunglasses, glasses and lenses that Ono's was to manufacture, market and sell. (First Patent Application). Specifically, Parnell claimed as his invention sunglasses and glasses that included a multi-focal segment built into the lens that was placed about 1 millimeter below the level of the center of the eye-wearer's lower limbus. (Id.) Parnell also claimed as his invention certain variations of these sunglasses and glasses, including among other things: (I) those having a multi-focal segment located about 5 millimeters below the center of the limbus; (ii) those which were also polarized; (ii) those with a trifocal (as opposed to bifocal) segment; and those with flat or progressive multifocal tops. Id.

In November 2003, Parnell approached potential investors, Van Koppersmith, Don Grady, Kelly Grady, Joe D. Dunnam, and John Elsevier seeking funding. (First Parnell Depo. pp. 18-22, 30-32; Fourth Koppersmith Affid. ¶ 2). Parnell represented to the new investors that he had a patent application for the sunglass products to be produced by Ono's that, when issued, would essentially give Ono's the exclusive right to its specialty sunglass market. (Elsevier Affid. ¶ 3; Fourth Koppersmith Affid. ¶ 2; Second Grady Affid. ¶ 2). Parnell further represented that as a member of Ono's, he would use his best efforts to promote the new sunglass product for the benefit of Ono's. (Fourth Koppersmith Affid. ¶ 2). Parnell also represented to the new investors that he would

transfer any rights he had in the First Patent Application to Ono's through a valid assignment. (Fourth Koppersmith Affid. ¶ 2). On or about April 19, 2004, Parnell assigned the First Patent Application to Ono's. (Assignment dated April 19, 2004).

**\*2** With the funding from these new investors, Ono's began producing, marketing and selling multi-focal sunglasses. On or about May 3, 2004, John Elsevier sold and transferred his interest in Ono's to Joe D. Dunnam. (Fourth Koppersmith Affid. ¶ 3). Also, on that same date, David Patrick Kelley purchased an interest in and became a member of Ono's. (Fourth Koppersmith Affid. ¶ 3). The individual investors bringing this lawsuit as plaintiffs are Van Koppersmith, Don Grady, Kelly Grady, David Patrick Kelley, and Joe D. Dunnam ("Plaintiff Members").

In January or February 2004, at a meeting of the members of Ono's, the members of Ono's decided to pursue the development and production of its multi-focal sunglasses using a finished plano lens. (Fourth Koppersmith Affid. ¶ 6). The use of a finished lens was beneficial to Ono's because it requires less processing and costs much less to produce a sunglass product using a finished lens as opposed to a semi-finished lens. (Fourth Koppersmith Affid. ¶ 5; First Parnell Depo. pp. 58-59). A pair of sunglasses or lenses produced by way of processing a semifinished lens is visually indistinguishable from a pair of sunglasses produced using a finished plano lens. (Fourth Koppersmith Affidavit ¶ 5). While Ono's was developing the finished plano lens, and negotiating with a company called Samsung Eyetech to supply the lenses, the members of Ono's did not discuss the idea with others and kept it as an internal discussion within the company. (First Parnell Depo. pp. 56, 71-72; Fourth Koppersmith Affid. ¶ 12). The revised agreement with Samsung specifically provided a confidentiality provision:

> The licensed materials, and any improvements thereto, are the confidential information of ONO'S and the exclusive property of ONO'S. For the purposes of this agreement, the term "improvements" shall mean any findings, discoveries, inventions, additions, modifications, formulations, or changes made by either ONO'S or SAMSUNG EYETECH during the term of the agreement that relate to the licensed materials.

(Revised Samsung Agreement).

Due to personal financial difficulties, Parnell filed Chapter 13 Bankruptcy on April 30, 2004. (Docket Sheet for Parnell Bankruptcy – April 30, 2004). On or about July 6, 2004, Parnell filed a motion with the Bankruptcy Court requesting that he be allowed to sell his remaining membership interests in Ono's to the other members of that company so that Parnell could obtain funds to pay his Chapter 13 payments. (Fourth Amended Complaint; Answer to Fourth Amended Complaint). On August, 17, 2004, the Bankruptcy Court granted Parnell's motion. (Order of Bankruptcy Court – August 17, 2004).

On August 18, 2004, Parnell and Ono's entered into an agreement entitled "Agreement Regarding Sale". (Agreement Regarding Sale). In that agreement, Parnell agreed to sell his remaining 41.7 % ownership interest in Ono's to Ono's, in return for $65,000.00 ($50,000.00 cash and assumption of a $15,000.00 loan previously made to Parnell by certain Plaintiff Members). (Agreement Regarding Sale). A closing was held on August 18, 2004, in which Parnell was paid the agreed sale price for his remaining shares in Ono's and Parnell executed certain documents to effectuate the transfer of his remaining interest in Ono's. (Agreement Regarding Sale; Assignment of Membership Interest; Assignment Nunc Pro Tunc). Paragraph 3 of the Agreement Regarding Sale provided that Parnell would execute any documents necessary to effect full transfer of the First Patent Application to Ono's and confirmed that he has no interest whatsoever in the First Patent Application. Specifically, the Agreement Regarding Sale provided as follows:

> **\*3** Upon payment as provided herein, Parnell agrees to execute any documents necessary to transfer his interest in the patent which he has previously transferred to Ono's. The parties acknowledge that the attorneys handling the patent matter may need additional documents signed by Parnell, although Parnell

> acknowledges that he has no current interest in said patent.

(Agreement Regarding Sale, ¶ 3). Parnell further agreed that he would make no efforts to damage the future business interests of Ono's:

> The parties acknowledge that as a result of the business activities certain ill will existed between and among them. Therefore, the parties agree that they will not engage in defamatory remarks with regard to each other and will make no efforts to damage the future business interests of each other.

(Agreement Regarding Sale, ¶ 4).

On August 18, 2004, Parnell also executed a document entitled "Assignment Nunc Pro Tunc" in which Parnell assigned to Ono's "the entire right, title, and interest in and to the said invention and application [First Patent Application], and in and to any and all continuations, continuations-in-part, or divisions thereof ..." (Assignment Nunc Pro Tunc). In addition, on that same date, Parnell executed a document entitled "Assignment of Membership Interest" in which Parnell assigned "all ... membership interest in Ono's Trading Company to the Company". (Assignment of Membership Interest).

On September 1, 2004, (exactly two weeks after he left Ono's), Parnell filed an application for Letters Patent in the USPTO, Application No.: 10/931,330 entitled "Multifocal Sunglasses, Glasses, and Lenses" (hereafter "Second Patent Application"), on the improved production method for Ono's multi-focal sunglasses (i.e., the method of production that involved starting from a finished, plano lens). (Second Patent Application; First Parnell Depo. pp. 165-166). Parnell identified himself as the sole inventor and owner of the invention disclosed in the Second Patent Application. (Second Patent Application). The Second Patent Application was filed while the First Patent Application previously assigned to Ono's was still pending before the USPTO. (First Patent Application; February 22, 2005, Letter to Van Koppersmith from Alston & Bird with Issue Fee Transmittal Form; Second Patent Application). Parnell admits that the invention disclosed in the Second Patent Application is the same production method using a finished plano lens that Ono's was working on while he was still with Ono's. (First Parnell Depo. pp. 154, 165-66).

Parnell admits that he considered the Second Patent Application (and the production method disclosed therein) confidential. (First Parnell Depo. p. 156; 305-306). In the Second Patent Application, Parnell copied much of the disclosure made in the First Patent Application. (Second Patent Application). In fact, Parnell stated in the Second Patent Application as follows: "United States Patent Application No.: 10/720,879, entitled Multifocal Sunglasses, Glasses, and Lenses, and filed on November 24, 2003, is herein incorporated by reference, in its entirety." (Second Patent Application). In other words, when he filed the Second Patent Application Parnell adopted by reference in its entirety the First Patent Application which he had previously assigned to Ono's. (Second Patent Application). Other similarities between the two applications included:

**\*4** Same Inventor: Stuart A. Parnell

Copendency: The Second Patent Application was filed while the First Patent Application was still pending

Same Title: Multi-Focal Sunglasses, Glasses, and Lenses

Same Technical Field of Invention: The Second Patent Application copies the First Patent Application word-for-word

Duplication of Written Description: Portions of the written description of the First Patent Application are copied into the Second Patent Application

Duplication of Claim Language: Large portions of claim language of the First Patent Application are copied into the Second Patent Application

Additionally, in claim 14 of the Second Patent Application, Parnell claimed as his invention a pair of sunglasses that included a bifocal segment with the bifocal top "about 1 millimeter below the vertical level of the center of the lower limbus." He also claims as his invention in claim 15 of the Second Patent Application a pair of sunglasses that included a bifocal segment with the bifocal top "about 5 millimeter [sic] below the vertical level of the center of the lower limbus." (Second Patent Application).

Parnell did not notify Ono's that he had filed the Second Patent Application, nor that he considered the finished plano lens production method his own. (Fourth Koppersmith Affidavit ¶ 8). Parnell admits that prior to his leaving Ono's in August 2004, there were discussions about Ono's patenting the invention embodied in the Second Patent. (First Parnell Depo. p. 58). Parnell states specifically that he asked Samsung to produce the finished plano lens for Ono's while he was with Ono's and again asked Samsung to produce the finished plano lens for his new company after he left Ono's. (First Parnell Depo. p. 310; Parnell Agreement with Samsung Eyetech). Parnell agrees that part of the objective of the Samsung Agreement was to preserve Ono's right and title to all inventions in the new production method using the finished plano lens. (First Parnell Depo. pp. 166-167). Parnell left Ono's before an agreement with Samsung was finalized. (First Parnell Depo. pp. 167-168). In Parnell's first deposition, he explained that his justification for filing and holding the Second Patent Application in his name was because he had worked on the invention before, during, and after his tenure with Ono's. (First Parnell Depo. pp. 304-310). Parnell acknowledges that he had not made any efforts to make or develop sunglasses with the finished plano lens before all of the Plaintiff Members invested in Ono's. (First Parnell Depo. p. 58).

Parnell initially starting making arrangements to sell sunglass products as The Nautical Group, LLC in late May or early June 2004 (before Parnell sold his interest in Ono's) and the business was initially conducted out of Parnell's residence. (Brabner Affidavit). With the financial assistance of a business associate, Stephen Brabner, Parnell purchased sunglass frames bearing the Ono's logo from two of Ono's suppliers, Cougar Sunglasses and Younger Optics. (Brabner Affidavit). On August 6, 2004, Brabner and Parnell filed documents to form a limited liability company called The Nautical Group, LLC. (Cert. of Formation). On June 8, 2004, Parnell sent a credit application to Younger Optics on behalf of The Nautical Group, LLC. (Younger Optics Documents). Parnell ordered lenses for The Nautical Group, LLC from Younger Optics on June 16, 2004, August 6, 2004, August 9, 2004, and August 23, 2004. (Younger Optics Documents). On August 18, 2004, Parnell purchased 1,800 sunglass frames containing the Ono's name and logo from Cougar Sunglass. (First Parnell Depo. pp. 135-137). These frames were identical to the ones that Ono's had been purchasing from Cougar Sunglasses (First Parnell Depo. p. 137; Cougar Sunglass Invoice). On June 9, 2004, Parnell contracted to have photos made of the Ono's sunglasses which he later used to display the sunglasses under The Nautical Group name. (Thigpen Affid.; Brabner Affid.).

 **\*5** After the August 18, 2004, buyout, Parnell and Brabner moved The Nautical Group business to a leased space and began attending trade shows and using sunglass frames which were marked with the Ono's logo. (Brabner Affid.; Bailey Affid.; First Parnell Depo. pp. 205-207). The Nautical Group sold the identical glasses advertised at a suggested retail price that was lower than the price offered by Ono's. (Bailey Affid.).

Ono's was notified in February 2005 that the First Patent Application had been approved and that it would issue and be published within one to three months from that time. (Third Koppersmith Affid. ¶ 6; February 22, 2005, letter from Alston & Bird to Koppersmith with issue fee transmittal form). During the first week of April 2005, Ono's received notice from the USPTO that the First Patent Application would be issued as Patent No. 6,883,913 on April 26, 2005. (Third Koppersmith Affid. ¶ 7; Issue Notification attached as Exhibit 3 to Third Koppersmith Affid.). However, on or about April 22, 2005, Ono's received notice that the patent would not publish on April 26, 2005. (Third Koppersmith Affid. ¶ 8). Parnell had been corresponding with the USPTO in an attempt to stop the First Patent Application from issuing as a patent. (First Parnell Depo. pp. 263-266; 275-279). Parnell spoke with the examiner in the USPTO two or three times (First Parnell Depo. p. 265) and sent four or five different documents to the patent examiner regarding the First Patent Application assigned to Ono's. (First Parnell Depo. p. 269). The record reflects at least three documents Parnell designates as "speed memos" that were sent by him to the USPTO after he ceased his membership in Ono's. (First Parnell Depo. pp. 263-266; 275-279). The first of these speed memos was sent on March 30, 2005, followed by two others dated April 4, 2005, and April 7, 2005. (First Parnell Depo. pp. 263-266; 275-279). Parnell states that the reason he filed these documents with the USPTO was to kill Ono's patent application. (First Parnell Depo. p. 278). Parnell did not want Ono's to get a patent on the product because he thought it would be detrimental to his new company. (First Parnell Depo. pp. 264-266).

The Second Patent Application filed by Stuart Parnell issued as [Patent No. 7,093,935](#) on August 22, 2006. (See [Patent No. 7,093,935](#)). Since the issuance of the ['935 patent](#), Parnell has sent at least two letters to Ono's lens supplier claiming that lenses sold by that company infringe on his registered patent. (See Second Parnell Deposition pp. 16-22). In addition

to demanding immediate cessation of production, Parnell demanded in the letters that all infringing lenses (i.e., Ono's sunglasses) be recalled from circulation. (Exhibits 2 and 3 to Second Parnell Depo.).

After leaving Ono's, Parnell contacted Big Rock Sports on behalf of his new company, The Nautical Group, to sell Big Rock Sports polarized multi-focal sunglasses. (First Parnell Depo. pp. 239-242). Parnell obtained a large order for approximately 11,000 sunglasses from Big Rock Sports and, with the advance money he received from Big Rock Sports, he got his wife to create a new limited liability company called PMP, LLC d/b/a The Nautical Group. (Patti Parnell Depo. pp. 33-34; Depo. of Stuart Parnell as Corporate Representative of SLT, LLC, p. 31; Feb. 11, 2005, Check from Big Rock Sports). Patti Parnell formed PMP, LLC on or about February 15, 2005, and has remained the sole member of that limited liability company since that time. (Articles of Organization of PMP, LLC; Patti Parnell Depo. pp. 33-36). She claims that her only involvement was to form the company and open the checking account and that her husband, Stuart Parnell, has done all the work with regard to that business. (Patti Parnell Depo. p. 90). However, she also acknowledges that she has written checks to herself from the PMP, LLC checking account for personal expenses. (Patti Parnell Depo. p. 54). Big Rock Sports has paid The Nautical Group at least $287,273.00 for polarized bifocal sunglass products, and Parnell continues to supply multi-focal sunglasses to Big Rock Sports. (Checks from Big Rock Sports to The Nautical Group; Second Parnell Depo. pp. 24-25).

 *6  In January 2005, Parnell approached Lien Tran and Tri Tran with some finished plano lenses that he wanted them to edge and put in frames for use as samples. (Lien Tran Depo. p. 20). Mr. and Mrs. Tran own a local eyeglass business under the name Tran Enterprises, Inc. d/b/a Eye Express. (Lien Tran Depo. pp. 5-6). In February 2005, Parnell asked the Trans to assist him in the fulfillment of the 11,000 unit Big Rock Sports order. (Lien Tran Depo. pp. 24-26). Because Parnell's credit was not good and he needed additional financing to complete the order, he asked Lien Tran to invest in his sunglass business. (Lien Tran Depo. pp. 32-34). Lien Tran agreed to invest, and she and Parnell formed SLT, LLC d/b/a The Nautical Group. (Lien Tran Depo. p. 37; Articles of Organization for SLT, LLC). Parnell testified that he transferred the purchase order from Big Rock Sports from PMP, LLC to SLT, LLC. (Depo. of Stuart Parnell as Corporate Representative of SLT, LLC, p. 90). Parnell admits that he has commingled funds between PMP, LLC and SLT, LLC.

(Transcript of Contempt Hearing of March 8, 2006, p. 28). Big Rock Sports has paid Parnell and The Nautical Group in its various manifestations at least $287,273.00 for these polarized bifocal sunglass products. (Checks from Big Rock Sports to The Nautical Group). To this day, Parnell continues to supply multi-focal sunglasses to Big Rock Sports. (Second Parnell Depo. pp. 24-25).

## LEGAL ANALYSIS

**A. Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted: "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.' " Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002)(quoting Anderson, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, at 249. (internal citations omitted).

The basic issue before the Court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See Anderson, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985) ).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 524 (11th Cir. 1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) ). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rest on the mere allegations or denials of the [non-moving] party's pleading, but.... must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e) "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

**B. Breach of Fiduciary Duties**

*\*7* Count Four of plaintiffs' amended complaint asserts a claim for breach of fiduciary duty. (Doc. 224, ¶¶ 73-77). Plaintiffs assert that Stuart Parnell, as founder, member, and managing member, owed certain fiduciary duties to Ono's and its members. The complaint alleges that Parnell breached his fiduciary duties "fraudulently and in bad faith" "by misappropriating trade secrets, usurping business opportunities, engaging in direct competition with Ono's while still a member of the Company and by engaging in the other improper conduct outlined above." Parnell acknowledges that he owed a duty as outlined in § 10-12-21 of the Alabama Limited Liability Company Act, but asserts that the duty is limited to actions engaged in while still a member of the company and ceases upon leaving the membership. Parnell contends that he did not engage in any conduct proscribed by § 10-12-36 while he was a member of the company. The Alabama Limited Liability Company Act provides in pertinent part:

> (f) A member's duty of loyalty to a member-managed limited liability company and its members is limited to each of the following:

> (1) To account to the limited liability company and to hold as trustee for it any property, profit, or benefit derived by the member in the conduct or winding up of the limited liability company's business or derived from a use by the member of the limited liability company's property, including the appropriation of the limited liability company's opportunity.

> (2) To refrain from dealing with the limited liability company in the conduct or winding up of the limited liability company's business as or on behalf of a party having an interest adverse to the limited liability company.

> (3) To refrain from competing with the limited liability company in the conduct of the limited liability company's business before the dissolution of the limited liability company.

(g) A member's duty of care to a member-managed limited liability company and its other members in the conduct or winding up of the limited liability company's business is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

(h) A member shall discharge the duties to a member-managed company and its other members under this chapter or under the operating agreement and exercise any rights consistently with the obligation of good faith and fair dealing.

(I) A member of a member-managed company does not violate a duty or obligation under this chapter or under the operating agreement merely because the member's conduct furthers the member's own interest.

ALA. CODE § 10-12-21(f)-(I).

If the management of a limited liability company is vested in a manager or managers pursuant to subsection (b) of § 10-12-22, then § 10-12-21, imposes these same duties on managers. ALA. CODE § 10-12-21(k); see also Harbison v. Strickland, 900 So.2d 385, 390 (Ala.,2004). Under the statute, Parnell, as a managing member, owed a duty of loyalty to the LLC and was obligated to discharge his duties in good faith and with fair dealing. While subsection (I) permits members to further their own interests, the statute clearly prohibits a member from doing so when his interests are adverse to the company.

The court finds that Stuart Parnell violated his duty of loyalty to Ono's. Parnell was a member of Ono's until August 18, 2004, yet made arrangements to sell sunglass products as The Nautical Group, LLC prior to that time. Parnell purchased sunglass frames bearing the Ono's logo from two of Ono's suppliers and filed documents to form The Nautical Group, LLC while he was a member of Ono's. Parnell also contracted to have photos made of the Ono's sunglasses to use to display the sunglasses under The Nautical Group name. Clearly these actions were adverse to Ono's. Parnell's filing of the second patent application on September 1, 2004, only two weeks after he left Ono's, also indicates that Parnell acted adversely to Ono's prior to leaving.

**\*8** Plaintiffs contend that defendant's duty of loyalty included the duty to assign to the company his interests associated with the second patent application. Courts have held that corporate officers have a duty to assign patents which were worked on during their tenure at the company.[1] See e.g. Gasser v. Infanti International, Inc., 353 F.Supp.2d 342, 352 (E.D. N.Y. 2005) (holding that officer or director of a corporation has a fiduciary duty to assign patent to that corporation); Lacey v. Rotating Productions Systems, Inc., 961 P.2d 1144 (Co. App. 1998) (holding that the plaintiff as a corporate officer had a fiduciary duty to assign the patent in question to his former employer); Golden Eagle/Satellite Archery, Inc. v. Epling, 244 JA.2d 959, 959-60 (4th Dept. 1997) (holding that president and chief executive officer must assign patent to corporation where he "worked on the patent using plaintiff's employees and computers"); Kennedy v. Wright, 676 F.Supp. 888 (C.D. Ill. 1988) (holding that inventor who was president, treasurer and chairman of the board of his employer, had a fiduciary duty to assign the patent because of his position in the company, because he used company time and money to build the invention, and because he treated the patents as if the business owned them); Great Lakes Crest Corp. v. Froom, 695 F.Supp. 1440 (W.D. N.Y. 1987) (holding that defendant officer had a legal duty to assign to company all patents and inventions); Davis v. Alwac International, Inc., 369 S.W.2d 797 (Tex. Civ. App. 1963) (same). Ono's decided to pursue the process which was described in the second patent application in January or February 2004 while Parnell was a member of Ono's. Although Parnell maintains that this process was his idea[2] and that he initially conceived of the idea prior to the formation of Ono's, he admits to working on the invention during his tenure with Ono's. The court is persuaded by the decisions cited above that such circumstances mandate that Parnell had a duty to assign to Ono's during his tenure at Ono's his interests in the invention represented by the second patent application.

1   There is some question whether state or federal law should apply to the issue of patent ownership. See Unarco Indus, v. Kelley Co., 465 F.2d 1q303 1305-06 (7th Cir. 1972) cert denied, 410 U.S. 929, 93 Sup. Ct 1365, 35 L.Ed. 2d 590 (1973) (question of assignability of patent license involved policy behind federal patent law and therefore federal common law applied); Standard Brands, Inc. v. United States Partition and Packing Corp., 199 F.Supp. 161, 176 (E.D. Wis. 1961) ( under the Erie doctrine, the issue of patent ownership between an individual and corporation depends upon state law). However, as plaintiff suggests, this dispute is largely academic because there is a uniformly developed body of case law across the various jurisdictions relating to patent ownership issues. See E.F. Drew & Co. v. Reinhard, 170 F.2d 679, 682 (2nd Cir. 1948) (noting no substantial difference exists between federal law on subject of patent ownership and that of the state); Kennedy v. Wright, 676 F.Supp. 888, 891 (C.D. Ill. 1988) ("this Court can discern no difference in the law applied by the aposite decisions of the respective jurisdictions" citing E.F. Drew supra).

2   According to plaintiffs, Van Koppersmith, not Parnell, brought up the idea of producing Ono's sunglasses using a finished lens at a meeting of the members in January or February 2004. (Fourth Koppersmith Affid. ¶ 4); Elsevier Affid.).

Even if Parnell was not obligated to assign the invention embodied in the second patent application to Ono's, Parnell's filing of the application remains further evidence that Parnell breached his duty of loyalty to Ono's. Although the second patent application was filed when Parnell was no longer a member of Ono's, Parnell obviously had to arrange for the preparation and filing of the patent application prior to its actual filing. The second application was filed only two weeks after Parnell left Ono's.

The court finds that Parnell's actions in founding and furthering the interest of a competing company while still a member of Ono's violated his duty of loyalty to Ono's. Therefore, summary judgment is due to be granted in favor

of plaintiffs and against defendant, Stuart Parnell, as to Count Four of plaintiffs' fourth amended complaint.

**C. Misappropriation of Trade Secrets**

Count Six of plaintiffs' fourth amended complaint asserts a claim for misappropriation of trade secrets. (Doc. 224, ¶¶ 83-88). The Alabama Trade Secrets Act defines a trade secret as information that:

    a. Is used or intended for use in a trade or business;

    b. Is included or embodied in a formula, pattern, compilation, computer software, drawing, device, method, technique, or process;

  \*9  c. Is not publicly known and is not generally known in the trade or business of the person asserting that it is a trade secret;

    d. Cannot be readily ascertained or derived from publicly available information;

    e. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; and

    f. Has significant economic value.

ALA.CODE § 8-27-2. "A person who discloses or uses the trade secret of another, without a privilege to do so, is liable to the other for misappropriation of the trade secret if" "[t]hat person's disclosure or use constitutes a breach of confidence reposed in that person by the other." ALA. CODE § 8-27-3. Plaintiffs argue that the method of producing sunglasses using the finished lens technology qualifies as a trade secret because it was used in Ono's business, was not generally known among Ono's competitors, was held in confidence among Ono's members and treated as confidential, was not readily ascertainable from publicly available material, and had significant economic value to Ono's. As such, plaintiffs assert that Parnell's filing of the second patent application, which sought to patent Ono's finished lens method, constituted a misappropriation of Ono's trade secret.

Parnell continues to argue that he did not invent this process until after leaving Ono's. However, as discussed above, Parnell admitted to working on the idea during his tenure with Ono's and the invention was embodied in the second patent application which was filed only two weeks after Parnell's separation from Ono's.

Parnell also asserts that plaintiffs have not alleged or offered evidence that any effort was made to maintain the secrecy of the information. However, to the contrary, plaintiffs produced evidence that even Parnell himself acknowledged that while Ono's was developing the finished plano lens, and negotiating with a company called Samsung Eyetech to supply the lenses, the members of Ono's did not discuss the idea with others and kept it as an internal discussion within the company. (First Parnell Depo. pp 71-72). In fact, the revised agreement with Samsung specifically included a confidentiality provision.

Parnell argues that plaintiffs have previously asserted to the patent office the contrary view that the second patent should not issue because the prior art was abundant and therefore unpatentable and that the information is publicly known or can be readily ascertained. (Doc. 241 Parnell's response, pp. 9, 13-14). However, Parnell has not supported this contention with evidence. Moreover a trademark process is not necessarily patentable. See Alderman v. Tandy Corp., 720 F.2d 1234, 1235 (11th Cir. 1983).[3] "Novelty and invention are not requisite for a trade secret as they are for patentability." Id. (citation omitted). A trade secret must merely "possess at least that modicum of originality which will separate it from everyday knowledge." Id. (quoting Cataphote Corp. v. Hudson, 444 F.2d 1313 (5th Cir. 1971)[4]).

[3]  The court acknowledges that although Alderman is an Eleventh Circuit case, it applied Texas law. As such, Alderman is clearly not binding authority regarding what constitutes a trade secret under Alabama law. However, like Alabama's Trade Secret Act, Texas law relies on the common law as stated in the Restatement of Torts. The Alabama Trade Secrets Act specifically provides that it "should be construed to be consistent with the common law of trade secrets" where the language of the Act does not otherwise conflict with the common law. ALA. CODE § 8-27-6. The comment to this section states that "[t]he Act draws primarily on the common law of trade secrets as it is reflected in the first Restatement of Torts (1939)." The comment goes on to explain that "[w]here contemporary problems or other policy considerations make deviations from the Restatement advisable, the Act draws first from the Uniform Trade Secrets Act and the case law that has developed since the Restatement."

4   Decisions of the Former Fifth Circuit filed prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

**\*10** The court finds that plaintiffs have adequately supported their misappropriation of trade secrets claim and Parnell has failed to establish a genuine issue of material fact. Thus, the court finds summary judgment is due to be granted in favor of plaintiffs and against Stuart Parnell as to Count Six of the fourth amended complaint.

**D. Breach of Contract**

Counts Three and Eight of plaintiffs' fourth amended complaint assert claims for breach of contract.

1. Count Three

Count Three alleges that Parnell breached his agreements to assign all rights in the first patent application to Ono's, to sign all documents necessary to insure the full assignment of all rights to the first patent application and pending patent, and to make no effort to damage the future business interest of Ono's. (Doc. 224, ¶¶ 68-72).

In the Agreement Regarding Sale, Parnell agreed "to execute any documents necessary to transfer his interest in the patent which he has previously transferred to Ono's" and expressly acknowledged "that he has no current interest in said patent." (Agreement Regarding Sale, ¶ 3). Parnell further agreed that he would make no efforts to damage the future business interests of Ono's. (Id. at ¶ 4). Plaintiffs allege that because the second patent application copied the subject matter of the first patent application and claimed the precise multi-focal sunglasses that were claimed in the first patent application that his claim to the new method of production was impermissible since determination of patentability is based on the product itself. Additionally, the second patent application included a claim for the product itself. Additionally, Parnell's protest of the first patent application clearly breached his agreement to make no efforts to damage the future business interests of Ono's. Plaintiffs further contend that Parnell breached the Nunc Pro Tunc Agreement by refusing to assign the second patent to Ono's. Parnell agreed in the "Assignment Nunc Pro Tunc" to assign to Ono's "the entire right, title, and interest in and to the said invention and application [First Patent Application], and in and to any and all continuations, continuations-in-part, or divisions thereof ..." "A 'continuation-in-part application' is an application for patent that has some subject matter in common with the earlier parent application, but one that 'may also contain additional matter not disclosed in the prior application.' " Avocent Huntsville Corp. v. ClearCube Technology, Inc., 443 F.Supp.2d 1284, 1331, n.176 (N.D. Ala. 2006) (quoting Augustine Medical, Inc. v. Gaymar Industries, Inc., 181 F.3d 1291, 1302 (Fed. Cir. 1999) ); see also AMJUR PATENTS § 120 ("A continuation-in-part application, by definition, adds new matter to the patent application previously filed."). Under certain circumstances, a continuation-in-part application may be given the benefit of an earlier filing date to the extent it discloses an invention previously disclosed in a prior application. 35 U.S.C. § 120. Parnell contends that because he did not claim the second patent application as a continuation-in-part and attempt to gain the earlier filing date under 35 U.S.C. § 120 that the application does not constitute a continuation-in-part. However, the second patent application, whether labeled as such, clearly meets the definition of a continuation-in-part. The second patent application specifically references the earlier filed application and has some subject matter in common with the earlier patent application, but it also contained additional matter not disclosed in the prior application. The fact that Parnell did not claim priority of filing date under 35 U.S.C. § 120 does not avoid assignment of second application. Not all continuation-in-part applications satisfy the requirements for priority specified in 35 U.S.C. § 120. See e.g. Urologix, Inc. v. Prostalund AB, 227 F. Supp. 2d 1033 (E.D. Wis. 2002). (Patent application was abandoned prior to filing of continuation-in-part application, and thus patent maturing from latter application was not entitled to parent application's filing date.)

**\*11** The case of Univ. of West Virginia Bd. of Trustees v. VanVoorhies is analogous to the instant case. Univ. of West Virginia Bd. of Trustees v. VanVoorhies, 278 F.3d 1288, 1292 (Fed. Cir. 2002). In VanVoorhies, a graduate student at the University of West Virginia assigned his invention to the University pursuant to the University's patent policy. Id. at 1292-93. The inventor executed a written assignment which extended as well to "any divisional, continuation, continuation-in-part or substitute applications." Id. at 1293. After completing his dissertation and receiving his doctoral degree from the University, VanVoorhies invented a second invention which became the subject of a second patent application. Id. The University sued the inventor, VanVoohries, claiming, among other things, breach of contract. Id. at 1294. The inventor argued that the application was not properly designated as a CIP of the assigned invention

because it is directed to an independent and distinct invention and because he conceived of the new invention and reduced it to practice while he was not associated with the University. Id. at 1296. The Court found that the differences did not establish that the application on the second invention was not properly designated as a CIP of the first invention. Id. at 1297.

> A continuation-in-part application is just what its name implies. It partly continues subject matter disclosed in a prior application, but it adds new subject matter not disclosed in the prior application. Thus, some subject matter of a CIP application is necessarily different from the original subject matter.

Id. (citing Manual of Patent Examining Procedure § 201.08 (7th ed. Rev. 1 Feb. 2000) ). The VanVoohries Court further explained that "[w]hether the [second] application is entitled to the priority date of the [first] application for common subject matter, which is the principal reason why one designates an application as a CIP, is a separate question which is not before us." Id. "The [second] application did, however, constitute a CIP." Id.

The court finds that in the instant case, the second application clearly constitutes a continuation-in-part and, as such, is subject to the Nunc Pro Tunc agreement. Thus, Parnell's refusal to assign the patent to Ono's is a breach of the Nunc Pro Tunc agreement.

### 2. Count Eight

Count Eight alleges Parnell breached the terms of the operating agreement for Ono's. (Doc. 224, ¶¶ 104-106). Parnell owed certain duties and obligations to Ono's and its other members as a result of the Operating Agreement and the incorporation in that agreement by law of the provisions of the Alabama Limited Liability Company Act. See Harbison v. Strickland, 900 So. 2d 385, 389-91 (Ala. 2004) (holding that operating agreements of limited liability companies incorporate the provisions of the statutes that allow for the creation of the entity and its operating agreement). Based on the court's discussion above concerning Parnell's breach of fiduciary duty, the court finds that Parnell has also breached the Operating Agreement, and that plaintiffs are therefor entitled to summary judgment in their favor on Count Eight.

### E. Damages

Alabama Code § 8-27-4 provides that the following remedies are available for the misappropriation of trade secrets:

(1) To the extent that they are not duplicative:

a. Such injunctive and other equitable relief as may be appropriate with respect to any actual or threatened misappropriation of a trade secret,

b. Recovery of any profits and other benefits conferred by the misappropriation that are attributable to the misappropriation (In establishing the misappropriator's profits, the complainant is required to present proof only of the misappropriator's gross revenue, and the misappropriator is required to present proof of his or her deductible expenses and the elements of profit attributable to factors other than the trade secret.), and

c. The actual damages suffered as a result of the misappropriation;

(2) Reasonable attorney's fees to the prevailing party if:

a. A claim of actual or threatened misappropriation is made or resisted in bad faith,

 *12  b. A motion to terminate an injunction is made or resisted in bad faith, or

c. Willful and malicious misappropriation exists; and

(3) Exemplary damages in an amount not to exceed the actual award made under subdivision (1), but not less than $5,000, if willful and malicious misappropriation exists.

ALA.CODE § 8-27-4.

The court has found that Parnell misappropriated the process of using a finished plano lens and, therefore, the court finds it appropriate to require Parnell to assign the second patent, which embodied that trade secret, to Ono's. This remedy is also appropriate under plaintiff's breach of fiduciary duty and breach of contract claims. The court having found that Parnell had a fiduciary duty to assign the second patent to Ono's and that Parnell expressly agreed to do so in the Nunc Pro Tunc Ageement, finds that Parnell should be required to

uphold his fiduciary duty and comply with the Nunc Pro Tunc Agreement by assigning the second patent to Ono's.

Plaintiffs have also presented evidence that Parnell, through The Nautical Group, has received at least $287,273.00 from Big Rock Sports for polarized bifocal sunglass products.[5] Subsection (1)(b) specifically provides for recovery of any such profits and other benefits conferred by the misappropriation. The court finds that the $287,273.00 in revenue is attributable to the misappropriation and, therefore, finds it appropriate to award plaintiffs compensatory damages in the amount of $287,273.00. The court further finds that damages in that amount would also be appropriate under plaintiffs' breach of fiduciary and breach of contract claims. However, separate awards under each count would be duplicative.

[5] Plaintiffs were previously awarded compensatory damages under their Lanham Act claim for revenue associated with the sale of infringing products. (Doc. 243). The previous award did not compensate plaintiffs for the $287,273.00 in sales to Big Rock Sports.

Plaintiffs also seek exemplary damages and attorneys fees asserting that Parnell's conduct was willful and malicious. The court agrees. Parnell's testimony at his depositions and previous hearings in this case make it clear that Parnell has attempted in every way imaginable to avoid his duties and obligations to plaintiffs with the purpose of benefitting himself financially and harming plaintiffs' interests. The court finds it appropriate to award exemplary damages equal to the amount of compensatory damages awarded, as expressly allowed under subsection (3) of § 8-27-4.

The court further finds that the compensatory damages should be imposed not only against Parnell personally, but jointly and severally against the Nautical Group, LLC, and PMP, LLC, as well as Patti Parnell, as the sole member of PMP, LLC, to the extent she received any funds or assets derived from the payments from Rock Creek. Plaintiffs have not shown that anyone other than Stuart Parnell engaged in willful and malicious conduct. Thus, the award of exemplary damages should only be assessed against Parnell himself.

### F. Parnell's Abuse of Process Counterclaim

**\*13** Parnell states in his response to plaintiffs' summary judgment motion that he intends to withdraw his abuse of process counterclaim. Therefore, summary judgment is due to be granted in favor of plaintiffs as to Parnell's counterclaim.

### CONCLUSION

For the reasons stated above, plaintiffs' motion for summary judgment as to Counts Three, Four, Six, and Eight and defendant's counterclaim alleging abuse of process (Doc. 233) is **GRANTED** in favor of plaintiffs. The court hereby awards plaintiffs compensatory damages in the amount of $287,273.00, exemplary damages in the amount of $287,273.00, and attorneys fees and costs. Additionally, the court will require defendants to assign to plaintiffs the second patent. Plaintiffs are **ORDERED** to file, on or before **December 8, 2006**, proposed language for an injunction to be issued against defendants consistent with this order. Plaintiffs are also **ORDERED** to file, on or before **December 15, 2006**, an accounting and supporting documents regarding their claimed attorneys fees and costs.

**DONE** and **ORDERED** this 22nd day of November, 2006.

**All Citations**

Not Reported in Fed. Supp., 2006 WL 8437743